# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and | § | |
| the States of ARKANSAS, COLORADO, | § | |
| ILLINOIS, INDIANA, LOUISIANA, | § | |
| NEW MEXICO, OKLAHOMA, | § | |
| TENNESSEE, and TEXAS | § | |
| *ex rel.* MICHAEL CARTER | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | **Case Number:** 3-19-CV-1238M |
| | § | |
| EMERGENCY STAFFING | § | |
| SOLUTIONS, INC.; HOSPITAL CARE | § | |
| CONSULANTS, INC., | § | |
| **Defendant** | § | |

## RELATOR'S RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS AND SUPPORTING BRIEF

Relator Michael Carter (Relator) hereby submits this Response in Opposition to the Motion to Dismiss filed by Defendants Emergency Staffing Solutions, Inc. and Hospital Care Consultants, Inc. (Defendants).  For the reasons more fully explained herein, Defendants' Motion to Dismiss should be denied.

John W. Joyce, *PHV* (LA 27525)
Laurence D. LeSueur, Jr., *PHV (*LA 35206)
Taylor L. Gamm, *PHV* (LA 39623)
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone:  (504) 589-9700
Facsimile:  (504) 589-9701
jjoyce@barrassousdin.com
llesueur@barrassousdin.com
tgamm@barrassousdin.com

## TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS .................................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ........................................................................................................................... 1

LAW GOVERNING THE MOTION TO DISMISS ...................................................................... 4

FACTUAL ALLEGATIONS ......................................................................................................... 5

*The "Hybrid Program"* ................................................................................................................ 5

*The "Hospitalist Program"* ......................................................................................................... 7

*Submission of False Claims* ........................................................................................................ 7

ARGUMENT .................................................................................................................................. 8

I.      The Complaint Sufficiently Alleges the "Who, What, Where, When, and How" of Specific Examples of Defendants' FCA, AKS and the Stark Law Violations as well as Sufficient Factual Details of Defendants' Scheme – Satisfying Any Applicable Pleading Standard .......................................................... 8

II.      Relator's Allegations Plausibly Allege Legally and Factually Viable Violations of the FCA, AKS and the Stark Law ..................................................... 12

       A.      Defendants' Schemes Are Obvious, Textbook Violations of the FCA, AKS and the Stark Law ................................................................... 12

       B.      Defendants Violated AKS Under the Well-Established One Purpose Rule ...................................................................................... 13

       C.      Relator Sufficiently Alleges Scienter  Under the FCA and AKS ......... 17

             a.      The Stark Law Personal Services Exception Does Not Apply (Count 2) .............................................................. 20

III.     Relator's Reverse FCA Claims Are Sufficiently Alleged ................................. 21

IV.     The Complaint Alleges Sufficient Facts to Establish a FCA Conspiracy ......... 23

V.      Relator Alleges Sufficient Facts to State Claims Under Analogous State Laws ................................................................................................................... 24

CONCLUSION .............................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................4

*Capshaw v. White*,
No. 3:12-CV-4457-N, 2017 WL 3841611 (N.D. Tex. Jan. 23, 2017)...............................10, 11

*Delhomme v. Caremark Rx Inc.*,
232 F.R.D. 573 (N.D. Tex. 2005) .................................................................16

*Gregory v. Houston Indep. Sch. Dist.*,
No. 14-2768, 2016 WL 5661701 ...................................................................15

*Griggs v. Hinds Junior College*,
563 F.2d 179 (5th Cir. 1977) .........................................................................26

*Health Choice All., LLC v. Eli Lilly and Co., Inc.*,
No. 5:17-CV-123-RWS-CMC, 2018 WL 4026986 (E.D. Tex. July 25, 2018) ......................24

*Kodsi v. Branch Banking and Trust Co.*,
No. 15-CV-81053, 2018 WL 830117 (S.D. Fla. Feb. 12, 2018) ...............................................2

*United States ex rel. Besancon v. Uchicago Argonne, LLC*,
No. 12-7309, 2014 WL 4783056 (N.D. Ill. Sept. 24, 2014) ....................................23

*United States ex rel. Brown v. Celgene Corp.*,
No. CV 10-3165-GHK SSX, 2014 WL 3605896 (C.D. Cal. July 10, 2014).........................24

*United States ex rel. Bruno v. Schaeffer*,
328 F. Supp. 3d 550 (M.D. La. 2018) .........................................................13

*United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*,
No. CV 18-312-JWD-EWD, 2022 WL 879492 (M.D. La. Mar. 23, 2022)......................12, 25

*United States ex rel. Capshaw v. White*,
No. 3:12-CV-4457-N, 2018 WL 6068806 (N.D. Tex. Nov. 20, 2018) ...............................19

*United States ex rel. Chandler v. Cook Cnty., Ill.*,
277 F.3d 969 (7th Cir. 2002) ...........................................................................3

*United States ex rel. Colquitt v. Abbott Labs.*,
858 F.3d 365 (5th Cir. 2017) ...........................................................................9

*United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*,
675 F.3d 394 (4th Cir. 2012) .........................................................................21

*United States ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ........................................................................ *passim*

*United States ex rel. Hebert v. Dizney*,
  295 F. App'x 717 (5th Cir. 2008) ...............................................................15

*United States ex rel. Hendrickson v. Bank of Am., N.A.*,
  343 F. Supp. 3d 610 (N.D. Tex. 2018) .......................................................20

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
  874 F.3d 905 (6th Cir. 2017) ......................................................................22

*United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*,
  816 F. App'x 892 (5th Cir.), *cert. denied*, 141 S. Ct. 905 (2020).................14, 15

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*,
  No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) .........................23

*United States ex rel. Lemon v. Nurses to Go, Inc.*,
  924 F.3d 155 (5th Cir. 2019) .......................................................................4

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
  519 F.App'x 890 (5th Cir. 2013) ................................................................10

*United States ex rel. Parikh v. Citizens Med Ctr.*,
  977 F. Supp. 2d 654 (S.D. Tex. 2013) ........................................................ *passim*

*United States ex rel. Patel v. Catholic Health Initiatives*,
  312 F. Supp. 3d 584 (S.D. Tex. 2018) ........................................................20

*United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*,
  No. 3:14-CV-00118-M, 2016 WL 5661644 (N.D. Tex. Sept. 30, 2016) .........................11, 19

*United States ex rel. Reddell v. DynCorp Int'l, LLC*,
  No. 1:14-CV-86, 2019 WL 12875471 (E.D. Tex. Mar. 20, 2019) ...........................12

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.*,
  355 F.3d 370 (5th Cir. 2004) ...................................................................19, 20

*United States ex rel. Schaengold v. Mem'l Health, Inc.*,
  No. 4:11-CV-58, 2014 WL 6908856 (S.D. Ga. Dec. 8, 2014) ...............................22

*United States ex rel. Tucker v. Christus Health*,
  No. CIV.A. 09-1819, 2012 WL 5351212 (S.D. Tex. Oct. 23, 2012).................................11, 15

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*,
  874 F.2d 20 (1st Cir. 1989)...................................................................................14

*United States v. Catholic Health Initiatives*,
  No. 4:18-CV-123, 2022 WL 2657131 (S.D. Tex. Mar. 31, 2022) ......................................3, 14

*United States v. Cockerell Dermatopathology, P.A.*,
  No. 3:21-CV-0672-B, 2021 WL 4894173 (N.D. Tex. Oct. 20, 2021)................................5, 22

*United States v. Crumb*,
  No. CV 15-0655-WS-N, 2016 WL 4480690 (S.D. Ala. Aug. 24, 2016)................................22

*United States v. Curo Health Servs. Holdings, Inc.*,
  No. 3:13-CV-00672, 2022 WL 842937 (M.D. Tenn. Mar. 21, 2022) ........................12, 22, 25

*United States v. Davis*,
  132 F.3d 1092 (5th Cir. 1998) ...............................................................................14

*United States v. Dental Health Programs, Inc.*,
  3:18-cv-00463, 2021 WL 3213709 (N.D. Tex. July 29, 2021) (Brown, J.) .............................4

*United States v. Exec. Health Res., Inc.*,
  196 F. Supp. 3d 477 (E.D. Pa. 2016) .......................................................................24

*United States v. Marlin Med. Sols. LLC*,
  No. SA-21-CV-00160-OLG, 2022 WL 190308, – F. Supp. 3d................................14, 18, 19

*United States v. Medoc Health Services, LLC*,
  470 F. Supp. 3d 638 (N.D. Tex. 2020) ..............................................................18, 19, 24

*United States v. Planned Parenthood Fed'n of Am. Inc.*,
  No. 2:21-CV-022-Z, 2022 WL 1290907 (N.D. Tex. Apr. 29, 2022) ..............................12, 25

*United States v. Shah*,
  981 F.3d 920 (11th Cir. 2020) ...............................................................................16

*United States v. Shoemaker*,
  746 F.3d 614 (5th Cir. 2014) .................................................................................23

*United States v. SouthEast Eye Specialists, PLLC*,
  570 F. Supp. 3d 561 (M.D. Tenn. 2021)....................................................................14

*United States v. Vora*,
  488 F. Supp. 3d 554 (W.D. Ky. 2020).......................................................................15

*United States ex rel. Wallace v. Exactech, Inc.*,
  No. 2:18-CV-01010-LSC, 2020 WL 4500493 (N.D. Ala. Aug. 5, 2020) ..............................23

*United States ex rel. Wismer v. Branch Banking & Trust Co.*,
    2013 WL 5989312 ..........................................................................................15

*Waldmann v. Fulp*,
    259 F. Supp. 3d 579 (S.D. Tex. 2016) ..........................................................2

**Statutes**

31 U.S.C. § 3729(a)(1)(C) ....................................................................................23

42 U.S.C. § 1320a-7k(d) ......................................................................................22

42 U.S.C. § 1395nn(a)(1) .....................................................................................21

Arkansas State Medicaid Fraud False Claims Act...............................................25

FCA ............................................................................................................ *passim*

AKS ............................................................................................................ *passim*

Stark Law ................................................................................................... *passim*

New Mexico Medicaid False Claims Act .............................................................25

**Other Authorities**

Fed. R. Civ. P. Rule 8 ........................................................................................4, 5

Fed. R. Civ. P. Rule 9(b)............................................................................ *passim*

Fed, R. Civ. P. Rule 12 .....................................................................................2, 4

## INTRODUCTION

Defendants do not dispute the key factual basis underpinning Relator's claims, and Defendants do not offer any supportable legal defenses that immunize them for their illegal kickback schemes.  Defendants concede—as they must—that they pay physicians on a per-referral basis to refer and admit patients to their client hospitals.  (Rec. Doc. 44 at p. 2.)  Defendants admit they pay physicians hourly rates which alone are "commiserate with fair market value," and in addition to this fair market base pay, Defendants also pay per-referral bonuses to physicians.  (*Id.*)  Defendants even acknowledge that they provide this excessive compensation with the "goal" of "supporting an increase in inpatient census"—unequivocally establishing that Defendants knowingly provide remuneration to induce referrals and submit false claims.  (Rec. Doc. 1 at ¶ 91; Rec. Doc. 44 at p. 10.)  The Court need not look any further than these critical concessions to find that Relator plausibly states a claim that Defendants violated the Anti-Kickback Statute (AKS), Stark Law, and False Claims Act (FCA).

Relator's Complaint also provides meticulous details of the two specific compensation schemes employed by Defendants Emergency Staffing Solutions, Inc. ("ESS") and Hospital Care Consultants, Inc.[1] to perpetuate its goals of increasing inpatient admissions through illegal kickbacks.  Contrary to Defendants' repeated challenges to the factual sufficiency of the Complaint, Relator alleges exactly how Defendants paid illegal kickbacks, specific executives who approved and oversaw kickbacks, the amount of those kickbacks, specific physicians who received those kickbacks, specific patients referred to inpatient care in exchange for kickbacks, and data showing how Defendants' schemes achieved their goal of boosting inpatient

---

[1]     For ease of reference, Relator will refer to both entities collectively as "Defendants," and will make distinctions between the two where necessary.

admissions.  (Rec. Doc. 1 at ¶¶ 83–135.) Therefore, not only does Relators' Complaint provide the exact "who, what, when, where, and how" to satisfy Rule 9(b), but the Complaint also clearly establishes the "particular details of a ***scheme*** to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) (emphasis added.)  Under this standard and considering these well-pled factual details—which ESS's motion ignores—Relator's Complaint is more than sufficient to state a claim under the FCA, AKS, and the Stark Law.

Confronted with Relator's well-pled Complaint, Defendants' motion repeatedly (and improperly) asks this Court to assume—based upon cherry-picked facts and Defendants' own unsupported speculations—that it did nothing wrong.  Incredibly, the opening of Defendants' brief asks for dismissal by baldly claiming the compensation schemes at issue were "designed by legal counsel to comply with applicable laws and regulations" and that Defendants' compensation schemes were "not connected to or otherwise related to profitability." (Rec. Doc. 44 at p. 2.)  But these types of unfounded, vague arguments outside of the pleadings are irrelevant to the Court's Rule 12 inquiry.[2]  At this stage, the Court must accept as true Relator's allegations and construe them in the light most favorable to Relator, not Defendants.

---

[2]      Whether or not Defendants compensation plans were legitimately designed by legal counsel to comply with applicable laws and regulations (and whether Defendants actually sought, received, and followed any hypothetical legal advice) is a completely speculative factual assertion wholly untethered to Relator's well-pled factual allegations, and therefore improper to consider in a motion to dismiss.  *See also Kodsi v. Branch Banking and Trust Co.*, No. 15-CV-81053, 2018 WL 830117, at *5 (S.D. Fla. Feb. 12, 2018) ("assertion of the affirmative defense of advice of counsel is rejected" at the pleading stage.) Tellingly, none of the paragraphs of the Complaint cited for Defendants' assertion are potentially relevant to an advice of counsel defense.  (Rec. Doc. 44 at p. 2.) And this Court cannot dismiss Relator's Complaint on the basis of Defendants' "advice of counsel" defense without evidence, and without granting Relator the opportunity to conduct discovery.  *See Waldmann v. Fulp*, 259 F. Supp. 3d 579, 585 (S.D. Tex. 2016).

This bedrock principle dooms Defendants' motion, as their entire brief is plagued with unsupported assumptions and improper inferences.[3]   Although Defendants frame these arguments as proposed "alternative, legal explanations" for Relator's claims, "any lawful alternative explanations cannot be given preference at this stage." *See United States v. Catholic Health Initiatives*, No. 4:18-CV-123, 2022 WL 2657131, at *9 (S.D. Tex. Mar. 31, 2022).   This is especially true here, as Defendants' hypothetical "alternative, legal explanations" are not only improper but illogical.   For instance, Defendants admit they pay their physicians "hourly rates commiserate with fair market value" and concede they pay their physicians on a per-referral basis for referrals and admissions to client facilities.   (Rec. Doc. 44 at p. 2.)   Defendants illogically suggest that this "additional work" somehow justifies per-referral and per-admission compensation (and that these payments were not "related to profitability"), but Defendants never cite any legal authority for these contentions, and they belie reality.   (*Id.*)   Because Defendants pay their physicians hourly, any "additional work" would simply require more time and thus

---

[3]   For example, Defendants baldly claim that their hybrid model "is not unique to Defendants."   (Rec. Doc. 44 at p. 2 n.1.)   But whether or not other physician staffing companies have "hybrid" physicians that cover both the Emergency Room and serve as Hospitalists is of no moment; Defendants' fraud is rooted in their illegal remuneration designed to increase inpatient admissions, not simply because their physicians had a "hybrid" role.   Defendants also speculatively argue that the Government's declination decision is indicative of the merits.   (Rec. Doc. 44 at pp. 2–3.)   But the Department of Justice and the Supreme Court make clear that the government's declination in no way indicative of the merits of Relator's claims, and the Government has advised this Court that its declination "does not mean that the United States found that Defendants did not violate the FCA, AKS or Stark," and it should not give rise to any inferences regarding the merits of Relator's claims here.   (Rec. Doc. 49-1 at p. 2.) *See also United States ex rel. Chandler v. Cook Cnty., Ill.*, 277 F.3d 969, 974 n.5 (7th Cir. 2002) ("There is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits.   The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney.") The State of Texas filed a similar notice, rebutting Defendants' arguments regarding Relator's claims under Texas law.   (Rec. Doc. 50.)

more pay under their admittedly fair market value hourly rate.  But that is not how Defendants' schemes operate: they admittedly condition *quid pro quo* compensation upon admissions and treatment, which is plainly violative of the FCA, AKS, and The Stark Law.

Under the correct standards, and construing all of the factual allegations in the Complaint liberally with all inferences drawn in Relator's favor, as this Court must do, there is no doubt that Defendants' motion must be denied, and this case should proceed toward discovery and trial.

## LAW GOVERNING THE MOTION TO DISMISS

In deciding Defendants' Rule 12 motion, the Court must "accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to Plaintiffs." *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019); *see also United States v. Dental Health Programs, Inc.*, 3:18-cv-00463, 2021 WL 3213709, at *2–3 (N.D. Tex. July 29, 2021) (Brown, J.) ("In considering a Rule 12(b)(6) motion to dismiss, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.") (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Claims are facially plausible when the factual content of the complaint allows the court to reasonably infer that the defendant is liable for the alleged wrong. *Id.*

In fraud cases like those under the FCA, Rule 9(b) also applies.  Under Rule 9(b), complaints "must state with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  While a heightened standard, Rule 9(b) "supplements but does not supplant Rule 8(a)'s notice pleading." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185–86 (5th

Cir. 2009).  Instead, Rule 9(b) "requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud.'"  *Id.* at 186.  Further, "'[r]ule 9(b)'s ultimate meaning is context-specific,' and thus there is no single construction of Rule 9(b) that applies in all contexts. Depending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand."  *Id.* at 188.   Based on this requirement to consider context, "the standard for an FCA claim lies somewhere between the standard Rule 8 pleading requirements and the traditional fraud pleading requirements of Rule 9(b)."  *United States v. Cockerell Dermatopathology, P.A.,* No. 3:21-CV-0672-B, 2021 WL 4894173, at *7 (N.D. Tex. Oct. 20, 2021) (citing *Grubbs*, 565 F.3d at 190.)  Under this Rule 9(b) standard for FCA claims in the Fifth Circuit—which is mentioned only in passing in Defendants' brief—Relator's well-pled Complaint contains sufficient factual matter to state a claim.

## FACTUAL ALLEGATIONS

### *The "Hybrid Program"*

Defendants' "Hybrid Program," poisons the "gatekeeping" function of the physician charged with making hospital admission decisions by paying emergency room physicians for each referral the physician makes to the hospital's inpatient unit.  (Rec. Doc. 1 at ▐ 96.)[4] Specifically, ESS pays its "Hybrid Program" physicians $100 per hour—a fair market hourly wage.  (*Id.* at ▐▐ 13, 95.) Defendants admit that the hourly rates are "commiserate with fair market value." (Rec. Doc. 44 at p. 2.)  But Defendants also illegally pay their "Hybrid Program" physicians—through Hospital Care Consultants, Inc.—on a per-patient basis for each inpatient

---

[4]     For ease of reference, Relator will refer to both ESS and Hospital Care Consultants, Inc. as "Defendants," and where appropriate, Relator will identify the distinctions between ESS and Hospital Care Consultants, Inc. that are identified in the Complaint.

hospital admission, in addition to the fair market value hourly wage.  (Rec. Doc. 1 at ¶¶ 13, 96.)[5] Defendants concede they pay this additional, above market payment, which is contingent exclusively on referrals.  (Rec. Doc. 44 at p. 2.)  Some ESS "Hybrid Program" physicians were paid $100 per admission, and others were paid $50 per admission.  (Rec. Doc. 1 at ¶ 96.) Therefore, the Complaint plainly alleges, and Defendants admit, that these "Hybrid Program" physicians were compensated on a *quid pro quo* per-patient basis for each inpatient admission, in addition to their fair market hourly wage.  (Rec. Doc. 1 at ¶¶ 13, 95–96; Rec. Doc. 44 at p. 2.) Defendants also paid their "Hybrid Program" physicians on a per-patient basis for individual tasks associated with patient care: $75 for a daily round, and $50 for transfers or discharges. (*Id.*).  Under this scheme, Defendants destroy the distinctions between emergency department physicians and hospitalists and poisons any independent medical judgment by providing them with a direct incentive to "self-refer" and admit patients to lucrative episodes of inpatient care.

There is no question that Defendants designed their "Hybrid Program" with one goal in mind—to "support[] an increase in inpatient census."  (Rec. Doc. 1 at ¶ 91.)  Defendants tout that their "Hybrid Program" is intended to "reduce frictions in the admission process and help ED physicians and hospitalist admit patients quickly." (*Id.*, at ¶ 92.)  To that end, Defendants target "low volume" hospitals in rural areas and performs "ROI [Return on Investment] Assessments," whereby Defendants evaluate the number of patients that the hospital *could* admit to inpatient care to increase revenue for both the hospital and Defendants.  (*Id.* at ¶ 93.)  Under this scheme, Relator provides examples of specific false claims for specific patients that were referred by specific physicians in exchange for specific kickbacks.  (*Id.* at ¶ 134.)

---

[5]     As explained in the Complaint, there is no practical difference between Defendants ESS and Hospital Care Consultants, Inc.; they operate out of the same building, employ the same management team, and pay the same contracted physicians.  (Rec. Doc. 1 at ¶ 13.)

***The "Hospitalist Program"***

Defendants also offer their client hospitals a "Hospitalist Program" under which physicians serve as hospitalists without covering the emergency department. (*Id.* at ¶ 116.) Under the "Hospitalist Program," the hospitalists are employees of Defendants and are paid a full-time, fair market salary. (*Id.* at ¶ 117.) But Defendants *also* pay their "Hospitalist Program" physicians an additional incentive to admit patients to inpatient care; Defendants pay their hospitalists another $50 per admission, transfer or discharge, and $25 per round per patient per day. (*Id.*) Defendants admit that these additional per-referral payments are in excess of the physicians' salary, which necessarily results in the physician being paid in excess of fair market value. (Rec. Doc. 44 at p. 2.) These additional payments likewise induce and corrupt "gatekeeping" hospitalists to fraudulently boost admissions. (Rec. Doc. 1 at ¶¶ 117–18.)

Like the "Hybrid Program," Defendants specifically designed the "Hospitalist Program" to increase inpatient admissions, and Defendants perform the same "ROI Assessment" for this program. Relator alleges one such "ROI Assessment" for Bradley County Medical Center in Arkansas, under which Defendants determined that their "Hospitalist Program" could have been used to admit more patients (regardless of any independent assessment of medical condition) and make millions for the hospital. (*Id.* at ¶¶ 120–23.)

***Submission of False Claims***

Relator also describes how Defendants' fraudulent schemes cause client hospitals to submit false claims—specifically via Form CMS-1450 and annual "cost reports." (*Id.* at ¶¶ 58–68; 127–28.) Similarly, Relator describes exactly how ESS's billing department submits 250,000 to 300,000 professional fee claims per year, and that because over half of Defendants' client

hospitals utilized the "Hybrid Program," a significant number of these claims are necessarily false, as they wrongly certified compliance with AKS and The Stark Law.  (*Id.* at ⁋ 127.)

## **ARGUMENT**

I.    **The Complaint Sufficiently Alleges the "Who, What, Where, When, and How" of Specific Examples of Defendants' FCA, AKS and the Stark Law Violations as well as Sufficient Factual Details of Defendants' Scheme—Satisfying Any Applicable Pleading Standard.**

Defendants primarily (and repeatedly) argue that the Complaint does not contain sufficient "particular facts" describing the "who, what, when, where, and how" of Defendants' fraud.  (Rec. Doc. 44 at p. 5.)[6]  This assertion is patently false.  A simple review of the Complaint demonstrates the requisite details of Defendants' fraud are clearly alleged.  The Complaint provides examples of twelve specific patients[7]—insured by Medicare or Medicaid—admitted by specific ESS contracted physicians (the "who").  (Rec. Doc. 1 at ¶ 134.)  The Complaint details how these specific patients were referred to inpatient hospital care; provides the precise amount charged to Medicare or Medicaid, the precise amount actually paid for such care, and identifies the false certifications made in connection with that treatment (the "what").  (*Id.* at ¶¶ 58–68, 134.) The Complaint also alleges the precise length of stay for these patients and time period of claims (the "when"), as well as how the tainted claims were billed at Memorial Hospital of Texas County in Guymon, Oklahoma (the "where") (*Id.* at ¶ 134.)  Finally, the Complaint details the precise above market, per-referral, remuneration Defendants paid in exchange for the referrals and admissions, which was completed through hospital processes and

---

[6]    Indeed, Defendants' motion makes this same boilerplate attack on each of Relator's causes of action.  (Rec. Doc. 44 at pp. 6, 11, 14, 17-19, 21.)

[7]    The specific patients referenced in the Complaint are identified anonymously in order to protect their identity—although Relator has identifying information for each of these patients.

personnel (the "how").  (*Id.* at  ¶¶ 83–90, 95, 96, 134.) Tellingly, Defendants' motion wholly ignores these well-pled factual details and specific examples of false claims, which easily satisfy even the strictest Rule 9(b) standards.  *See United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 371 (5th Cir. 2017)  (district court applied "too rigid an application of Rule 9(b)" by requiring allegations that hospitals or doctors were Medicare providers and submitted certified claims for reimbursement—facts which Relator plainly alleges.)

What is more, and because the Complaint meets the strictest Rule 9(b) standard, there is no doubt that the Complaint also meets the more flexible Fifth Circuit standard governing FCA claims, which requires Relator to allege only "particular details of a ***scheme*** to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *See Grubbs,* 565 F.3d at 190.  As explained in *Grubbs*, the FCA is a remedial statute intended to protect the Treasury by assisting relators in "rooting out" fraud, and the statute is broadly written to reach all types of fraud that might result in loss to the Government.  *See Grubbs*, 565 F.3d at 184 (citations omitted).   To that end, *Grubbs* set forth a "workable construction of Rule 9(b) . . . that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud."  565 F.3d 180, 190 (5th Cir. 2009).  *Grubbs* concluded that the typical "time, place, contents, and identity" Rule 9(b) pleading standard—the approach advanced by Defendants' motion—is not a "straitjacket," and instead, Rule 9(b) is "context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act."  *Id. Grubbs* squarely rejected the "laundry list" inquiry suggested by Defendants, finding that a relator need not include "exact dollar amounts, billing numbers, or dates" to establish FCA liability, and that "[t]o require these details at pleading is one small step shy of requiring

production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates." *Id*.

Instead, for FCA claims predicated upon AKS and Stark violations—such as those Relator alleges here—the Complaint need only "plead with particularity" that Defendants "made kickbacks with the intent of inducing referrals" and the "particular details of a scheme … paired with reliable indicia that lead to a strong inference that claims were actually submitted[.]" *United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) (citing *Grubbs*, 565 F.3d at 190)).[8]   In such cases, "courts have allowed the plaintiff to plead the fraudulent scheme with particularity and provide representative examples of specific fraudulent acts conducted pursuant to that scheme." *Capshaw v. White*, No. 3:12-CV-4457-N, 2017 WL 3841611, at *11 (N.D. Tex. Jan. 23, 2017) (quoting *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 768 (S.D. Tex. 2010)).

The Complaint does just that.  Based on his personal knowledge, Relator sets forth how Defendants target rural hospitals with low volumes of inpatient admissions; how they prepare "ROI Assessments;" and how they tout that their compensation schemes can boost inpatient admissions at those client hospitals and "admit patients without a fight." (Rec. Doc. 1 at ¶ 92.) As conceded by Defendants, to accomplish these goals, they pay their physicians on a per-patient basis for referrals in addition to a fair market wage.  (*Id.*, at ¶¶ 95–96, 117; Rec. Doc. 44 at p. 2.)

---

[8]   As Defendants' motion acknowledges, a violation of AKS serves as a basis for a FCA claim when, as here, the government has conditioned payment of a claim upon a false certification of compliance with AKS.  *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F.App'x 890, 893 (5th Cir. 2013).  The same is true with respect to Stark violations, which are also "common predicate violations" for imposing FCA liability; Stark "bars entities from submitting claims to federal health care programs if the services forming the basis of the claims were furnished pursuant to referrals from physicians with which the entities had a financial relationship." *Parikh*, 977 F. Supp. 2d at 663 (citations omitted).

The Complaint lists twelve specific examples of patients that were admitted to Defendants' client hospital MHTC by physicians paid under this scheme.  (Rec. Doc. 1 at ⁋ 134.) Relator also alleges specific data, based on his personal observations, revealing hundreds of specific false claims for inpatient care that Defendants caused to be submitted through their illegal referral schemes.  (*Id.* at ⁋⁋ 132–134.)  That data also shows that Defendants' compensation schemes caused a disproportionately high number of inpatient admissions—achieving the exact goal Defendants pitch to potential client hospitals.  (*Id.*)  Finally, Relator alleges the exact forms and claims submitted by Defendants' client hospitals, the certifications made therein regarding compliance with AKS and Stark, and the number of claims that Defendants' schemes caused to be submitted by their client hospitals in violation of the FCA.  (*Id.* at ⁋⁋ 63–68, 128.)

These allegations unquestionably plead Defendants' schemes with particularity and provide representative examples of specific fraudulent actions conducted under the scheme to satisfy Rule 9(b) under *Grubbs.  See Capshaw*, 2017 WL 3841611 at *11.  That Relator does not identify every specific bill, location, date, and individual responsible for every false claim and kickback payment at issue is not fatal to Relator's causes of action; courts in this Circuit routinely find that such details are unnecessary to state a claim when, as here, the Complaint contains sufficient details of the ***scheme***.[9]     Indeed, in *Grubbs*, the relator's claims were based

---

[9]     *See United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, No. 3:14-CV-00118-M, 2016 WL 5661644, at *6 (N.D. Tex. Sept. 30, 2016) (FCA claims satisfied Rule 9(b) alleging details of "in-home assessment program" scheme though the "specific date or location" and specific physicians were missing from the complaint); *United States ex rel. Tucker v. Christus Health*, No. CIV.A. 09-1819, 2012 WL 5351212, at *4 (S.D. Tex. Oct. 23, 2012) (allegations satisfied Rule 9(b) by describing manner in which billing was false and/or fraudulent, providing categories of fraudulent billings, even though complaint did not identify specific false bills by date or patient name, nor identify each individual who participated in submitting the false bills); *Parikh*, 977 F. Supp. 2d at 666–68 (complaint "more than satisf[ied]" Rule 9(b) by alleging amounts physicians received
*Footnote continued on next page …*

on an alleged scheme relayed to him by two doctors that explained how they fraudulently bill face-to-face visits. *Grubbs*, 565 F.3d at 193.   Relator's claims are likewise based on the details of Defendants' schemes that were communicated and revealed to him personally, and therefore are likewise sufficient under *Grubbs*.

## II. Relator's Allegations Plausibly Allege Legally and Factually Viable Violations of the FCA, AKS and the Stark Law.

### A. Defendants' Schemes Are Obvious, Textbook Violations of the FCA, AKS and the Stark Law.

Relator's Complaint details all facts, as well as the relevant statutes, demonstrating that Defendants' conduct is squarely violative of the FCA, AKS, and the Stark Law because Defendants provide direct incentives, on a per-patient basis, to physicians in exchange for referrals.   (Rec. Doc. 1 at ¶¶ 1–8, 16–49, 53, 97.)   The Department of Health and Human Services Office of Inspector General (HHS-OIG) has long warned of such "incentive programs used to compensate physicians (directly or indirectly) for referring patients to the hospital."[10] "These arrangements are implicated by the anti-kickback statute because they can constitute remuneration offered to induce, or in return for, the referral of business paid for by Medicare or Medicaid.  In addition, they are not protected under the existing 'safe harbor' regulations." *Id.*  In fact, the first enumerated "Suspect Hospital Incentive Arrangement" is: "Payment of any sort of

---

in illegal bonuses and specific patients that were illegally referred); *United States ex rel. Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875471 (E.D. Tex. Mar. 20, 2019); *United States v. Planned Parenthood Fed'n of Am. Inc.*, No. 2:21-CV-022-Z, 2022 WL 1290907, at *11 (N.D. Tex. Apr. 29, 2022); *United States ex rel. Byrd v. Acadia Healthcare Co., Inc.*, No. CV 18-312-JWD-EWD, 2022 WL 879492 (M.D. La. Mar. 23, 2022); *United States v. Curo Health Servs. Holdings, Inc.*, No. 3:13-CV-00672, 2022 WL 842937 (M.D. Tenn. Mar. 21, 2022).

[10] *See* United States Department of Health and Human Services Office of Inspector General (HHS-OIG) Special Fraud Alert: Hospital Incentives to Physicians (Issued May 1992) available at: https://oig.hhs.gov/documents/special-fraud-alerts/876/121994.html

incentive by the hospital each time a physician refers a patient to the hospital." *Id.* Unsurprisingly, and belying Defendants' assertion that its schemes were perfectly "legal," enforcement of illegal pay per admission schemes like those perpetrated by Defendants are frequently the subject of enforcement actions under the FCA, Stark Law, and the AKS,[11]

### B.     Defendants Violated AKS Under the Well-Established One Purpose Rule.

Defendants attempt to characterize its compensation schemes as benign, and Relator's allegations as "fanciful," by arguing that Relator must show that the "sole and unequivocal purpose" of Defendants' illegal payments are to induce referrals.  (Rec. Doc. 44 at p. 9.) But Defendants grossly misstate the law.  In this Circuit, Relator need only allege sufficient facts to demonstrate that *one purpose* of ESS's scheme is to induce referrals because the AKS is "broadly interpreted to cover any arrangement where ***one purpose of the remuneration*** is … for the referral of services or to induce future referrals." *United States ex rel. Bruno v. Schaeffer*, 328 F. Supp. 3d 550 (M.D. La. 2018) (citing *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (emphasis added); Rec. Doc. 1 at ¶ 26 (citing *United States  ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2018 WL 6068806, at *1 (N.D. Tex. Nov. 20, 2018) ("As long as *any* part of the transaction was intended to induce referrals,  the transaction violates the law." (emphasis in

---

[11]     *See* Department of Justice, Press Release, "Two Physician Groups to Pay Over $33 Million to Resolve Claims Involving HMA Hospitals" (December 18, 2017) available at: https://www.justice.gov/opa/pr/two-physician-groups-pay-over-33-million-resolve-claims-involving-hma-hospitals.   (Emergency Room Staffing Company received remuneration from Hospital to recommend patient be admitted to Hospital); Department of Justice, Press Release, "Adventist Health System Agrees to Pay $115 Million to Settle False   Claims   Act   Allegations"   (Sept.   21,   2015)   available   at: https://www.justice.gov/opa/pr/adventist-health-system-agrees-pay-115-million-settle-false-claims-act-allegations (Hospital System paid bonuses on a formula that improperly took into account the value of physicians referrals.); See also *Parikh*, 977 F. Supp. 2d at 666–68 (complaint "more than satisfied" Rule 9(b) by alleging amounts physicians received in illegal bonuses and specific patients that were illegally referred).

original).  The One Purpose Rule is widely recognized by courts in this Circuit and elsewhere.

In fact, the One Purpose Rule is so engrained in AKS jurisprudence that Defendants' own motion

cites *Davis* and the One Purpose Rule (Rec. Doc. 44 at p. 8), and numerous decisions have

applied that principal to deny motions to dismiss AKS claims when, as here, the factual

allegations specify exactly how a defendant's compensation scheme incentivizes, entices, or

rewards referrals.  *See United States v. Catholic Health Initiatives*, No. 4:18-CV-123, 2022 WL

2657131, at *9 (S.D. Tex. Mar. 31, 2022) ("[U]nder the AKS, 'the presence of a legitimate

business purpose for the arrangement … will not legitimize a payment if there is *also* an illegal

purpose.'") (emphasis in original); *See United States ex rel. Parikh v. Citizens Medical Ctr.*, 977

F. Supp. 2d 654 (S.D. Tex. 2013); *see also United States v. Marlin Med. Sols. LLC*, No. SA-21-

CV-00160-OLG, 2022 WL 190308, at *6, – F. Supp. 3d – (W.D. Tex. Jan. 12, 2022)

(recognizing the Fifth Circuit employs the "one purpose" test and rejecting arguments that

allegations were "consistent with legal conduct."); *United States v. Bay State Ambulance &

Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29 (1st Cir. 1989); *United States v. SouthEast Eye

Specialists, PLLC*, 570 F. Supp. 3d 561, 577 (M.D. Tenn. 2021).  Relator's claims are not

"fanciful," but rather, Defendants ignore the well-pled claims and misapply the law.

    The scant authority cited in Defendants' motion does nothing to support their arguments,

either.  Defendants rely primarily upon *United States ex rel. Integra Med Analytics, L.L.C. v.

Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir.), *cert. denied*, 141 S. Ct. 905

(2020), which dealt with "upcoding" FCA claims (not AKS claims) and was based almost

exclusively on statistical data that allegedly showed the defendant billed certain codes above the

national average, which, according to the relator, showed fraud.  Assessing these specific

allegations, the Fifth Circuit found that the allegations were only "conceivable rather than

plausible" because there were no specific factual allegations to suggest misconduct, but only statistics, which showed only that the defendant was "ahead of most healthcare providers" in billing under CMS guidelines. *Id.*. Unlike *Integra Health*, however, this case involves AKS claims judged under a different legal standard, and there are ample facts—including but not limited to the Relator's personal knowledge of specific amounts paid to physicians on a per-patient basis for referrals—in addition to the statistical data cited in the Complaint that show Defendants' AKS schemes are more than "plausible" and sufficient to defeat ESS's motion. (Rec. Doc. 1 at ¶¶ 63–68, 127–29.) *See Christus Health*, 2012 WL 5351212, at *4.[12]

The remainder of Defendants arguments, "alternative, legal explanations," and appeals for this Court to make inappropriate factual inferences in their favor should likewise be rejected. Defendants attempt to immunize their kickbacks because the Complaint "does not challenge the medical necessity of the services provided." (Rec. Doc. 44 at p. 9.) But Defendants' argument is a red herring; their illegal per-referral payment scheme is the basis for the AKS violations, and "medical necessity is not relevant for the AKS theory of liability." *United States v. Vora*, 488 F.

---

[12]   None of the remaining authorities cited in Defendants' motion warrant a different conclusion, either. *United States ex rel. Hebert v. Dizney*, 295 F. App'x 717, 722 (5th Cir. 2008) is not an AKS case, the decision predates *Grubbs*, and it did not apply the current Rule 9(b) standard in this Circuit. What is more, the scant allegations in *Hebert* (made after being permitted leave to amend *twice*) of general falsities regarding quality of care stand in stark contrast to the level of detail in Relator's Complaint. *Gregory v. Houston Indep. Sch. Dist.*, No. 14-2768, 2016 WL 5661701, is likewise unpersuasive. The complaint in *Gregory* did not identify what services were fraudulently billed, and did not allege the "how" or "when" any false claims were submitted. Finally, *United States ex rel. Wismer v. Branch Banking & Trust Co.*, 2013 WL 5989312 considered a complaint that lacked any detail whatsoever regarding whether (or how) the defendant made any false submission to the government, and there were no details of a *scheme*—the complaint included only one example of the defendant's alleged fraudulent reduction of the loan obligation.

Supp. 3d 554, 565 (W.D. Ky. 2020).   The absence of allegations regarding medical necessity does nothing to detract from Relator's claims.

Defendants also misconstrue their own AKS violations with the potential AKS violations of the "1,000+ physicians" with whom Defendants contract.   (Rec. Doc. 44 at p. 9.)  The state of mind of the physicians—who are currently not parties to this case—is irrelevant to Defendants' own well-established AKS and FCA violations resulting from their offering and paying per-referral amounts.  *See United States v. Shah*, 981 F.3d 920, 926 (11th Cir. 2020).   Therefore, Defendants' reliance on the physicians' state of mind is legally incorrect and does nothing to rebut Relator's well-pled claims.  *See Id.* (citing *Davis*, 132 F.3d at 1094 (holding that there is separate "state of mind component" for the payor crime under the AKS than the "payee crime," and finding no tension with Fifth Circuit precedent.)

Lastly, Defendants myopically present "alternative, legal explanations" that wholly ignore Relator's well-pled facts.   For example, Defendants isolate one set of data from the Complaint showing that Defendants' schemes boost inpatient admissions from the emergency room.   Then, relying on an extraneous article not in the pleadings, they argue that there is a "legal and obvious alternative explanation" for the data.  (Rec. Doc. 44 at p. 13.)[13]  But Relator's well-pled facts show that Defendants' admitted kickback scheme caused a higher proportion of inpatient admissions at MHTC.   (Rec. Doc. 1 at ¶¶ 129–33.) And Defendants cannot rely on matters outside the pleadings at this stage to rebut those well-pled facts. *Delhomme v. Caremark*

---

[13]     Defendants' lone citation to an article does nothing to show its schemes were legal. Indeed, the Department of Justice has prosecuted claims similar to Relator's based upon an emergency physician staffing company's illegal kickback payments made to induce inpatient admissions, as Relator alleges here.  *See*  https://www.justice.gov/opa/pr/two-physician-groups-pay-over-33-million-resolve-claims-involving-hma-hospitals.
Defendants' arguments based upon this medical journal should also be rejected for a threshold reason: it improperly relies upon matters outside the pleadings.

*Rx Inc.*, 232 F.R.D. 573 (N.D. Tex. 2005).   Neither must the Court accept Defendants' unadorned "alternative, legal explanation" for the data at this stage, especially because the data is corroborated by countless other allegations detailing the intent and process behind Defendants' kickback scheme; the MHTC data simply shows the effect of Defendants' ROI proposals and company-wide efforts to increase inpatient admissions for their client hospitals.  (Rec. Doc. 1 at ⁋⁋ 120–123; 132–134.)  The MHTC data is just one of many factual examples showing reliable indicia that claims were submitted, and it cannot be isolated from the remainder of Relator's factual allegations to show an "alternative, legal explanation."

Simply put, Defendants' bald defense that its schemes were "legal" is disproved by ample allegations in the Complaint, including details of how Defendants' entire value proposition is intended to boost inpatient admissions, how Defendants pay the same "gatekeeping" physicians a per-patient amount for each referral, and how those physicians are obviously incentivized to refer patients to inpatient care as a result.  (Rec. Doc. 1 at ⁋⁋ 91–126.) The Court must accept all these facts as true and construe them in a light most favorable to Relator.   Defendants' isolated "alternative" explanation for one, but not all or even most, of Relator's factual allegations does nothing to warrant dismissal.

### C.    Relator Sufficiently Alleges Scienter Under the FCA and AKS.

Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Relator alleges exactly how, based on his personal knowledge of Defendants' operations in rural hospitals between July 2017 and September 2018, and his meetings with executives, Defendants specifically designed the "Hybrid Program" to "support[] an increase in inpatient census" by "admit[ting] patients without a fight" and specifically targeted "lower volume" facilities to increase admissions.  (Rec. Doc. 1 at ⁋⁋ 91–94.)  Relator also alleges details of Defendants' "ROI Assessment," which evaluates "how

many more patients that the hospital had previously discharged or transferred to another facility could … have been admitted to the facility, resulting in additional revenue for the hospital and ESS."  (*Id.* at ¶ 93.)  Defendants' "ROI Assessment" specifically tracks metrics regarding patient referrals, discharges, treatment, and transfers, and evaluates the data from a revenue standpoint, without regard to any consideration of their actual medical care.  (*Id.*) Indeed, Defendants do not dispute that their compensation models were intended to increase inpatient admissions; Defendants admit its schemes were intended to "leverage" those admissions.  (Rec. Doc. 44 at p. 10.)  To achieve that goal, Defendants pay their "Hybrid Program" physicians a per-patient referral amount, in addition to a base hourly fair market wage, to incentivize those physicians (who served as a "gatekeeper" for both referring and admitting) to send patients to inpatient care. (Rec. Doc. 1 at ¶¶ 95–106.)  Further, Defendants obviously know their per-referral compensation exceeds fair market value and is directly contingent on the physicians' referral to inpatient care—Defendants admit this as well.  (Rec. Doc. 44 at p. 2.)

These allegations and Defendants' admissions are more than sufficient to satisfy the intent element under the FCA and AKS, which "does not require proof of specific intent to violate the law or defraud the Government" and does not require that defendant have actual knowledge of the statutes.  *See Marlin Med. Sols. LLC*, 2022 WL 190308, at *3–4 (citing 31 U.S.C. § 3729(b)(1); 42 U.S.C. § 1320a-7b(h)); *Medoc Health*, 470 F. Supp. 3d at 638.  Rather, Relator must allege only that Defendants had actual knowledge of the information or acted in deliberate ignorance of or with reckless disregard for the truth or falsity of the claims.  *Id.* at *12. This element is easily satisfied at the pleading stage; Relator need only allege facts to show Defendants "committed the act[s] voluntarily and intentionally," and not necessarily with the purpose to violate the law.  *Id.* at *4.  Relator meets this standard under *Marlin Med.* and *Medoc*

- 18 -

*Health*, as the Complaint alleges details showing Defendants "voluntarily and intentionally" paid its physicians on a per-patient basis for referrals to boost admissions.  (Rec. Doc. 1 at ¶¶ 96, 117).  Further, and contrary to ESS's argument, there is no requirement that Relator allege that specific individuals act with the requisite scienter, as opposed to corporate entities.[14]

Defendants' only other argument related to scienter complains that Relator improperly group pleads.  But when a complaint designates the nature of the defendant's relationship to a particular scheme and identifies the defendant's role, grouping defendants is permissible.  *See United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C*., No. 3:14-cv-00118-M, 2016 WL 5661644, at *9 (N.D. Tex. Sept. 30, 2016).  Indeed, the case cited in Defendants' motion— *Capshaw v. White*, 2018 WL 6068806, at *4–5—denied a motion to dismiss because the complaint described how each defendant "played a role" in the kickback scheme.  *See also Medoc Health, LLC*, 470 F.Supp. 3d at 657 (separate allegations about each individual's role in the scheme were sufficient under Rule 9(b) despite group pleading causes of action); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004).

Relator's Complaint meets this threshold.  It describes exactly how each Defendant employs this scheme: ESS contracts with hospitals, and Hospital Care Consultants operates the "Hospitalist" arm of ESS's scheme.  (Rec. Doc. 1 at ¶ 13.)  The Complaint also describes the two entities' distinct roles in the scheme: ESS pays contracted fair market rates, and Hospital Care Consultants pays the contracted physicians per-patient referral incentive payments.  (*Id.*).  Relator also alleges facts to show why Hospital Care Consultants is an "alter ego" of ESS: the

---

[14]     ESS argues that a company "cannot act or have a mental state by itself," citing *United States ex rel. Haight v. RRSA (Com. Div.), LLC*, No. 3:16-CV-1975-S, 2020 WL 6163139 (N.D. Tex. Oct. 20, 2020).  But that decision actually found that the allegations of intent were sufficient under Rule 9(b) against certain individuals that certified that a company was an eligible small business.

two entities operate out of the same building, employ the same management team, pay the same "Hybrid Program" contracted physicians, and they are both collectively referred to by others as "ESS" without recognizing a distinction between the two entities.  (*Id.*)  The Complaint does not impermissibly group plead, and none of the authorities cited in ESS's motion show otherwise.[15]

### a.   The Stark Law Personal Services Exception Does Not Apply (Count 2).

Defendants' only substantive attack on Relator's Stark claim relies on the "personal services" exception.  (Rec. Doc. 44, p. 14.)  According to Defendants, they did not violate Stark because their own physicians performed inpatient services at the client hospitals, and therefore the referral and admission of patients does not constitute a referral for purposes of Stark.  (*Id.* at p. 24.)  But Defendants' argument should be rejected for a threshold reason: AKS and Stark exceptions are "affirmative defenses on which [Defendants] have the burden of proof and therefore not appropriate to consider under a 12(b)(6) motion." *See Parikh* 977 F. Supp. 2d at 668-69 (collecting cases).  Accordingly, Defendants' request for this Court to view Relator's well-pled facts *in their favor* to establish an affirmative defense should be swiftly rejected.

What is more, the substance of Defendants' argument related to the Stark "personal services" exception is legally and factually flawed.  The Complaint details facts showing how Defendants' schemes violate Stark because physicians have a direct compensation relationship

---

[15]   In *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 633 (N.D. Tex. 2018), nearly every element of the relator's complaint was insufficiently alleged, and relator did not make any factual allegations to distinguish the defendants. Unlike *Hendrickson*, the Complaint here details specific facts regarding each defendant's role in the scheme, and separate actions they took in furtherance of the scheme.  (Rec. Doc. 1 at ⁋ 13).  Neither is *United States ex rel. Patel v. Catholic Health Initiatives*, 312 F. Supp. 3d 584, 605 (S.D. Tex. 2018) controlling here.  The Court in *Patel* found that the claims fundamentally did "not add up to liability under the False Claims Act" and was legally deficient under multiple elements of the FCA.

with Defendants (they receive remuneration from Defendants), those physicians refer patients to inpatient episodes of care, and DHS was billed through and paid for Medicare and Medicaid programs.   (Rec. Doc. 1 at ¶¶ 106–110); *see also* 42 U.S.C. § 1395nn(a)(1).   Although Defendants argue that the "personal services" exception applies because only their physicians perform the DHS, the factual reality of inpatient hospital care—as pled in Relator's complaint—disproves Defendants' entire argument.   Prohibited referrals of inpatient hospital admission trigger around the clock comprehensive care, and durable medical equipment, as well as coverage for SNF treatment for 100 days after discharge—which is necessarily performed by individuals *other* than Defendants' physicians—and fall outside the "personal services" exception.   (Rec. Doc. 1 at ¶¶ 87–89).   Indeed, another district court in this state expressly rejected Defendants' very argument in an analogous case.   *See Parikh*, 977 F. Supp. 2d at 665. In *Parikh*, the court found that "personal service" exception did not apply because the plaintiff, as Relator does here, alleged other physicians performed services resulting from the illegal kickbacks—the inpatient referral scheme "fundamentally" caused the submission of a facility fee billed by the hospital which falls outside the exception.   977 F. Supp. 2d at 668; *see also United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 399 (4th Cir. 2012) (bills for professional fees and for facility fees fell outside personal services exception for Stark).   The same result should be reached here, as Defendants' schemes necessarily cause the submission of claims for facility fees and other inpatient care that that fall outside the "personal services" exception.   (Rec. Doc. 1 at ¶¶ 59–63.)   Relator's Stark claims are well-pled.

## III.   Relator's Reverse FCA Claims Are Sufficiently Alleged.

Defendants also attack the factual sufficiency of Relator's reverse FCA claim, which is based upon Defendants' knowing failure to report overpayments resulting from its submission of false claims under the illegal compensation schemes.   Defendants' arguments should be rejected.

In a case involving a government healthcare program, the reverse false claims provision requires the relator to allege facts showing an intentional failure to report and return overpayments from the government.  *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) (citing 31 U.S.C. § 3729(a)(1)(G)).  Here, the Complaint alleges exactly how Relator reported ESS's schemes to its CEO Ron Weiss, he advised Relator only that Defendants "can pay [physicians] for their work."  (Rec. Doc. 1 at ¶¶ 102–103.) But Mr. Weiss's excuse did not address the illegality of ESS's compensation arrangement, and he did nothing to correct or report any overpayments resulting from the scheme, which creates liability under the reverse FCA provision.  (*See id.*)  Specifically, Defendants are obligated under the "60-Day Rule" set forth in 42 U.S.C. § 1320a-7k(d) to report and return any overpayments resulting from false claims, and its failure to do gives rise to reverse FCA liability.  *See Cockerell Dermatopathology, P.A.*, 2021 WL 4894173, at *10–11; *Curo Health Servs. Holdings, Inc.*, 2022 WL 842937, at *14; *United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 WL 6908856, at *17 (S.D. Ga. Dec. 8, 2014); *United States v. Crumb,* No. CV 15-0655-WS-N, 2016 WL 4480690, at *16 (S.D. Ala. Aug. 24, 2016).

Relator's FCA claim is not impermissibly "redundant" either.  Contrary to ESS's argument, there is not an automatic violation of the reverse FCA provision simply because of the original false claim for payment.  ESS's reverse FCA liability is predicated upon those separate claims for which it *knew* were overpaid as a result of its schemes—such as those following Relator's reports to CEO Ron Weiss.  As a result, and even if ESS's argument that Relators' claims are "redundant" was persuasive, it is premature.  *See United States ex rel. Wallace v.*

- 22 -

*Exactech, Inc.*, No. 2:18-CV-01010-LSC, 2020 WL 4500493, at *21 (N.D. Ala. Aug. 5, 2020).[16]

Defendants' authorities to the contrary are not persuasive, as they do not involve any knowing

violations of the 60-day rule as set forth above.  *See United States ex rel. Integra Med Analytics,*

*LLC v. Creative Sols. in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283 (W.D.

Tex. Nov. 13, 2019); *United States ex rel. Besancon v. Uchicago Argonne, LLC*, No. 12-7309,

2014 WL 4783056 (N.D. Ill. Sept. 24, 2014) (contract with government did not impose any

obligation to repay, unlike 60-day rule).  Here, the 60-Day Rule constitutes an "obligation" owed

by Defendants, which triggers their reverse FCA liability for avoiding that obligation.

## IV.   The Complaint Alleges Sufficient Facts To Establish A FCA Conspiracy.

To state a claim under 31 U.S.C. § 3729(a)(1)(C), "a relator must show (1) the existence

of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid

by the Government and (2) at least one act performed in furtherance of that agreement." *Grubbs*,

565 F.3d at 193 (quotations omitted).  An "express, explicit agreement is not required; a tacit

agreement is enough . . . [and a] conspiracy may be proven with only circumstantial evidence or

inferred from a concert of action." *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir.

2014) (citation and internal quotation marks omitted).

There are ample details supporting Relator's FCA conspiracy claim.  ESS paid its

contracted physicians a fair market hourly wage, while Hospital Health Consultants paid those

same physicians additional, illegal remuneration on a per-patient basis (presumably to hide the

illegality of the arrangement) for referrals.  (Rec. Doc. 1 at ¶¶ 13–14, 96, 117.) Together, these

---

[16]   For instance, while unlikely, a jury could find that Defendants caused the submission of
the original false claims without the requisite state of mind but upon Relator's proving of
facts showing that Defendants subsequently learned that those claims were improperly
paid and they should be returned, the same jury could find that Defendants violated the
reverse FCA provision. *Exactech, Inc.*, 2020 WL 4500493, at *21.

two entities agreed—with its contracted physicians—to pay and receive per-referral payments contingent upon the admission of government insured patients to inpatient hospital care and to defraud the government in their respective roles toward the ultimate goal of implementing the illegal compensation schemes.  These allegations are sufficient to show an unlawful agreement, as well as overt acts, to support a FCA conspiracy claim.  *Medoc Health*, 470 F. Supp. 3d at 659.

## V.  Relator Alleges Sufficient Facts To State Claims Under Analogous State Laws.

ESS's challenges to Relator's state law claims are the same arguments lodged against Relator's FCA, AKS and Stark claims, and they suffer from the same flaws outlined above. Because Relator has demonstrated the Complaint is adequately plead under the applicable Federal pleading standards, *see generally supra*, this Court should conclude that Relator's analogous state law claims are adequately alleged.  *See Health Choice All., LLC v. Eli Lilly and Co., Inc.*, No. 5:17-CV-123-RWS-CMC, 2018 WL 4026986 (E.D. Tex. July 25, 2018) (recognizing that courts should interpret state law false claims consistently with the FCA.)

Indeed, Relator specifically alleges that Defendants operate in 50 client hospitals in 12 states, and contract with over 1,000 independent contractor physicians.  (Rec. Doc. 1 at ₽ 12.) Relator also alleges, based on his personal observations at multiple client hospitals in New Mexico, Oklahoma, and Arkansas, that Defendants employ their illegal compensation arrangements in multiple states.  (*Id.* at ₽₽ 12–14.)  Although Defendants complain that Relator alleges facts relating only to Oklahoma, Defendants ignore details that show that, under the correct *Grubbs* pleading standard, their schemes necessarily caused the submission of false claims in other states.  *See United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 496 (E.D. Pa. 2016) (facts sufficiently alleged "nationwide scheme" to under analogous FCA statutes in 27 states); *United States ex rel. Brown v. Celgene Corp.*, No. CV 10-3165-GHK SSX, 2014 WL 3605896, at *10 (C.D. Cal. July 10, 2014) (complaint sufficiently alleged nationwide

scheme, and there was "no reason to conclude that [the defendant's] alleged misconduct was limited to" one state); *Planned Parenthood Fed'n of Am. Inc*., 2022 WL 1290907, at *11; *Acadia Healthcare Co., Inc.*, 2022 WL 879492; *Curo Health*, 2022 WL 842937 at *12.

The only new argument Defendants make is with respect to Relator's claims under the Arkansas Medicaid Fraud False Claims Act and the New Mexico Medicaid False Claims Act. Defendants contend that under these statutes, they can be liable only "through the Attorney General" under the ASMFFCA, but that is not a basis for dismissal at this stage. Although the Arkansas Attorney General has not decided to intervene at this stage, Relator plausibly alleges facts that *could* trigger the Attorney General's intervention and Defendants' liability under the ASMFFCA. Defendants' attack on Relator's claim under the NMMFCA fails for the same reason; although the New Mexico Attorney General has not intervened, Relator alleges sufficient facts to show the plausibility that it could intervene based on "substantial evidence of a violation" Relator intends to prove in this litigation. Defendants are not shielded from liability under these statutes simply because the state of Arkansas and New Mexico have decided not to intervene at this juncture, and Defendants fails to cite any authority to suggest otherwise.

## **CONCLUSION**

Defendants' motion rests upon their own, self-serving characterizations of the fraudulent schemes described in the Complaint, which are wholly inappropriate to consider at the pleading stage. This Court must accept Relator's factual allegations as true and construe them in a light most favorable to Relator, not Defendants. Upon doing so, Defendants' Motion is due to be denied.[17]

---

[17] Nevertheless, should the Court find any deficiency in the Complaint, this Court should follow its own precedent, and well-settled Fifth Circuit precedent, and grant Relator leave

*Footnote continued on next page …*

Dated August 2, 2022

Respectfully submitted,

*/s/ Laurence D. LeSueur, Jr.*
John W. Joyce, *PHV* (LA 27525)
Laurence D. LeSueur, Jr., *PHV (*LA 35206)
Taylor L. Gamm, *PHV* (LA 39623)
BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone:  (504) 589-9700
Facsimile:  (504) 589-9701
jjoyce@barrassousdin.com
llesueur@barrassousdin.com
tgamm@barrassousdin.com

Frohsin Barger & Walthall
James F. Barger Jr, *PHV* (GA 843064)
100 Main Street
Saint Simons Island, Georgia  31522
Telephone:  205/933-4006
Fax:  205/933-4008
jim@frohsinbarger.com

Waters & Kraus LLP
Charles S. Siegel, TX 18341875
Caitlyn E. Silhan, TX 24050813
3141 Hood Street, Suite 700
Dallas, TX  75219
Telephone:  214/357-6244
Fax:  214/357-7252
siegel@waterskraus.com
csilhan@waterskraus.com

*Counsel for Relator Michael Carter*

---

to amend.  *See Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977); *United Healthcare Services, Inc. v. NextHealth, LLC*, 2021 WL 764035, at *18 (N.D. Tex. Feb. 26, 2021) (Brown, J.) (concluding that "the Court ordinarily permits a plaintiff one opportunity to replead following a first motion to dismiss.")