IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, and the States of ARKANSAS, COLORADO, ILLINOIS, INDIANA, LOUISIANA, NEW MEXICO, OKLAHOMA, TENNESSEE, and TEXAS, *ex rel.* MICHAEL CARTER<br><br>Plaintiffs,<br><br>v.<br><br>EMERGENCY STAFFING SOLUTIONS, INC. and HOSPITAL CARE CONSULTANTS, INC.,<br><br>Defendants. | §§§§§§§§§§§§§§§§§ | Civil Action No. 3:19-cv-1238-E |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Emergency Staffing Solutions, Inc. and Hospital Care Consultants, Inc.'s (collectively, "Defendants") Motion to Dismiss Complaint. (Doc. 44). Here, Defendants have sought dismissal based on Federal Rules of Civil Procedure 9(b) and 12(b)(6). (See Doc. 44 at 11-12, et seq.). Having considered the Motion to Dismiss, the response and reply, the record, and the relevant law, the Court hereby **DENIES IN PART** the Motion to Dismiss with respect to Counts 1-5, and Count 6 in the Complaint. The Court **GRANTS IN PART** the Motion to Dismiss with respect to Counts 6-13, and Count 14, and dismisses these claims without prejudice.

I. BACKGROUND

This False Claims Act ("FCA") *qui tam* action was filed on May 22, 2019 by Relator Michael Carter ("Carter") against Emergency Staffing Solutions, Inc. ("ESS") and Hospital Care

Consultants, Inc. ("HCC") (collectively, "Defendants"). In Carter's *Qui Tam* Complaint ("Complaint"), alleges that Defendants operate an illegal kickback scheme whereby the "pay doctors to refer patients to inpatient hospital care and unjustly profit by billing and causing the billing of federally-funded and state-funded healthcare programs." (Doc. 2, ¶ 1). The United States of America ("United States") declined to intervene after an investigation into the allegations. (*See* Doc. 24). All nine states named as plaintiffs ("Plaintiff States") have likewise declined to intervene.[1]

Carter is a hospital administrator with 25 years of experience in health care management and has served as the Chief Operating Officer and Chief Executive Officer of serval hospitals. (Doc. 2, ¶ 14). Carter has spent much of his career as an executive in rural hospitals; through this experience working with such hospitals, Carter encountered Defendants. (Doc. 2, ¶ 14).

ESS is medical management and physical staffing company that contracts with hospitals—mainly rural and suburban—to provide physicians and boost revenue. (Doc. 2, ¶ 12). ESS provides emergency room physicians to work in client hospitals' emergency departments ("E.D.s") and supplies physicians who work as hospitalists, providing patient care and coordinating care to patients admitted to the hospitals at which they are contracted to work. (Doc. 2, ¶ 12). According to Carter, HCC is an alter-ego corporation of ESS and operates the "hospitalist" arm of Defendants' operation. (Doc. 2, ¶ 13). Carter alleges that HCC's "primary responsibility is to create a phantom buffer between Emergency Staffing Solutions (which is the entity paying contracted physicians) and Hospital Care Consultants (the entity that pays contracted physicians the per-patient referral incentive payments)." Carter alleges that ESS and HCC operate out of the same building in Dallas,

---

[1] Both the United States and Texas have filed Statements of Interest in response to Defendants' motion to dismiss clarifying that their declination to intervene in this matter is not a comment on the merits of this case. (*See* Doc. 50; Doc. 52).

Texas, employ the same management team, and pay the same contracted physicians. (Doc. 2, ¶ 13). Moreover, Carter alleges that hospital administrators and others familiar with Defendants both ESS and HCC refer to the companies as "ESS" collectively and recognize no distinction between them. (Doc. 2, ¶ 14)

The gravamen of the Complaint is that ESS and HCC operate an illegal kickback scheme in which they incentivize physicians to refer and admit patients to inpatient care. Carter alleges that this scheme violates the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn. Carter alleges that Defendants caused hospitals to submit legally false Medicare and Medicaid claims by falsely certifying compliance with these laws, which constitute false claims under the False Claims Act. 31 U.S.C. §§ 3729-3733.

Carter alleges that ESS and HCC are paid a flat-rate by client hospitals while ESS independently bills, collects, and retains all "professional fee" billings related to services provided by ESS physicians. (Doc. 2, ¶ 2). Defendants promote their business as being able to increase hospital revenue through increased inpatient admissions; to do so, Carter alleges, ESS continually strives to increase hospital in-patient admissions by illegally incentivizing its contracting physicians to refer and admit patients to inpatient treatment. (Doc. 2, ¶3). Carter alleges that ESS illegally compensates its physicians by proving them with direct *quid pro quo* renumeration based on each inpatient admission the physicians refer or orders to the hospitals where the physicians work and that contract with Defendants. (Doc. 2, ¶ 4). Carter argues that this scheme violates both the Anti-Kickback Statute and the Stark Law.

According to the Complaint, ESS uses what it calls a "Hybrid Program" in roughly half of its contracting hospitals. In this program, the ESS-contracted physicians work both in the hospital's emergency department—from where the majority of inpatient referrals come—and as hospitalists,

providing general care to patients that have been admitted to inpatient care. (Doc. 2, ¶ 5). These physicians are paid an hourly rate of $100 per hour—which, according to Carter, commensurate with the fair market value for physicians employed in similar capacities and locations—as well as on a per-patient referral basis for each patient the physician admitted to inpatient care in the hospital. (Doc. 2, ¶ 5; 95-96). Carter alleges that the "Hybrid Program" violates the Anti-Kickback Statute and the Stark Law, causing ESS and the hospitals with whom ESS contracts to submit false Medicare claims in violation of the FCA. (Doc. 2, ¶¶ 91-115). Specifically, Carter alleges that the Hybrid Program pays physicians on a *quid pro quo* per-patient basis for each in patient admission in addition to their fair market hourly rate. (Doc. 2 ¶¶ 95-96). Carter alleges that Defendants also pay their Hybrid Program physicians on a per-patient basis for individual tasks associated with inpatient care--$75 per round and $50 for discharges and transfer. (Doc. 2, ¶¶ 95-96). Carter alleges that this operation violates the Anti-Kickback Statute and the Stark Law because it incentivizes referrals for reasons other than medical necessity and it constitutes an improper referral to a health care provider with whom the referring physicians have financial relationships.

Carter alleges that ESS, through its alter-ego "sister company" HCC, also employs a "Hospitalist Program," in which Defendants collectively supply physicians to work exclusively as hospitalists who focus solely on admitting and caring for patients admitted to inpatient care. (Doc. 2, ¶ 6). Carter alleges that ESS, through HCC, pays Hospitalist Program physicians illegal kickbacks based directly on the volume of patients those physicians admit to inpatient care. Carter alleges that Hospitalist Program physicians also receive an additional incentive to admit patients to inpatient care by being paid $50 per admission, transfer, or discharge, and $25 per round per patient per day. (Doc. 2, ¶ 116). These payments are in addition to HCC-contracted hourly rates, and thus result in physicians receiving far above market pay if they admit more patients to inpatient

care and thus have more patients to see during their rounds. (Doc. 2, ¶ 117-18). Carter alleges that this arrangement, like the Hybrid Program, poisons the admitting physician's "gatekeeping" role by monetarily incentivizing physicians to admit more patients to inpatient care than is necessary. Carter contends that the Hospitalist Program violates the Stark Act because it involves prohibited referrals to designated health service providers with whom the referring physician has a financial relationship.

Carter alleges that he learned of the allegedly fraudulent nature of Defendants' business model during his time working as Chief Operating Officer and administrator of Memorial Hospital of Texas County ("MHTC") in Guymon, Oklahoma. (Doc. 2, ¶ 15). In his Complaint, Carter alleges how he became familiar with Defendants business model—specifically its Hybrid Program—and saw it in practice at MHTC. Carter alleges that the ESS physicians at MHTC received an hourly rate of $100 per hour—which he alleges is a fair marked wage for an independent contractor physician working in a rural hospital based on his experience and the statements of an ESS physician. (Doc. 2, ¶ 95). Carter alleges that, in addition to the hourly rate, ESS physicians at MHTC were paid on a per-patient referral basis for each patient they admitted to inpatient care—at a rate of either $50 or $100 per admission. (Doc. 2, ¶ 96). He also alleges that the ESS physicians were paid for individual tasks they performed in their role as hospitalists on patients receiving inpatient care—$25 or $75 per round, $50 per transfer to another facility or discharge. (Doc. 2, ¶ 96).

Carter alleges that this arrangement violates the Anti-Kickback Statute and the Stark Law and causes Defendants and their contracting hospitals to submit false Medicare claims in violation of the FCA when they submit various forms certifying that their claims do not violate such laws. (Doc. 2, ¶¶ 64-76). Carter alleges that he has knowledge of hundreds of specific false claims for

inpatient episodes of care that ESS caused to be submitted by MHTC. (Doc. 2, ¶ 129). Further, he describes how, from October 2015 to September 2017, ESS-contracted physicians accounted for a vastly disproportionate number of referrals to inpatient care at MHTC. (Doc. 2, ¶¶ 132-33).

Carter filed his Complaint in this *qui tam* action on May 22, 2019. Carter alleges five claims against Defendants under the FCA and ten claims under the laws of the nine Plaintiff States. Below are the Counts as enumerated in the Complaint:

1. presentation of false claims under the FCA, 31 U.S.C. § 3729(a)(1)(A), based on violations of the Federal Anti-Kickback Statute, 42 U.S.C § 1320a-7b(b);
2. presentation of false claims under the FCA, 31 U.S.C. § 3729(a)(1)(A), based on violations of the Stark Law, 42 U.S.C. § 1395nn;
3. making or using false record(s) or statement(s) to cause claim to be paid under the FCA, 31 U.S.C. § 3729(a)(1)(B);
4. violation of the reverse-false-claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(G);
5. conspiracy under the FCA, 31 U.S.C. § 3729(a)(1)(C);
6. violation of the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE. ANN. § 36.002;
7. violation of the Arkansas State Medicaid Fraud False Claim Act, ARK. CODE § 20-77-900;
8. violation of the Colorado Medicaid False Claims Act, COLO. REV. STAT. §§ 25.5-4-303.5, *et seq.*;
9. violation of the Illinois False Claims Act, 740 ILL. COMP. STAT. 175/1, *et seq.*;
10. violation of the Illinois Insurance Claim Fraud Prevention Act, 740 ILL. COMP. STAT. 92-5(b);
11. violation of the Indiana Medicaid False Claims and Whistleblower Protection Act, IND. CODE § 5-11-5.7, *et seq.*;
12. violation of the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. §§ 46:437.1, *et seq.*;
13. violation of the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. §§ 27-14-1, *et seq.*;
14. violation of the Oklahoma False Claims Act, OKLA. STAT. tit. 63 § 5053.1(b); and
15. violation of the Tennessee Medicaid False Claims Act, TENN. CODE. ANN. §§ 71-5-181, *et seq.*

(Doc. 2, at 45-59). In their Motion to Dismiss, Defendants argue that all fifteen counts should be dismissed because Carter failed plead specific facts which establish a plausibility of entitlement to relief in accordance with the requirements of Rule 8(a)(2) and Rule 9(b). (*See* Doc. 44, pg. 6-32).

Defendants argue that Carter's FCA claims—Counts 1 through 5—should be dismissed because Plaintiff failed plead specific facts which establish a plausibility of entitlement to relief in accordance with the requirements of Rule 8(a)(2) and Rule 9(b). (*See* Doc. 44, at 29).

Defendants' Motion to Dismiss further asserts that Carter's state law claims—Counts 6 through 15—should be dismissed because: (1) state false claims act claims are assessed under the same standard as the FCA; (2) Carter utilized the same theories of fraud underlying their presentment claims in Counts 1 and 2; (3) Carter failed to state a claim for Counts 1 and 2 under Rule 8(a)(2) and Rule 9(b); and (4) Carter alleges no specific facts relating to any state other than Oklahoma. (*See* Doc. 44, at 29-32). Defendants assert alternative arguments for the dismissal of Counts 7 and 13—arguing that Carter lacks standing to sue under the Arkansas State Medicaid Fraud False Claim Act and the New Mexico Medicaid False Claims Act, respectively. The Motion to Dismiss is fully briefed and is now ripe for consideration.

## II.   LEGAL STANDARD

### A.   The Standard of Review

At the outset, Federal Rule of Civil Procedure 8(a)(2) requires plaintiffs' pleadings to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED R. CIV. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

However, when, as here, a complaint alleges claims brought under the False Claims Act (FCA) or state equivalents of the FCA, Federal Rule of Civil Procedure 9(b) apply to those claims. *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the representation and what [the person] obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). Put simply, Rule 9(b) requires the "who, what, when, where, and how" of the fraud. *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

However, Rule 9(b)'s "'time, place, contents, and identity' standard is not a straightjacket[,]" and the Fifth Circuit has given the rule a "flexible" interpretation in the FCA context so as to achieve the FCA's remedial purpose. *See Grubbs*, 565 F.3d at 190. The Fifth Circuit has held that a complaint can survive a motion to dismiss by "alleging the details of an actually submitted false claim" or by "alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that the claims were actually submitted." *Id*. Additionally, the Fifth Circuit has explained:

> Malice, intent, knowledge, and other condition of mind of a person may be averred generally. FED R. CIV. P. 9(b). This second sentence of Rule 9(b) "relaxes the particularity requirement for conditions of the mind, such as scienter." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994). As this court has explained, in order to adequately plead scienter, "a plaintiff must set forth specific facts that support an inference of fraud." *Id.* Facts that show a defendant's motive to commit the fraud may sometimes provide a factual background adequate for an inference of fraudulent intent. *Id.*

*U.S. ex rel. Willard*, 336 F.3d 375, 384–85 (5th Cir. 2003). "In cases of fraud, Rule 9(b) has long played that screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later." *U.S. ex rel. Grubbs*, 565 F.3d at185. "A dismissal for failure to

plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)[.]" *U.S. ex rel. Hebert v. Dizney*, 295 F. App'x 717, 721 (5th Cir. 2008).

### B.     The Statutory Framework

#### 1.     *The False Claims Act*

The False Claims Act, passed in 1863 to "stem the widespread fraud by private Union Army suppliers in Civil War defense contracts[,]" is intended to root out fraud. *Grubbs*, 565 F.3d at 184. An FCA suit can be brought either by the United States or by private persons on behalf of the United States—termed *qui tam* relators—for defrauding the federal government. *Id.*

The FCA "prohibits, in relevant part, 1) the presentment of false claims to the Government, 2) the use of false record or statement to get a false claim paid, and 3) conspiracies to get false claims paid." *Id.* at 183; *see also* 31 U.S.C § 3729(a)(1)(A)-(C). The FCA also prohibits "reverse false claims," which when a person "knowingly makes, uses, or causes to be made or used, a false statement material to an obligation to pay or transmit property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C § 3729(a)(1)(G); *see U.S. ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) ("In a reverse false claim suit, the defendant's actin does not result in improper payment by the government to the defendant, but instead results in no payment to the government when payment is obligated.").

To plead a presentment claim under the FCA, the United States or a relator must plead facts establishing: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that is presented to the Government." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (citations omitted). A "false record or statement" claim does not require showing that a false claim was actually presented to

the Government—all it "requires is that the defendant [(1)] made a false record or statement[(2)] for the purpose of getting a false or fraudulent claim paid by the Government." *U.S. ex rel. Grubbs* 565 F.3d 193. To plead a FCA conspiracy claim, a plaintiff must allege: "'(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement.'" *Id.* (quoting *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).

The typical FCA claim is one in which the United States or a relator alleges that a defendant either did not perform the services it claimed to perform for the government or overcharged the government for services it performed. *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013) (collecting cases). However, FCA claims can also be based on "accurate claims submitted for services actually rendered [but] still considered fraudulent . . . [because] the services were rendered in violation of other laws." *Id* (citing *U.S. ex rel. Thompson,* 125 F.3d at 902 (holding that an Anti-Kickback Statue violation may support a claim under the FCA under a false certification theory)). When "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *U.S. ex rel. Thompson*, 125 F.3d at 902. "Thus, a defendant's violation of a law on which the government conditions payment may serve as a 'predicate' violation that invokes FCA liability." *U.S. ex rel. Parikh*, 977 F.Supp. 2d at 663.

Two such laws are the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1), and the Stark Law, 42 U.S 1395nn(a)(1)(A)-(B). "Because compliance with the AKS and Stark is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these

statutes may be 'false or fraudulent' for purposes of the FCA." *Id.* at 664 (citing *U.S. ex rel. Thompson*, 125 F.3d at 901–903).

### 2. *The Anti-Kickback Statute*

The Anti-Kickback statute prohibits any individual from soliciting or receiving "any renumeration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" in return for referring, arranging, purchasing, or ordering any good, service, facility or item "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320(b)(1)(A)-(B). "As long as *any* part of the transaction was intended to induce referrals, the transaction violates the law." *U.S. ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2018 WL 6068806, at *1 (N.D. Tex. Nov. 20, 2018) (citing *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (holding that district court's jury instruction that cash payments to a doctor had to be "for no other purpose" than inducing referrals as an erroneous statement of law)).

### 3. *The Stark Law*

The Stark Law prohibits a physician from making referrals to for the furnishing of designated health services ("DHS") to an entity with which he or she has a "financial relationship." 42 U.S.C § 1395nn(a)(1)(A). Such referrals are "prohibited referrals." Additionally, the entity may not present or cause to be presented a Medicaid bill or claim to individual, third party payor, or other entity for DHS furnished pursuant to a prohibited referral. 42 U.S 1395nn(a)(1)(B). A "financial relationship" under the Stark Law includes a compensation arrangement between the physician and the entity. 42 U.S.C. § 1395nn(a)(2). Designated health services under the Stark Law includes "[i]npatient and outpatient hospital services."42 U.S.C. § 1395nn(h)(6)(K). The Stark Law does not have a scienter requirement—it is a strict liability statute. Thus, if a physician is referring a patient to a DHS provider with whom the physician has a financial relationship, the

referral or financial relationship up must fall within one of the Stark Law's exceptions. *See* 42 U.S.C. § 1395nn(b)-(e).

### III. ANALYSIS

#### A. The FCA Claims: Counts 1-5

Defendant argues that Carter does not adequately plead violations of the FCA, the Anti-Kickback Statute, and the Stark Law. The Court disagrees. Carter pleads in great detail facts that—if true—establish both the submission of false claims and a "scheme to submit false claims" that is "paired with reliable indicia that lead to a strong inference that the claims were actually submitted." *U.S. ex rel. Grubbs*, 565 F.3d at 190.

Carter sets out in detail a kickback and prohibited referral scheme that would serve as a predicate for FCA violations if his allegations are true. Carter alleges how ESS and HCC incentive physicians to refer patients to inpatient care in exchange for significantly above-market pay. (Doc. 2 ¶¶ 13, 95-97; 100-02;116-127). He alleges that the referrals involved in the Defendants' business model do not fall within any of the exceptions to the Anti-Kickback Scheme and the Stark Law. (Doc. 2, ¶¶ 104, 111-15, 126). Carter alleges that he had personal knowledge of this arrangement from his time working with ESS and HCC as a COO and administrator at Memorial Hospital of Texas County in Guymon, Oklahoma. (Doc. 2, ¶ 127-34). The Complaint details how from October 2015 to September 2017, ESS physicians generate a vastly disproportionate amount of the inpatient admissions at MHTC. (Doc. 2, ¶¶ 132-33). He even gives specific examples of patients admitted to MHTC by ESS physicians who were paid month for each referral. (Doc. 2, ¶ 134). Thus, the Court concludes that Carter pleaded specific facts which establish a plausibility of entitlement to relief on all his federal causes of action (Counts 1 through 5) in accordance with the requirements of Rule 8(a)(2) and Rule 9(b).

**B.     The State Law Claims**

The Court next turns to Carter's state law claims, asserted against nine different states in Counts 6 through 15. "Absent allegations about how a state law differs from the FCA—which [Carter] has not pled here—courts interpret state false claims laws consistently with the FCA." *Health Choice All., LLC, on behalf of U.S. v. Eli Lilly & Co., Inc.*, No. 5:17-CV-123-RWS-CMC, 2018 WL 4026986, at *58 (E.D. Tex. July 25, 2018), *report and recommendation adopted*, No. 5:17-CV-123-RWS-CMC, 2018 WL 3802072 (E.D. Tex. Aug. 10, 2018) (citing *U.S. ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 537-38 (N.D. Tex. 2012), *aff'd* 858 F.3d 365, 373 (5th Cir. 2017) (dismissing both FCA and state law claims with prejudice concurrently when requirements of FCA were not met and no difference in state law was shown)).

*1.     Oklahoma State Law Claim: Count 14*

For the reasons discussed above, the Court also concludes that Carter has plead specific facts to establish a plausibility of entitlement to relief on his Oklahoma state-law false claims act claim under Rule 8(a)(2) and Rule 9(b). Carter alleges specific facts relating to the allegedly unlawful kickback and prohibited referral scheme that he believes Defendants perpetrated in at MHTC in Oklahoma, and specifically identifies claims submitted to Oklahoma's Medicare program that be believes were tainted by Anti-Kickback Statute and Stark Law violations. (Doc. 2, ¶¶ 127-34). Thus, the Court concludes that he has plausibly alleged that Defendants violated the Oklahoma False Claims Act, OKLA. STAT. tit. 63 § 5053.1(b).

*2.     Remaining State Law Claims: Counts 6-13, 15*

Finally, the Court concludes that Carter has failed to state a claim for the remaining state-law claims. While Carter has sufficiently alleged a fraudulent scheme to violate the Anti-Kickback Statute, the Stark Law, the FCA, and the Oklahoma False Claims Act, he has utterly failed to plead specific facts regarding the remainder of the state-law claims. First, Carter has neither alleged any

"details of an actually submitted false claim" nor alleged any "particular details of a scheme to submit false claims paired with a *reliable indicia* that lead to a strong inference" that false claims were submitted in any state other than Oklahoma. *U.S. ex rel. Grubbs*, 565 F.3d at 190 (emphasis added).

Carter makes only two non-conclusory statements about Defendants' activities in states other than Oklahoma in the entirety of his entire 63-page Complaint. First, he states that he "first encountered ESS while employed as an Administrator at Miners Colfax Medical Center in Raton, New Mexico—where ESS supplied Emergency Department physicians." (Doc. 2, ¶ 14). Second, he discusses an "ROI [return on investment] Assessment" Defendants conducted for Bradley County Medical Center in Warren, Arkansas that was included in ESS's marketing materials. (Doc. 2, ¶¶ 119-22). Carter discusses how the ROI Assessment detailed how ESS was able to boost hospital revenue by increasing admission, but does not indicate that he has any firsthand knowledge of Defendants' arrangement with Bradley County Medical Center. (Doc. 2, ¶¶ 120-122).

Beyond these limited references to states other than Oklahoma, Carter makes no non-conclusory allegations about any other state. He states that ESS operates in 50 client hospitals and operates in 12 states. (Doc. 2, ¶ 12). Beyond that, Carter merely states that "ESS operates in a violates the respective False Claims Acts and State Laws of the following states[,]" an proceeds to list the nine Plaintiff States and their respective laws that are analogous to the FCA. While Carter may have alleged a nationwide scheme of FCA violations predicated on Anti-Kickback Statute and Stark Law violations, he has provided no reliable indicia leading to a strong inference that Defendants submitted false claims in any state other than Oklahoma. *U.S. ex rel. Grubbs*, 656 F.3d 190; *see also U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 723 (N.D. Tex.

2011) (state claims dismissed because relator did not allege "any facts showing fraud" in those states or "any basis for such knowledge as would support such allegations"); *Health Choice All.*, 2018 WL 4026986, at *59 ("To meet [the] heightened [Rule 9(b)] pleading standard, Relator must allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings."). As such, the Court must conclude that Carter has failed to plead specific facts which establish a plausibility of entitlement to relief on his non-Oklahoma state-law claims (Claims 6-13, 15). As such, the Court **dismisses those claims without prejudice.**

    **C.**    **Relator's Request to Amend the Complaint**

In a single footnote to the last sentence of his response, Carter requests that, "should the Court find any deficiency in the Complaint, this Court should follow its own precedent, and well-settled Fifth Circuit precedent, and grant [Carter] leave to amend." (Doc. 54, pg. 31-32, n. 17). Carter did not amend his Complaint in response to the Motion to Dismiss as matter of course as allowed under the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 15 (a) (A party may amend its pleadings once as a matter of course "21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b) . . . whichever is earlier). Because Carter elected to respond to Defendants' Rule 12(b)(6) motion rather than amend his Complaint as a matter of course, he requires leave of Court or Defendants' written consent to do so. FED. R. CIV. P. 15(a)(2).

Rule 15 states that courts "should freely give leave when justice so requires." *Id.* However, "leave to amend under Rule 15 is by no means automatic." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003). Although Rule 15(a) favors granting leave to amend, the decision whether to grant or deny leave to amend a pleading is a matter within the district court's discretion. *See Thomas v. Chevron U.S.A., Inc.*, 832 F.3d 586, 590–91 (5th Cir. 2016). It is well established that a party seeking to amend a pleading under Rule 15(a) need not always file a formal motion; but

the party must "give the court some notice of the nature of his or her proposed amendments" and support the request for leave to amend with "some specificity" which is required. *Id.* at 590; *see U.S. ex rel. Willard*, 336 F.3d at 387 ("A formal motion is not always required, so long as the requesting party has set forth with particularity the grounds for the amendment and the relief sought."). A plaintiff that simply "tack[s] on a general curative amendment request" in response to a motion to dismiss does not provide a sufficient basis for why the court should grant leave. *Goldstein*, 340 F.3d at 254. "[A] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought, cf. FED. R. CIV. P. 7(b)—does not constitute a motion within the contemplation of Rule 15(a)." *U.S. ex rel. Willard*, 336 F.3d at 387(internal quotation omitted).

Carter's request for leave to amend, dropped in a footnote to the final sentence of his response, is the epitome of "a general curative amendment request." *See Goldstein*, 340 F.3d at 254. Carter provides no explanation for how he might cure the deficiencies raised by Defendants, such as whether there are additional facts that might remedy the pleading defects. *See id.* at 255 (holding that the district court properly exercised its discretion in denying leave to amend because plaintiffs "did not suggest in their responsive pleading any additional facts not initially pled that could, if necessary, cure the pleading defects").

The Fifth Circuit has "not provided strict guidelines as to what constitutes a sufficient request for leave to amend," but has stated that "it is clear that *some* specificity is required." *Thomas*, 832 F.3d at 590. The Fifth Circuit has previously held that a district court did not abuse its discretion in denying the plaintiffs leave to amend where, as here, the plaintiffs: (1) did not amend their complaint as a matter of right, (2) submitted a general curative request to amend their complaint in their response to the motion to dismiss, (3) did not submit a proposed amended

complaint to the court, and (4) failed to provide "some specificity" to the court and defendant of the substance of their proposed amendment. *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002). For those same reasons, the Court denies without prejudice Carter's request to amend his Complaint. *See id.*; *see also Goldstein*, 340 F.3d at 254-55 (affirming denial of motion for leave to amend where plaintiffs stated only that "Should this Court find that the Complaint is insufficient in any way, however, plaintiffs respectfully request leave to amend.").

However, if he so wishes, Carter may properly request leave to amend by filing a separate motion to amend that, in accordance with Fifth Circuit case law, sets forth with specificity and particularity the grounds for amendment and the relief sought. *See Thomas.*, 832 F.3d at 590; *U.S. ex rel. Willard*, 336 F.3d at 387. In accordance with the Local Rule 15.1, Carter must attach to any motion for leave to amend a copy of the proposed amended complaint. **Any such motion shall be filed with the Court no later than April 21, 2023, at 5:00 pm, central standard time.**

**At this time, Defendants' deadline to respond is stayed**. If Carter does not file a motion to amend, Defendants deadline to respond shall be either 14 days after the April 21, 2023—May 5, 2023. If Carter does move for leave to amend, Defendants' deadline to respond shall be governed by the Federal Rules of Civil Procedure.

## IV. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS IN PART AND DENIES IN PART** the Motion to Dismiss. (Doc. 44). The Court grants the Motion to Dismiss with respect to Counts 6, 7, 8, 9, 10, 11, 12, 13, and 15 and dismisses these claims without prejudice. The Court denies the Motion to Dismiss with respect to Counts 1, 2, 3, 4, 5, and 14. The Court denies without prejudice Carter's request for leave to file an amended complaint. Carter may properly move for leave to amend but must do so in accordance with Fifth Circuit case law and the Local Rules of

this Court. Defendants' deadline to respond is stayed. If Carter does not move for leave to amend, Defendants deadline to respond shall be May 5, 2023. If Carter does move for leave to amend, Defendants' deadline to respond shall be governed by the Federal Rules of Civil Procedure.

    **SO ORDERED:** March 31, 2023.

                                        Ada Brown
                                        UNITED STATES DISTRICT JUDGE