IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| and the State of OKLAHOMA, ex | § | |
| rel. MICHAEL CARTER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 3:19-cv-01238-E |
| | § | |
| EMERGENCY STAFFING | § | |
| SOLUTIONS, INC. and HOSPITAL | § | |
| CARE CONSULTANTS, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court in this qui tam action are four motions to exclude expert testimony (ECF Nos. 137, 140, 146 & 148)—which United States District Judge Ada Brown referred to the undersigned, *see* ECF No. 191. For the reasons and to the extent explained below, the Court **GRANTS in part** Relator's *Daubert* Motion to Exclude Todd Mello (ECF No. 137); **GRANTS in part** Relator's *Daubert* Motion to Exclude Defendants' Non-Retained Employees (ECF No. 140); **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Timothy Smith (ECF No. 146); and **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Jason Wells (ECF No. 148).

## Background[1]

Relator Michael Carter—a hospital administrator—alleges that Defendants Emergency Staffing Solutions, Inc. (ESS) and Hospital Care Consultants, Inc. (HCC) (collectively, "Defendants") violated (1) the Federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), and the Stark Law, 42 U.S.C. § 1395nn, by operating an illegal kickback scheme in which they incentivize physicians to refer and admit patients to inpatient care; and (2) the False Claims Act (FCA) and Oklahoma FCA, by causing hospitals to submit legally false Medicare and Medicaid claims by falsely certifying compliance with these laws, which constitute false claims under the FCA. *See generally* Compl., ECF No. 2.

As relevant to the pending motions, Carter contends that ESS uses a "Hybrid Program" where ESS-contracted physicians work both in the hospital's emergency department and as hospitalists, providing general care to patients that have been admitted to inpatient care. *Id.* ¶ 5. These physicians are paid an hourly rate of $100 per hour—which is commensurate with the fair market value for physicians employed in similar capacities and locations—as well as on a per-patient referral basis for each patient the physician admits to inpatient care in the hospital. *Id.* ¶ 5; ¶¶ 95-96. Relator alleges that the "Hybrid Program" violates the AKS and the Stark

---

[1] The background of this qui tam action is more thoroughly set forth in the Court's Memorandum Opinion and Order granting in part Defendants' motion to dismiss. *See* Mem. Op. & Order, ECF No. 62.

Law, causing ESS and the hospitals with whom ESS contracts to submit false Medicare claims in violation of the FCA. *Id.* ¶¶ 100-115.

Carter alleges that Defendants also pay their Hybrid Program physicians on a per-patient basis for individual tasks associated with inpatient care, $75 per round and $50 for discharges and transfer. *Id.* ¶¶ 95-96. He contends that this operation violates the AKS and the Stark Law because it incentivizes referrals for reasons other than medical necessity and it constitutes an improper referral to a health care provider with whom the referring physicians have financial relationships. *Id.* ¶¶ 100-115.

In addition, Carter alleges that ESS, through its alter-ego "sister company" HCC, also employs a "Hospitalist Program," in which Defendants collectively supply physicians to work exclusively as hospitalists who focus solely on admitting and caring for patients admitted to inpatient care. *Id.* ¶ 6. He alleges that ESS, through HCC, pays Hospitalist Program physicians illegal kickbacks based directly on the volume of patients those physicians admit to inpatient care. He asserts that Hospitalist Program physicians also receive an additional incentive to admit patients to inpatient care by being paid $50 per admission, transfer, or discharge, and $25 per round per patient per day. *Id.* ¶ 116. These payments are in addition to HCC-contracted hourly rates, and thus result in physicians receiving far above market pay if they admit more patients to inpatient care and thus have more patients to see during their rounds. *Id.* ¶¶ 117-18. Carter contends that this arrangement poisons the admitting physician's "gatekeeping" role by monetarily

3

incentivizing physicians to admit more patients to inpatient care than is necessary and violates the Stark Act because it involves prohibited referrals to designated health service providers with whom the referring physician has a financial relationship. *Id.* ¶¶ 118, 124-26.

The United States and all nine states named as plaintiffs declined to intervene. *See* Notice of Declination, ECF No. 24. Both the United States and Texas filed Statements of Interest clarifying that their declination to intervene is not a comment on the merits of this case. *See* ECF No. 50; ECF No. 52.

On March 31, 2023, the Court granted Defendants' Motion to Dismiss with respect to claims premised upon all state laws other than Oklahoma state law and denied the motion in all other respects. *See* Mem. Op. & Order, ECF No. 62. On May 5, 2023, Defendants filed their Answer asserting various affirmative defenses including, as relevant here, that Relator's claims are barred in whole or in part "by [AKS] safe harbors including, without limitation, the personal services management contracts and outcomes-based payment arrangements safe harbor" and "Stark Law safe harbors including, without limitation, the personal service arrangements, fair market value compensation, and limited remuneration safe harbors." Defs.' Ans. to Qui Tam Compl., Affirmative Defenses Nos. 13 and 14, ECF No. 63.

Defendants have filed a motion for summary judgment on all remaining claims—Counts 1, 2, 3, 4, 5 and 14—contending that "they did not violate the AKS, the Stark Law or the FCA and that there is no genuine dispute as to whether such

4

violations occurred." Defs.' Summ. J. Br. 13, ECF No. 135.[2] Carter has filed a motion for partial summary judgment with respect to Affirmative Defenses Nos. 13 and 14, asserting "that Defendants' conduct cannot qualify under its claimed [AKS] or Stark Law safe harbors." Pl.'s Summ. J. Br. 7, ECF No. 144. The summary judgment motions are pending before Judge Brown.

On May 15, 2024, Carter filed a motion to exclude expert testimony by Defendants' retained expert Todd Mello and a motion to exclude expert testimony by Defendants' non-retained employees (ECF Nos. 137 & 140). Defendants filed motions to exclude expert testimony by Carter's two retained experts, Timothy Smith and Jason Wells (ECF Nos. 146 & 148). These motions have been referred to the undersigned, *see* ECF No. 191, and are ripe for disposition.

## **Legal Standard**

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[2] Citations to the record and the parties' briefing refer to the CM/ECF page number at the top of each page rather than page numbers at the bottom of each filing.

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers and determine whether expert testimony should be presented to the jury. 509 U.S. 579, 590-93 (1993). Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590-91. A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Moreover, to be admissible, expert testimony must be "not only relevant but reliable." *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific

testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors. *Daubert*, 509 U.S. at 594. In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test." *Id.* at 593. As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152; *see also United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (The Court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it.") (citation omitted). Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to

the sound discretion of the district court. *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [trier of fact's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### Analysis

### A. Relator's *Daubert* Motion to Exclude Todd Mello (ECF No. 137)

Defendants retained Todd Mello, a healthcare professional with more than thirty years of healthcare valuation and transaction experience, (1) to prepare "retrospective fair market value (FMV) and commercial reasonableness (CR) opinions related to the payments" made to certain independent physicians contracted by Defendants "for the provision of emergency medicine and hospitalist services"; (2) to provide a rebuttal to certain contentions contained in the report of Carter's retained expert Timothy Smith; and (3) to "opine on Mr. Smith's conclusions that certain payments made by Defendants to Physicians were

intended to induce referrals." *See* Defs.' App. to Resp. to *Daubert* Mot. to Exclude Todd Mello ("Defs.' Resp. App."), Ex. A (Report of Todd Mello), ECF No. 162 at 5-6. Mello opines that Defendants' payments did not exceed FMV and were commercially reasonable; that the "incentive" compensation did not exceed market levels; and that Defendants' client hospitals did not achieve admission rates that were materially higher than national rates. *Id.*, Ex. A (Report of Todd Mello), ECF No. 162 at 10-18.

Carter contends that Defendants retained Mello "to perform an *ex post facto* data analysis in a transparent attempt to shoehorn their illegal 'incentive' compensation scheme into safe harbors under the AKS and Stark law," but that Mello does not meet the qualification and relevance standards under Federal Rule of Evidence 702 or *Daubert*. Relator's Mem. in Support of *Daubert* Mot. to Exclude Todd Mello ("Relator's Br.") 5, ECF No. 138. He moves the Court to "exercise its gatekeeping function under *Daubert*" and exclude Mello's opinions on the grounds that he: (i) lacks sufficient facts or data; (ii) relies upon benchmark data that is impermissible according to guidelines for the Centers for Medicare and Medicaid (CMS); and (iii) admitted Defendants' compensation structure takes into account the volume of referrals, which precludes application of any AKS or Stark safe harbors as a matter of law, rendering his opinion completely irrelevant and prejudicial. *Id.*

The Court addresses Carter's arguments in turn.

### 1. *Mello's opinions related to the Hybrid Program (but not the Hospitalist Program) are based on sufficient facts and data.*

Carter moves to exclude Mello's opinions on the grounds that his opinions are based on insufficient facts and data. *See* Relator's Br. 15-21. He argues that Mello makes broad conclusions about Defendants' overall operation despite only analyzing eight client hospitals in Oklahoma (and lacking data on certain of those eight hospitals) and the corresponding physicians at those client hospitals, instead of Defendants' approximately 53 client hospitals nationwide. *See id.* Carter also contends that Defendants revealed for the first time after disclosing Mello's report that they also contracted with Eastern Oklahoma Medical Center (Poteau) and produced over 1100 pages of new documents on April 26, 2024, over 18 months after they were initially requested and after Defendants represented that they had produced all of the relevant materials. As such, none of this data was considered by Mello, bringing his FMV opinion to include just 5 of 9 hospitals in Oklahoma (and 5 out of 52-53 total). *See id.* at 18-19.

In addition, Carter notes that "Mello excluded the Hospitalist Program from his evaluation, and he could not identify which client hospitals utilized the Hybrid Program as compared to the Hospitalist Program." *Id.* at 17. He requests that, "[a]t minimum, Mello should be precluded from offering any opinion regarding the Hospitalist Program client hospitals that were, according to his own admissions, outside of his analysis." *Id.*

In response, Defendants assert that Carter's "arguments are based on an incorrect assessment of the scope of Mello's opinions." Defs.' Resp. and Br. in Opp. to Relator's *Daubert* Mot. to Exclude Todd Mello ("Defs.' Resp. Br.") 11, ECF No. 161. They note that, "based on Mello's report and deposition testimony, Mello limited his analysis and resulting opinions to specific hospital locations and physicians for which he had available data." *Id.* at 11. And, Defendants point out, "Mello is not offering an opinion about *all* of Defendants' payments at *all* client hospitals. *Id.* at 12-13 (original emphasis). Additionally, Defendants contend that

> Mello limiting the data analysis to Defendants' client hospitals in Oklahoma is logical—not cherry-picking as claimed by Relator— because the Court previously ruled that Relator only stated a claim upon which relief may be granted as to an alleged scheme in *Oklahoma* and the Court expressly limited the scope of discovery in this case to *Oklahoma* hospitals."

*Id.* at 11-12 (original emphasis).

Among the conditions imposed by the Federal Rules of Evidence on the admissibility of expert opinion testimony is that the testimony be "based on sufficient facts or data." Fed. R. Evid. 702(b). Under the framework explained in *Daubert*, "Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant." Johnson, 685 F.3d at 459 (internal quotation marks and citation omitted). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 355 (5th Cir. 2007) (internal quotation

marks and citation omitted). An opinion based on "insufficient, erroneous information" fails the reliability standard. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (affirming exclusion of expert opinion that relied on false assumptions rebutted by undisputed record evidence). Although the *Daubert* reliability analysis is flexible and the proponent of the expert evidence need not satisfy every one of its factors, *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004), "the existence of sufficient facts and a reliable methodology is in all instances mandatory," *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).

Generally, the "fact-finder is entitled to hear [an expert's] testimony and decide whether . . . the predicate facts on which [the expert] relied are accurate." *Pipitone*, 288 F.3d at 250. But expert testimony that relies on "completely unsubstantiated factual assertions" is inadmissible. *Hathaway*, 507 F.3d at 319 n.4. When an expert's testimony is "not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's] position," the trial court should exclude it. *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996).

Here, following a review of Mello's expert report and deposition testimony, the parties' arguments, the record, and applicable law, the Court agrees with Defendants that, with respect to Hybrid Program client hospitals, Mello's opinions are based on sufficient facts and data. Mello's report and deposition testimony make clear that he limited his analysis and resulting opinions to specific hospital locations and physicians for which he had available data. *See* Defs.' Resp. App., Ex.

A (Report of Todd Mello), ECF No. 162 at 7 ("Per direction from Counsel, I have focused my opinion on the following facilities located in Oklahoma"); *id.*, Ex. A (Report of Todd Mello), ECF No. 162 at 11 ("Where data was incomplete or unavailable, I excluded the location or provider from the specific analysis."); *see also id.*, Ex. B (Mello Dep. Tr., 216:7-10; 217:1-4; 222:19-23), ECF No. 162 at 155-57.

Further, the Court previously ruled "that Carter has failed to plead specific facts which establish a plausibility of entitlement to relief on his non-Oklahoma state-law claims (Claims 6-13, 15) [and] dismissed those claims without prejudice." *See* Mem. Op. & Order 15, ECF No. 62. The Court also expressly limited the "geographic scope of permissible discovery . . . to the State of Oklahoma, unless otherwise agreed by the parties in writing or otherwise ordered by the court." Order 2, ECF No. 93. Thus, Mello's focus on data from Oklahoma hospitals comports with the Court's prior orders and is certainly not a basis to conclude that his opinions are based on insufficient facts and data.

Further, Mello's FMV analysis is limited to the physicians listed in his expert report, and his admission-to-visit ratio analysis is limited to Defendants' client hospitals in Oklahoma for which he had the data. *See* Defs.' Resp. App., Ex. B (Mello Dep. Tr., 176:9-20; 176:25–177:7), ECF No. 162 at 125-26. In addition, Mello testified at his deposition that he had sufficient data to do his analysis—*see id.*, Ex. B (Mello Dep. Tr., 181:17–182:12), ECF No. 162 at 129-30—and Carter has failed to persuade the Court otherwise.

Finally, the cases upon which Carter relies to support his arguments are distinguishable. First, his reliance upon *Jacked Up, LLC v. Sara Lee Corp.* is misplaced. *See* Relator's Br. 20 (citing *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 804 (N.D. Tex. 2018), *aff'd*, 2018 WL 2064126 (N.D. Tex. May 2, 2018)). *Jacked Up* concerned Sara Lee's challenge to Jacked Up's lost profits expert who relied solely on pro forma projections—not actual revenue data—and he specifically chose to base his opinions on one of the more aggressive projections, while excluding from his consideration other pro formas. *Id.* at 804-805. He also failed to conduct an analysis about the validity or reasonableness of the projection upon which he relied. *Id.* The court concluded that Jacked Up's lost profits expert's damages testimony was inadmissible under Federal Rule of Evidence 702 because "Jacked Up failed to establish a factual basis" for its expert's assumptions. *Id.* at 810. Here, by contrast, Mello relies on actual data (not projections) and limits his opinions to the hospitals and physicians for which he has sufficient data. *See* Defs.' Resp. App., Ex. A (Report of Todd Mello), ECF No. 162 at 11 ("Where data was incomplete or unavailable, I excluded the location or provider from the specific analysis."); *see also id.*, Ex. B (Mello Dep. Tr., 216:7-10; 217:1-4; 222:19-23), ECF No. 162 at 155-57.

*Breaud v. Werner Enters., Inc.*, upon which Carter relies to support his contention that Mello examined only a one-sided view of the data to render an opinion, is inapposite. 2006 WL 8432363 (M.D. La. Mar. 20, 2006). In *Breaud*, while there were no measurements or data collected at the scene of an automobile

accident, the expert reviewed photographs to "arbitrarily" decide "that the 18-wheeler traveled ten feet before striking a utility trailer." *Id.* at *2. The expert then used this unreliable figure as a foundation for his other calculations. *Id.* The district court excluded his causation opinion as "not based on sufficient facts or data." *Id.* Here, Mello declines to speculate or proffer opinions when lacking data. *See* Defs.' Resp. App., Ex. A (Report of Todd Mello), ECF No. 162 at 11 ("Where data was incomplete or unavailable, I excluded the location or provider from the specific analysis."); *see also id.*, Ex. B (Mello Dep. Tr., 216:7-10; 217:1-4; 222:19-23), ECF No. 162 at 155-57.

On this record, the Court finds that Mello's opinions concerning Hybrid Program client hospitals are (i) limited to the appropriate geographical scope of relevance; (ii) limited to the appropriate scope when necessitated by the availability of data (or lack thereof); and (iii) are based on sound data. Carter may attack this testimony through cross-examination and presentation of contrary evidence. *See, e.g.*, *Daubert*, 509 U.S. at 596; *Pipitone*, 288 F.3d at 250.

The Court agrees with Carter, however, that "Mello should be precluded from offering any opinion regarding the Hospitalist Program client hospitals that were, according to his own admissions, outside of his analysis." Relator's Br. 17. At his deposition, Mello declined to offer any opinions on the Hospitalist Program, stating that his "main focus was on the hybrid program." *See* Defs.' Resp. App., Ex.

B (Mello Dep. Tr., 110:18-25; 111:1-14), ECF No. 162 at 106-07.[3] Thus, Mello's opinions related to the Hospitalist Program—to the extent Mello has formed such opinions—are excluded as not based on sufficient facts and data.

### 2. Mello's FMV opinion about physician pay is not based on unreliable methodology.

Carter argues that Mello's methodology is unreliable because "official commentary from [CMS] 'preclude[s]' Mello from relying upon the very benchmark data he used to opine that Defendants' compensation is consistent with FMV." Relator's Br. 21. In response, Defendants contend that "Mello's [FMV] opinions should not be rendered inadmissible under *Daubert* due to the claimed 'precluded reliance doctrine.'" Defs.' Resp. Br. 17. A brief understanding of the Stark Law, its safe-harbor provisions, and CMS guidance is required to understand and resolve Carter's challenge.

Generally, the Stark Law prohibits doctors from referring Medicare patients to an entity for "designated health services" when the doctors have a financial relationship with the entity, and further prohibits that entity from presenting claims for payment to Medicare for any medical services it rendered to such patients. 42 U.S.C. § 1395nn(a)(1). Because compliance with the Stark Law is a

---

[3] Defendants argue that Mello was merely "mistaken" in responding to Relator's counsel's line of questioning at Mello's deposition, and they attempt to persuade the Court that, based on his report, Mello should be permitted to provide opinions concerning the Hospitalist Program client hospitals, notwithstanding his deposition testimony. *See* Defs.' Resp. Br. 13. The Court rejects Defendants' argument, as nothing in Mello's expert report convinces the Court that it should disregard his deposition testimony.

condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes may be "false or fraudulent" for purposes of the FCA. *See United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 902 (5th Cir. 1997); U.S. ex rel. Parikh v. Citizens Med. Ctr., 977 F. Supp. 2d 654, 663 (S.D. Tex. 2013).*

As previously explained, Defendants assert in their Answer that "Relator's claims are barred in whole or in part by Stark Law safe harbors including, the personal service arrangements, fair market value compensation, and limited remuneration safe harbors." *See* Defs.' Ans. to Qui Tam Compl., Aff. Defense No. 14, ECF No. 63. Each of these safe harbors requires that the physician's compensation cannot be "determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician." *See* 42 C.F.R. § 411.357(d) (personal service arrangement safe harbor); 42 C.F.R. § 411.357(l) (fair market value compensation safe harbor); 42 C.F.R. § 411.357(z) (limited remuneration to a physician safe harbor).

CMS's most recent regulations, published in 2020, further emphasize earlier regulations that FMV cannot be determined by reliance on data that involve entities and physicians in a position to refer business to each other. *See Medicare Program: Modernizing and Clarifying the Physician Self-Referral Regulations*, 85 Fed. Reg. 77492, 77555 (Dec. 2, 2020).

One of the critical issues to be determined at trial in this matter is whether the compensation arrangements alleged in the Complaint fall within the scope of the safe harbor exceptions to Stark, including the fair market value exception, 42 C.F.R. § 411.357(l). The statutory definition of "fair market value" is "the value in arms[-]length transactions, consistent with the general market value, . . ." 42 U.S.C. § 1395nn(h)(3). Regulations provide that

> Fair market value means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the time of the service agreement . . . .

42 C.F.R. § 411.351. CMS guidelines also state that, "[u]ltimately, fair market value is determined based on facts and circumstances. The appropriate method will depend on the nature of the transaction, its location, and other factors. Because the statute covers a broad range of transactions, we cannot comment definitively on particular valuation methodologies." *Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase III)*, 72 Fed. Reg. 51012, 51015-51016 (Sept. 5, 2007).

In Mello's expert report, he prepared "retrospective fair market value (FMV) and commercial reasonableness (CR) opinions related to the payments" made to certain independent physicians contracted by Defendants "for the provision of

emergency medicine and hospitalist services." *See* Defs.' Resp. App., Ex. A (Report of Todd Mello), ECF No. 162 at 5-6. Mello opines, *inter alia*, that Defendants' payments did not exceed FMV and were commercially reasonable. *Id.*, Ex. A (Report of Todd Mello), ECF No. 162 at 10-18. He bases his conclusions on his review of the data and on his "more than thirty years of healthcare valuation and transaction experience" during which time he has provided hundreds of FMV opinions in various contexts, "including compensation/services arrangements exclusively to the healthcare and life science industries in both a transaction/compliance support role, as well as a litigation setting." *Id.*, Ex. A (Report of Todd Mello), ECF No. 162 at 5-6. Mello compared Defendants' compensation data to three national "benchmark" datasets. *Id.*, Ex. A (Report of Todd Mello), ECF No. 162 at 13. Upon questioning by Carter's counsel, Mello agreed that the "benchmark" data from nationwide physician compensation surveys upon which he relied to calculate FMV included data from physicians and entities in a position to refer business to one another, and he did nothing to cull out this data in his FMV analysis. *Id.*, Ex. B (Mello Dep. Tr., 192:16–193:19; 196:15–199:25), ECF No. 162 at 138, 141-44.

Mello testified that he did not review guidance from CMS in performing his FMV analysis, and instead made his calculation based on his "experience." *Id.*, Ex. B (Mello Dep. Tr., 188:18–189:5; 196:2-7), ECF No. 162 at 134-35, 141. He testified that he did not re-read the CMS guidance, but he performed his FMV analysis

19

"consistently with the way [he has] for the past thirty years." *Id.*, Ex. B (Mello Dep. Tr., 196:2-7), ECF No. 162 at 141.

Relying on CMS commentary, *supra*, Carter contends that the "precluded reliance doctrine" prevents Mello from offering a reliable FMV opinion about physician pay by using data from nationwide physician compensation surveys because it may contain data points from entities and physicians in a position to refer or generate business. *See* Relator's Br. 21-25. In response, Defendants argue, among other things, that Carter "cites no case law or rule to support his argument [but only CMS commentary]" and, CMS re-affirmed in 2020 that its comments about not relying on certain data is dependent on the circumstances and is merely a "important program integrity safeguard." Defs.' Resp. Br. 20 (citing 85 Fed. Reg. 77555 (Dec. 2, 2020)). Defendants maintain that "[g]iven the nature of this case and the required post-facto analysis many years later, the only available and reliable data are physician compensation surveys." *Id.* at 20-21. They also state that "the specific data that Relator contends Mello must exclude from the compensation surveys is impractical and impossible given the limitations of physician surveys." *Id.* at 21. They assert that "[r]egardless of whether the data is perfect, Mello testified that these compensation surveys are relied on in opinions day-in and day-out by valuation experts, including Relator's expert, Timothy Smith, when he issues fair market value opinions. Accordingly, the data Mello uses are industry-standard tools that appraisers use to analyze fair market value of physician compensation and it is relied upon in the industry." *Id.* at 21-22.

Defendants also maintain that "CMS'[s] advice cannot be construed as a legal doctrine that prevents a healthcare valuation expert from using industry standard data to determine whether payments were in excess of fair market value." *Id.* at 20.

Here, following a review of Mello's expert report and deposition testimony, the parties' arguments, the record, and applicable law, the Court finds that, although Mello included data from physicians and entities in a position to refer business to one another in reaching his opinions (contrary to CMS guidelines), this is not a basis to exclude his testimony. This ruling is based on well-established precedent indicating that, with respect to non-scientific expert testimony, the "relevant reliability inquiry concerns may focus upon personal knowledge or experience," rather than a testable methodology. *Kumho,* 526 U.S. at 150-52. Mello's experienced discussion of standards and practices in the health care industry, and use of benchmarks commonly used in the industry, may prove helpful to the average juror, even if he does not follow CMS guidelines. The Court is also mindful that CMS guidelines recognize that "[u]ltimately, fair market value is determined based on facts and circumstances. The appropriate method will depend on the nature of the transaction, its location, and other factors. Because the statute covers a broad range of transactions, we cannot comment definitively on particular valuation methodologies." *Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase III),* 72 Fed. Reg. 51012, 51015-51016 (Sept. 5, 2007).

Further, if Carter questions Mello's chosen methodology or the opinions reached, he should vigorously cross-examine Mello at trial and/or present contrary evidence. *See Daubert,* 509 U.S. at 596. Finally, Defendants have asserted affirmative defenses related to these safe harbors under the Stark Law, and it is improper to have a *Daubert* challenge transformed into a trial on the merits. *See, e.g., Pipitone,* 288 F.3d at 250 ("[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits.").

### 3. Mello's opinions about FMV and admissions rates are relevant.

Carter contends that "Mello's *ex post facto* analysis of Defendants' finite data is not relevant to the facts of this case." Relator's Br. 26. According to Carter,

> Mello did not perform any analysis or evaluation of the core issue in this case regarding the compensation structure in Defendants' contracts with its physicians that set forth cash "incentives" for admissions—a structure he had never witnessed in his 34 years of experience. Neither did Mello come to any conclusions regarding whether Defendants' compensation is compliant with AKS or Stark law, or whether the compensation met the requirements for the safe harbors to the prohibitions in those statutes.

*Id.* In opposition, Defendants argue that Mello's opinion regarding "FMV and admissions rates is highly relevant." Defs.' Resp. Br. 22. The Court agrees.

In the Complaint, Carter alleges that: 1) Defendants paid far in excess of fair market value to its physicians; 2) Defendants' productivity incentive payments amounted to a significant portion of the total pay; and 3) Defendants' physicians

admitted a statistically significant higher percentage of patients to the client hospitals as compared to national average. *See* Compl. ¶¶ 101, 130.

Given the nature of the factual allegations and claims asserted in this case, the Court finds that Mello's opinions on the FMV of Defendants' physician compensation and the national admission averages are relevant, as is his conclusion that Defendants' productivity incentive payments to physicians "were not intended to produce referrals." Defs.' Resp. Br. 23.

In addition, the Court rejects Carter's contention that Mello's opinions are not relevant because he does not come to conclusions regarding legal compliance with Stark or AKS, or whether the compensation met the requirements for the relevant safe harbors. The Court agrees with Defendants that "Mello expressing legal opinions would be wholly improper, as he is not an attorney." *See* Defs.' Resp. Br. 24-25.

For these reasons, the Court **GRANTS** Relator's *Daubert* motion with respect to any expert opinions by Mello concerning the Hospitalist Program and **DENIES** the motion in all other respects. Mello is precluded from offering any expert opinions or testifying regarding the Hospitalist Program but may offer expert opinions and testimony concerning the Hybrid Program.

### B. Relator's *Daubert* Motion to Exclude Defendants' Non-Retained Employees (ECF No. 140)

Carter moves to exclude the expert testimony of Defendants' non-retained experts, Dr. Ficklen, Tracy Campos, and Shonda Rupe. *See* Relator's *Daubert* Mot. 1-2.

### 1. *Dr. Ficklen*

Defendants designated Dr. Ficklen as an expert to testify about "CMS inpatient admission policies and guidelines and the efforts of Defendants to ensure physician compliance with same" and to testify that "Defendants' inpatient encounter compensation does not serve to induce an increase in patient referrals or admissions by physicians." *See* Defs.' App. to Resp. to Relator's *Daubert* Mot. to Exclude Defs.' Non-Retained Witnesses ("Defs.' Resp. App."), Ex. A (Defs.' Desig. of Expert Witnesses), ECF No. 158 at 4-5.

Carter moves to exclude Dr. Ficklen's expert testimony at trial, contending he is unqualified in light of his deposition testimony that he was not aware Defendants had designated him as an expert and that he had no expertise in the areas for which he had been designated. *See* Relator's Mem. in Support of *Daubert* Mot. to Exclude Defs.' Non-Retained Witnesses ("Relator's Br.") 16-17, ECF No. 141.

In response, Defendants "agree to de-designate Ficklen as an expert witness," but reserve the right to call him as a fact witness. Defs.' Resp. to Relator's *Daubert* Mot. to Exclude Non-Retained Witnesses ("Defs.' Resp. Br.") 4, ECF No. 157. Accordingly, Carter's motion to exclude Dr. Ficklen as an expert witness is **DENIED as moot**.

### 2. *Ms. Campos*

Ms. Campos, ESS's Chief Nursing Officer (CNO), is expected to offer expert testimony concerning "CMS inpatient admission policies and guidelines and the efforts of Defendants to ensure physician compliance with same." *See* Defs.' Resp. App., Ex. A (Defs.' Desig. of Expert Witnesses), ECF No. 158 at 4.

Carter contends that Ms. Campos should not be permitted to testify as an expert at trial because she "has no qualifications that render her an expert, and her testimony cannot satisfy the reliability standards imposed by Rule 702 and *Daubert*, either." Relator's Br. 17. In response, Defendants assert that Ms. Campos is qualified as an expert based on ten years of performing her duties, including "educating physicians and nurses on CMS guidelines for admission[,]" and that her opinions are "reliable." Defs.' Resp. Br. 4-6. Further, Defendants contend that

> part of Campos' role was to train Defendants' physicians on CMS inpatient admission guidelines to ensure all appropriate patients were admitted. These opinions are relevant to the case at hand as it illustrates Defendants' true method of helping their client hospitals maximize their appropriate admissions, which is diametrically opposed to Relator's claims that Defendants incentivized and encouraged physicians to improperly admit patients.

*Id.* at 6.

The trial judge must—as a threshold matter—determine whether the proffered witness is qualified to give the expert opinion she seeks to express. *Kumho,* 526 U.S. at 156; *Daubert,* 509 U.S. at 588. The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that

it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

The Court has carefully reviewed the parties' contentions and Ms. Campos's deposition testimony, using the *Daubert* rubric, and concludes that Defendants have fallen short of meeting their burden of showing Ms. Campos is qualified as an expert regarding CMS inpatient admissions criteria and ensuring physician compliance with those criteria. Ms. Campos testified at her deposition that she is a registered nurse in Texas and California. App. to Relator's Mot. for Partial Summ. J., Ex. E (Campos Dep. Tr. 46:1-9), ECF No. 145 at 398. She attained an associate's degree in nursing from San Antonio College and a bachelor's degree from Prairie View A&M. *Id.*, Ex. E (Campos Dep. Tr. 45:15-25), ECF No. 145 at 397. However, she does not have a formal degree of specialty in CMS compliance, *id.*, Ex. E (Campos Dep. Tr. 46:17-20), ECF No. 145 at 398, and she did not testify that she took any courses—in nursing school or later—related to CMS inpatient admissions criteria. Rather, her educational efforts related to compliance are limited to HIPAA and EMTALA compliance. *Id.*, Ex. E (Campos Dep. Tr. 47:1-8), ECF No. 145 at 398.

Following nursing school in 1998, Ms. Campos went to work at Conroe Regional Hospital as a floor nurse. *Id.*, Ex. E (Campos Dep. Tr. 44:4-25), ECF No. 145 at 397. Over the next decade, she worked her way up the ranks as a nurse at Conroe Regional Hospital until she became the "Medical/Surgical Director." *Id.* In none of these roles, however, did she perform any duties specific to "compliance" generally—much less ensuring physician compliance with CMS inpatient

admissions criteria. *Id.*, Ex. E (Campos Dep. Tr. 45:1-4), ECF No. 145 at 397. After she left Conroe Regional Hospital, Ms. Campos worked as an ER director at a hospital in Huntsville. *Id.*, Ex. E (Campos Dep. Tr. 43:1-2), ECF No. 145 at 397. Her duties there included scheduling nursing staff, education, and "ensuring equipment is appropriate." *Id.*, Ex. E (Campos Dep. Tr. 43:11-12), ECF No. 145 at 397. But again, she did not have any role that involved "teaching people about [ ] compliance issues" generally or CMS compliance specifically. *Id.*, Ex. E (Campos Dep. Tr. 43:19-44:1), ECF No. 145 at 397. She was hired as CNO for ESS in 2014. *Id.*, Ex. E (Campos Dep. Tr. 41:3-4), ECF No. 145 at 395.

And while Defendants point to Ms. Campos's ten years of experience as CNO and her various job duties, they have failed to meet their burden of demonstrating how she has the requisite education, experience, skill, or training to testify to CMS inpatient admission policies and ensuring physician compliance with those policies. Although Ms. Campos is a member of Defendants' compliance department, she testified at her deposition that her role there requires her to "[e]nsur[e] staff and physicians, specifically the nursing staff, have EMTALA and HIPAA training." *Id.*, Ex. E (Campos Dep. Tr. 54:1-8), ECF No. 145 at 263. Ms. Campos testified that she is tasked with ensuring that the nursing staff was properly trained in emergency room care procedures and patient privacy and confidentiality. *Id.*, Ex. E (Campos Dep. Tr. 54:9–55:15), ECF No. 145 at 263. From what the Court can discern, based on her deposition testimony, Ms. Campos's role in Defendants' compliance department does not involve any direct physician-level

training on any topic. *Id.*, Ex. E (Campos Dep. Tr. 55:16-22), ECF No. 145 at 263. Otherwise stated, after careful review of the parties' briefing and record, it is not evident to the Court that Ms. Campos's position in Defendants' compliance department or her tasks, without more, render her qualified to testify about physician compliance with CMS policies and criteria for admissions. Absent the required assurances as to reliability, which are lacking, the Court will not allow Ms. Campos to testify as an expert concerning CMS inpatient admission policies and guidelines and physician compliance with those criteria.

Accordingly, Carter's motion to exclude Ms. Campos's expert testimony is **GRANTED**.[4]

### 3. Ms. Rupe

Defendants offer Ms. Rupe to testify about various issues concerning physician compensation at Defendants' client hospitals, including, *inter alia*, her opinions that "the volume of patient referrals has no bearing on the inpatient encounter compensation paid by Defendants to physicians," that "Defendants do not compensate physicians for patient referrals," and that "Defendants do not incentivize physicians based on patient referrals or based on admission volume thresholds." Defs.' Resp. App., Ex. A (Defs.' Desig. of Expert Witnesses), ECF No. 158 at 4.

---

[4] Defendants contend that Ms. Campos should be entitled to testify at trial as a "key fact witness." Defs.' Resp. Br. 9, ECF No. 157. But Carter's motion did not address this issue, and the Court does not address it here.

Carter moves to exclude Ms. Rupe's expert testimony contending that she cannot opine on intent, that she is unqualified, that Defendants fail to explain how she applied any methodology to the facts at issue to arrive at her opinions, as required to meet their burden under Rule 702, and that, as a part-owner of Defendants' businesses, she has a financial incentive in the litigation which undermines the reliability of her opinions. Relator's Br. 21-29. Defendants provide no argument in response to Defendants' assertion that Ms. Rupe's financial interest in the litigation disqualifies her as an expert.

After reviewing the parties' briefing and Ms. Rupe's deposition testimony, the Court finds she has a direct financial interest and personal stake in the litigation which fatally undermines the reliability of her testimony and precludes her from testifying as an expert. Among other things, Ms. Rupe testified at her deposition that she is the Chief Operating Officer for ESS and HCC. App. to Relator's Mot. for Partial Summ. J., Ex. A (Rupe Dep. Tr. 8:8-18), ECF No. 145 at 5. And she is a "part-owner" in HCC. *Id.*, Ex. A (Rupe Dep. Tr. 14:16-17), ECF No. 145 at 7. Not only does she earn a salary as COO—which includes a "commission structure component"—she receives compensation in the form of a distribution from her ownership in HCC. *Id.*, Ex. A (Rupe Dep. Tr. 14:5-7), ECF No. 145 at 7. That is, "[i]f HCC makes a profit, [she] receive[s] a distribution. *Id.*, Ex. A (Rupe Dep. Tr. 14:10-11), ECF No. 145 at 7.

As succinctly stated by one district court:

[C]ourts of this country draw a line where the expert's incentive structure crosses the threshold from an *indirect incentive* to reach a certain conclusion to a *direct financial interest* in doing so. Once the expert obtains a direct financial interest in the outcome of the litigation (whether by his or her status as a party, by contingency fee agreement, or otherwise), any semblance of independence or promise of intellectual rigor that normally adheres to an expert witness is fatally wounded. Under those rare circumstances, the conflict of interest is so great, and raises so many serious questions about the integrity of [the] expert testimony, that to admit the conflicted testimony would violate public policy.

*Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452, at *4 (C.D. Cal. Oct. 31, 2014) (internal citations and quotations omitted) (original emphasis).

While Ms. Rupe's financial interest and personal stake in this litigation could possibly be addressed on cross-examination, here, Defendants' opposition fails to even respond to Carter's argument or address Ms. Rupe's financial interest and whether her testimony is reliable in the face of her part-ownership. In light of Defendants' silence on this issue, which may be understood as a tacit acknowledgment of Ms. Rupe's substantial financial interest in the outcome of this litigation, the Court finds Ms. Rupe's financial interest "creates an inherent bias that also would undermine the reliability of her testimony." *See Accrued Fin. Svcs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002) (Testimony from experts who have a direct financial stake in the outcome of litigation is "against public policy . . . ."); *see also Hoke v. Anderson*, 2019 WL 2128631, at *4 (W.D. Tex. May 15, 2019) (designated expert's status as a party rendered testimony unreliable).

Accordingly, Carter's motion to exclude Ms. Rupe's expert testimony is

**GRANTED**.[5]

### C. Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Timothy Smith (ECF No. 146)

Carter retained Smith to evaluate the structure of the compensation Defendants paid to physicians with whom they contracted to provide emergency medicine and hospitalist services to certain hospitals and "to evaluate the compensation models in terms of their economic functioning and incentives as well as to assess them relative to common industry norms and practices for physicians providing these types of services." *See* Relator's App. to Resp. in Opp. to Defs.' *Daubert* Mot. to Exclude Timothy Smith ("Relator's Resp. App."), Ex. B (Report of Timothy Smith), ECF No. 153 at 11. Smith's evaluation "also included consideration of certain compliance concerns with the compensation structure." *Id.*, Ex. B (Report of Timothy Smith), ECF No. 153 at 11. Smith does not offer any legal opinions on any ultimate issues of whether Defendants' alleged schemes complied with the AKS, Stark Law, or FCA, and he does not offer any opinions on Defendants' subjective intent. *See id.* Smith issued the following opinions "based on documentation and information provided to [him] by counsel and publicly available sources[,] [and] relied on [his] 29 years of experience in the healthcare industry":

---

[5] As with Ms. Campos, Defendants contend that Ms. Rupe should be entitled to testify at trial as a "key fact witness." Defs.' Resp. Br. 9, ECF No. 157. Again, because Carter's motion did not address this issue, the Court does not address it here.

- Opinion 1: The hourly pay rate and base salary structure provided a base level of compensation to the physicians providing emergency medicine and hospitalist services for whatever work they performed during a work shift at the hospital.

- Opinion 2: The ESS and HCC physician agreements included a compensation penalty for failure to complete medical records documentation on a timely basis or for failing to work a scheduled shift.

- Opinion 3: In general, the only form of incentive compensation made available to the ESS and HCC physicians working for the hybrid or hospitalist programs was based on the volume of hospital admissions.

- Opinion 4: ESS/HCC's incentive compensation for physicians in the hybrid program focused on production incentives measured only in terms of hospital admissions and not the full scope of physician productivity and workload.

- Opinion 5: ESS's and HCC's incentive compensation was not tied to performance measures of clinical quality despite the company's risk of reduced reimbursement on professional fees for failure to meet Medicare's value-based payment programs.

- Opinion 6: ESS's and HCC's incentive compensation plans did not reward the specific quality measures of timely and accurate completion of medical record documentation, while they did include a penalty for failure in this area.

- Opinion 7: ESS and HCC created a financial incentive for hospital admissions that did not include measurement of appropriate clinical decision-making, despite marketing its hybrid program as increasing admissions due to appropriate clinical decision-making.

- Opinion 8: ESS and HCC stood to gain financially from increased and sustained admission numbers by marketing these results to hospital clients.

- Opinion 9: ESS's hybrid program did not include an important two-physician review safeguard that served to mitigate the impact of the financial incentives for admissions at hospitals.

- Opinion 10: ESS and HCC did not enact compliance program safeguards to mitigate and correct the financial incentive for hospital admissions in the

hybrid and hospitalist programs, despite the risks associated with compensating physicians for admissions.

*Id.*, Ex. B (Report of Timothy Smith), ECF No. 153 at 16-17.

Defendants request that the Court strike Relator's expert designation of Smith and exclude him from testifying at trial because his "opinions are not relevant or probative to any fact issues" in this case. Defs.' Mot. to Strike 22. They also argue that Smith's opinions are unreliable given his lack of experience in the rural healthcare industry and his failure to engage in quantitative analysis or use any methodology for which Defendants can test his opinions. *Id.* at 23-24. The Court addresses these arguments in turn.

### 1. *Smith's opinions meet Daubert's relevance threshold.*

Defendants contend Smith's opinions are irrelevant for a panoply of reasons, including that Smith does not arrive at any ultimate legal conclusions regarding the elements of Carter's claims; that Smith's opinions are only "academic" regarding what measures Defendants did not take; and that he failed to perform a FMV analysis or quantitative assessment of Defendants' admissions rates. *Id.* at 10-22. They argue that "[i]nstead of answering th[e] crucial question about what historically occurred at Defendants' client hospitals at issue in this case, Smith's opinions amount to worthless conjecture about his subjective perception of *risk* with Defendants' productivity incentive compensation model and his opinions on all the things Defendants theoretically could have done instead." *Id.* at 22 (original emphasis). They further contend that, even if relevant, the Court should exclude

his opinions because "the probative value is substantially outweighed by the danger of confusing the issues or misleading the jury." *Id.* at 10 (quoting Fed. R. Evid. 403).

After carefully reviewed the parties' contentions, Smith's expert report, and his deposition testimony, using the *Daubert* rubric, the Court finds that Smith's opinions are relevant to the claims and could assist the jury in understanding the economic structure of Defendants' arrangements, the behaviors that Defendants' allegedly incentivized (admissions), and how Defendants' compensation differs from traditional productivity-based compensation that is common in the industry.

While Defendants are correct that Smith omits various issues that may be relevant, an "expert's testimony need not be dispositive of all issues in a case to be relevant to the jury." *U.S. ex rel. Ruscher v. Omnicare, Inc.*, 2015 WL 5178074, at *12 (S.D. Tex. Sept. 3, 2015). In *Ruscher*, the court found that an expert's opinion regarding uncollected debts was relevant to the relator's AKS claim, because that evidence related to "something of value" provided as remuneration to support the AKS claim. *See id.* Similarly, Smith's opinions are relevant to whether Defendants offered remuneration for referrals to their client hospitals based on "economic function" of their physician contracts in violation of the AKS and Stark Law.

Further, the Court agrees with Carter that "while Mr. Smith does not provide opinions regarding any ultimate issues on the elements of Relator's claims, his opinions are nevertheless relevant and admissible to rebut Defendants' assertions regarding how and why they compensated physicians." Relator's Resp. Br. 19

(citing *Kambala v. Signal Int'l L.L.C.*, 2015 WL 11110594, at \*4 (E.D. Tex. June 26, 2015)). In *Kambala*, the court recognized it would be "unfairly prejudicial" to allow Defendants to discuss the reasons they paid the "incentives," without allowing Relator to offer expert testimony that shows these reasons are belied by Defendants' own documents and common industry practices. *See id.*

Further, Smith's failure to opine on issues such as FMV and admission rates is not grounds to disqualify him. FMV is relevant to only certain exceptions to the AKS and Stark Law. Proving those exceptions, asserted by Defendants as affirmative defenses, will be Defendants' burden at trial (and involve disputed factual and legal issues in the pending summary judgment motions). While Defendants' expert Mello provided an *ex post facto* analysis of FMV, *see supra* Sec. A, Smith's lack of an FMV in his report is not a basis to exclude his testimony. Further, in his expert rebuttal report, Smith explains that FMV is not relevant to his expert report because it is outside the scope of what he was asked to review and evaluate. And, he states that "compliance with healthcare regulations involves a larger set of requirements and considerations than simply FMV and CR. My scope of work relates to this larger set." *Id.*, Ex. B (Report of Timothy Smith), ECF No. 153 at 47.

Similarly, Smith's failure to perform a quantitative analysis to compare admission rates at Defendants' client hospitals compared to national data is not a basis for disqualification. With regard to admission rates, Carter need not prove that Defendants' "incentives" actually resulted in increased admissions or

overutilization to establish an AKS violation; so long as the evidence demonstrates Defendants offered or paid the "incentives" for the referrals, a defendant violates the AKS even if those referrals do not occur. *United States ex rel. Parikh*, 977 F. Supp. 2d at 665 ("The AKS's plain language thus makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results.")

Finally, Defendants highlight that when asked at his deposition how his opinions can assist the trier of fact in this case, Smith responded in his deposition: "I don't know." *See* Defs.' Mot. to Strike 4 (citing Smith Dep. Tr., 273:22–274:6). Defendants, however, omit Smith's full testimony in which he explains why his testimony is relevant: the "economic functioning" of Defendants' contracts with physicians—what behavior they incentivized—as well as their attempts to mitigate compliance concerns raised by their direct "incentive" scheme based upon industry norms and practices. *See* Relator's Resp. App., Ex. C (Smith Dep. Tr., 272:20-23; 277:12-20), ECF No. 153 at 71-72. These opinions are relevant to Carter's allegations that Defendants paid these "incentives" in exchange for referrals to Defendants' client hospitals in violation of the AKS and Stark Law, and those rules' prohibitions on paying physicians based on the volume of referrals.

### 2. Smith's opinions meet Daubert's reliability threshold.

Defendants contend that Smith's opinions are unreliable because (i) he lacks experience in the "rural healthcare industry" and (ii) his opinions are not based

upon any testable, quantitative analysis. Defs.' Mot. to Strike 23-26. The Court addresses these arguments in turn.

First, Defendants challenge Smith's qualifications to give a reliable opinion on the "productivity-based compensation of physicians in rural hospitals that work as emergency physicians or hospitalists," citing his lack of rural healthcare experience. *Id.* at 23-24. In response, Carter argues that lack of experience specific to physician compensation agreements in rural hospitals in Oklahoma "is not grounds to exclude his opinion, as Mr. Smith unquestionably possesses 'qualifications in the general field' of physician compensation and compliance with fraud and abuse laws to render his opinions, and the law does not require him to have experience specific to rural hospitals." Relator's Resp. Br. 17.

"The standard for qualifying expert witnesses is fairly liberal; the witness need not have specialized expertise in the area directly pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question." *Guzman v. Mem'l Hermann Hosp. Sys.*, 2008 WL 5273713, at *15 (S.D. Tex. Dec. 17, 2008). "Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 455 (5th Cir. 2009). The relevant inquiry is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues." *Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir. 1999) (quotation marks omitted). The court has wide discretion in determining

whether an expert is qualified. *See Am. Can! v. Arch Ins. Co.*, 597 F. Supp. 3d 1038, 1044-45 (N.D. Tex. 2022) (citation omitted).

Under this standard, the Court finds that Smith possesses the requisite qualifications and experience to offer opinions regarding the structure of Defendants' compensation scheme. Smith is a healthcare valuation professional with over 29 years' experience examining physician compensation structures in the healthcare industry and compliance with the fraud and abuse laws. *See* Relator's Resp. App., Ex. B (Report of Timothy Smith), ECF No. 153 at 11-12. He has authored two texts on these subjects. *Id.*, Ex. B (Report of Timothy Smith), ECF No. 153 at 26-27. At his deposition, Smith also detailed many examples of the types of physician arrangements with which he has experience evaluating the economic function of different pay models through a compliance lens. *Id.*, Ex. C (Smith Dep. Tr., 34:2–35:15; 43:4-20; 44:10-21; 44:18–52:16; 81:10–85:2), ECF No. 153 at 58-61, 63. Moreover, any challenges to Smith's experience with rural hospitals are proper subjects for cross-examination, and not grounds for disqualification under *Daubert*. *See U.S. ex rel. Ruscher*, 2015 WL 5178074, at *11 (expert's "comparative lack of experience with the specific types of entities at issue in this case is the proper subject for cross-examination.").

Second, Defendants argue that Smith's opinions are unreliable because they are not based upon any testable, quantitative analysis or methodology. *See* Defs.' Mot. to Strike 24-26. In response, Carter contends that "Defendants ignore the

details of Mr. Smith's 35-page report that outlines his precise methodology and the basis of his opinions." Relator's Resp. Br. 29.

After carefully reviewed the parties' contentions, Smith's expert report, and his deposition testimony, the Court finds that Smith's opinions meet the *Daubert* reliability threshold. Smith explains in his report that he reviewed Defendants' contracts and internal documentation to determine the economic functioning of Defendants' physician compensation structure, and compared those functions with (i) the "compliance environment for physician services" (including the statutes and regulations themselves, as well as agency guidance and numerous secondary sources listed in his report), and (ii) his experience evaluating hundreds of physician compensation arrangements in his vast 29-year career in this field. *See* Relator's Resp. App., Ex. B (Report of Timothy Smith), ECF No. 153 at 11-12, 39-43.

Smith's methodology included examining the physician contracts, e-mail correspondence, internal reporting documents revealing how the compensation arrangement functioned, and other materials related to Defendants' compliance efforts. *Id.*, Ex. C (Smith Dep. Tr., 135:12–136:8), ECF No. 153 at 66. To compare Defendants' compensation structure with common industry, Mr. Smith examined the public information sources listed on his report. *Id.*, Ex. C (Smith Dep. Tr. 137:1-19), ECF No. 153 at 67.

Insofar as Defendants take issue with Smith's failure to consider Dr. Maddox's testimony denying he was influenced by incentive payments (and

disagreeing with Smith), *see* Defs.' Mot. to Strike 25-26, this is not grounds to exclude Smith's contrary conclusions and opinions.[6]

Finally, Defendants complain that Smith lacked a specific publication source to support his opinion that Defendants' "incentive" pay structure warranted a heightened compliance scrutiny due to the direct compensation offered in exchange for referrals. Defs.' Mot. to Strike 25. The Court agrees with Carter, however, that this argument "does nothing to warrant excluding Mr. Smith's opinion, as [this is a] classic questions regarding the basis and sources of Mr. Smith's opinion that relate[s] to the weight of his testimony, rather than the opinions' admissibility." Relator's Resp. Br. 31 (citing *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004)).

For these reasons, the Court **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Timothy Smith.

### D. Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Jason Wells (ECF No. 148)

Carter retained Jason Wells, a Certified Public Accountant (CPA), as an expert to determine the amount of economic damages incurred by the Federal and State agencies, as well as interest, treble damages, and statutory per occurrence penalties recoverable under 31 U.S.C. § 3729, resulting from Defendants' alleged

---

[6] Specifically, when asked about a specific doctor, Dr. Maddox, who denied that the productivity incentive payments had any impact on his decision to admit patients to a hospital, Smith stated that "as an incentive, [it] may not have a corrupting effect on that decision making of that doctor." Defs.' App. in Support of Mot. to Strike, Ex. C (Smith Dep. Tr., 184:11–185:4), ECF No. 147 at 47-48.

illegal "incentive" scheme. *See* Relator's App. in Supp. of Resp. in Opp. to Defs.' *Daubert* Mot. to Exclude Jason Wells ("Relator's Resp. App."), Ex. A (Report of Jason Wells), ECF No. 160 at 3-5. Wells's calculations pertain to physician payments for patients admitted to Memorial Hospital of Texas County for the period January 1, 2015, to September 23, 2018. *See id.* Defendants seek to exclude Wells's damages opinions as irrelevant and unreliable. The Court considers these arguments in turn.

### 1. *Wells's damages opinions meet Daubert's relevance threshold.*

Defendants contend that Wells's damages calculation are "misaligned with Relator's claims and allegations" and, therefore, should be excluded as irrelevant. *See* Defs.' Mot. to Strike 2. In response, Carter counters that Defendants' "attacks [on] the relevance of Mr. Wells' calculations [are] based on a fundamental misunderstanding of the recoverable damages under the FCA resulting from Defendants' AKS, Stark Law and FCA violations." Relator's Resp. Br. 12, ECF No. 159. For the reasons that follow, the Court agrees with Carter.

First, Defendants complain that Wells did not analyze the services rendered by Defendants to offset the amount paid by the Government. *See* Defs.' Mot. to Strike 4-5. Carter responds that in a case involving FCA violations premised upon false certifications with the AKS and Stark Law, such as this one, the measure of damages is the full amount paid on the ineligible claims. *See* Relator's Resp. Br. 13. In support, Carter cites to *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), in

which the Seventh Circuit affirmed treble damages based on the full amount of Medicare reimbursements to a defendant who had obtained the patients in violation of the AKS, and points to district courts in the Fifth Circuit similarly relying on *Rogan* and holding that the measure of damages is the full amount paid on ineligible claims. *See id.* (citing *United States ex rel. Hueseman v. Professional Compounding Centers of America, Inc.*, 2024 WL 2244818, at *10 (W.D. La. May 1, 2024); *United States ex rel. Wheeler v. Union Treatment Centers, LLC*, 2019 WL 571349, at *9 (W.D. Tex. Feb. 12, 2019)). Notably, in Defendants' reply brief, they do not address Carter's arguments. *See* Defs.' Reply, *passim*, ECF No. 172.

Contrary to Defendants' contentions, it is not necessary for Wells to consider the FMV of the services rendered by Defendants, as the claims submitted were not eligible "in the first place" because of Defendants' alleged false certifications of compliance with the AKS and Stark Law. *See United States ex rel. Wheeler*, 2019 WL 571349, at *9 (citing *United States v. Novak*, 2018 WL 4205540, at *4 (N.D. Ill. Sept. 4, 2018)); *see also United States ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199 (M.D. Fla. Sept. 21, 2012) (holding "the Government's damages resulting from the payment of [claims that were tainted by a kickback arrangement and that would not have been paid had the Government known the truth] equals the full amount that Medicare paid.").

Second, Defendants argue that Wells's opinion lacks relevance because he did not specifically delineate Defendants' violative conduct to the "occurrences"—

Medicare claims submitted by Defendants and their client hospital. *See* Defs.' Mot. to Strike 4-5. In response, Carter asserts that "this argument, too, reflects Defendants' misunderstanding of the applicable fraud and abuse laws, which permit Relator to pursue all claims tainted by Defendants' false certification of compliance with Stark Law and AKS as damages." Relator's Resp. Br. 15.

The Court agrees with Carter. There is no requirement that a damages expert attribute each and every precise claim to specific false certifications to render a damages opinion. *See United States ex rel. Hueseman*, 2024 WL 2244818, at *10 (rejecting argument that government's damage expert could not articulate precisely which claims were based upon different fraud theories).

### 2. Wells's damages opinions meet Daubert's reliability threshold.

Defendants contend that Wells's opinion should be excluded as unreliable because he relies on Carter's counsel's assumptions without conducting any independent analysis. *See* Defs.' Mot. to Strike 7-9. The Court finds that Defendants' objections are insufficient to warrant exclusion of Wells's testimony. *See Mullenix v. Univ. of Tex. at Aus.*, 2021 WL 4304815, at *8 (W.D. Tex. Sept. 21, 2021) (finding defendant's argument that the plaintiff's expert "simply parrots a variety of calculations he arrived at using simple math applied to assumptions he was asked to make by [p]laintiff's counsel" was not a basis for disqualification and was the proper subject of cross-examination). From what the Court can discern, although Carter's counsel provided Wells with several assumptions upon which he

relied, Wells analyzed the relevant financial information and calculated the damages based on this data and the assumptions provided. On this record, the Court finds that Wells performed an independent review and analysis of the information. Defendants' concerns, therefore, go to the weight that the jury should give Wells's testimony, and not to the admissibility of his testimony. *See Scrum All., Inc. v. Scrum, Inc.*, 2021 WL 1725564, at *2-3 (E.D. Tex. Apr. 30, 2021) (finding that plaintiff's argument that defendant's expert "did not conduct an independent analysis or do anything to study or verify the facts or data that form the basis of his expert opinion" and instead "merely synthesi[zed] [ ] [d]efendant's positions" could be addressed by plaintiff on cross-examination); *Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, 2017 WL 3388020, at *2 (E.D. Tex. Aug. 3, 2017) ("[Plaintiff]'s concerns regarding the extent of defense counsel's influence on [the expert's] report goes to the weight of his testimony rather than its admissibility.").

Defendants' related contention that Wells's testimony would not be helpful to the trier of fact because he uses simple math is equally unavailing. "[C]ourts routinely recognize that though the arithmetic an expert employs may involve simple calculations, an expert's compilation and synthesis of information is helpful to the trier of fact in ascertaining damages." *United States ex rel. Mitchell v. CIT Bank, N.A.*, 2022 WL 1233651, at *6 (E.D. Tex. Apr. 26, 2022) (citing cases). *See also In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2023 WL 1813530, at *9 (C.D. Cal. Feb. 7, 2023) (ruling that "the Court does not find that [plaintiffs' expert's] straightforward calculations to approximate damages renders

his models and opinions unreliable and inadmissible. His calculations use reasonable methods and inputs, including [another expert's] figures, which is enough here.").

For these reasons, the Court **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Jason Wells.

### Conclusion

For the reasons and to the extent explained above, the Court **GRANTS in part** Relator's *Daubert* Motion to Exclude Todd Mello (ECF No. 137); **GRANTS in part** Relator's *Daubert* Motion to Exclude Defendants' Non-Retained Employees (ECF No. 140); **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Timothy Smith (ECF No. 146); and **DENIES** Defendants' Motion to Strike Designation of Expert Witness and Exclude Expert Testimony of Jason Wells (ECF No. 148).

**SO ORDERED.**

January 30, 2025.

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE