IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the State of OKLAHOMA, ex rel. MICHAEL CARTER, | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | Case No. 3:19-cv-01238-E |
| EMERGENCY STAFFING SOLUTIONS, INC. and HOSPITAL CARE CONSULTANTS, INC., | §<br>§<br>§<br>§<br>§ | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are (i) Defendants' Motion for Summary Judgment (ECF No. 134), and (ii) Relator's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses Based upon Anti-Kickback Statute and Stark Law Exceptions (ECF No. 143). For the reasons set forth below, the undersigned recommends that the District Judge **GRANT in part** Defendants' Motion for Summary Judgment (ECF No. 134) and **DENY** Relator's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses Based upon Anti-Kickback Statute and Stark Law Exceptions (ECF No. 143).

## Background

### A. Procedural History

1

On May 22, 2019, Michael Carter (Relator)—a hospital administrator—filed this *qui tam* action against Emergency Staffing Solutions, Inc. (ESS) and Hospital Care Consultants, Inc. (HCC) (sometimes collectively, "Defendants"), providers of emergency and inpatient physician staffing to client hospitals in Oklahoma and other states. Compl. ¶ 2, ECF No. 2. Relator alleges Defendants operate an illegal kickback scheme whereby they "pay doctors to refer patients to inpatient hospital care and unjustly profit by billing and causing the billing of federally-funded and state-funded healthcare programs." *Id.* ¶ 1. Relator asserts claims against Defendants under the False Claims Act (FCA) for:

(i)    presentment of false claims under 31 U.S.C. § 3729(a)(1)(A), predicated on alleged violations of the federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b) (Count 1),

(ii)   presentment of false claims under 31 U.S.C. § 3729(a)(1)(A), predicated on alleged violations of the Stark Law, 42 U.S.C. § 1395nn (Count 2);

(iii)  making of false records or statements for the purpose of getting a false or fraudulent claim paid by the government under 31 U.S.C. § 3729(a)(1)(B) (Count 3);

(iv)   submission of reverse false claims under 31 U.S.C. § 3729(a)(1)(G) (Count 4); and

(v)    conspiracy to get false claims paid in violation of 31 U.S.C. § 3729(a)(1)(C) (Count 5).

*Id.* ¶¶ 136-158. In addition to the federal law claims, Relator named as Plaintiffs nine states, including Oklahoma, for violations of the Oklahoma False Claims Act, Okla. Stat. tit. 63 § 5053.1(b) (Count 14). *Id.* ¶¶ 159-208.

The United States and all nine states declined to intervene. *See* Notice of Declination, ECF No. 24. Both Texas and the United States filed Statements of Interest (*see* ECF No. 50; ECF No. 52), each clarifying that its declination to intervene was not a comment on the merits of this case.

On March 31, 2023, the Court denied Defendants' motion to dismiss Relator's federal law claims and his Oklahoma FCA claim and granted Defendants' motion to dismiss claims premised upon all other states' laws. *See* Mem. Op. & Order 17-18, ECF No. 62.[1] In denying the motion to dismiss the federal law claims, the Court stated:

> [Relator] sets out in detail a kickback and prohibited referral scheme that would serve as a predicate for FCA violations if his allegations are true. [Relator] alleges how ESS and HCC incentivize physicians to refer patients to inpatient care in exchange for significantly above-market pay. He alleges that the referrals involved in the Defendants' business model do not fall within any of the exceptions to the Anti-Kickback Scheme and the Stark Law. [Relator] alleges that he had personal knowledge of this arrangement from his time working with ESS and HCC as a COO and administrator at Memorial Hospital of Texas County [MHTC] in Guymon, Oklahoma. The Complaint details how from October 2015 to September 2017, ESS physicians generate[d] a vastly disproportionate amount of the inpatient admissions at MHTC. He even gives specific examples of patients admitted to MHTC by ESS physicians who were paid month[ly] for each referral. Thus, the Court concludes that [Relator] pleaded specific facts which establish a plausibility of entitlement to relief on all his federal causes of action (Counts 1 through 5) in accordance with the requirements of Rule 8(a)(2) and Rule 9(b).

---

[1] Citations to the record and the parties' briefing refer to the CM/ECF page number at the top of each page rather than page numbers at the bottom of each filing.

*Id.* at 12 (internal citations omitted). Further, the Court found that Relator pleaded "specific facts to establish a plausibility of entitlement to relief . . . under Rule 8(a)(2) and Rule 9(b)" for violations of the Oklahoma FCA. *Id.* at 13.

On May 5, 2023, Defendants filed their Answer asserting various affirmative defenses including, as relevant here, that Relator's claims are barred in whole or in part by AKS and Stark Law safe harbor provisions. Defs.' Ans. to Qui Tam Compl., Affirmative Defenses Nos. 13 and 14, ECF No. 63.

Defendants now seeks summary judgment on all remaining claims—Counts 1, 2, 3, 4, 5 and 14—contending that "they did not violate the AKS, the Stark Law or the FCA and that there is no genuine dispute as to whether such violations occurred." Defs.' Mem. in Support of Mot. for Summ. J. 13 ("Defs.' Summ. J. Br."), ECF No. 135. Relator, in turn, seeks partial summary judgment with respect to Affirmative Defenses Nos. 13 and 14, asserting "that Defendants' conduct cannot qualify under its claimed [AKS] or Stark Law safe harbors." Relator's Mem. in Support of Mot. for Partial Summ. J. 7 ("Relator's Summ. J. Br."), ECF No. 144. The motions have been fully briefed are ripe for disposition.

Because this dispute arises in the context of Medicare statutes and regulations, the Court will discuss the relevant legal framework, prior to setting forth additional background facts.

## B. <u>Regulatory Framework for Medicare Reimbursement</u>

The Medicare Act, 42 U.S.C. § 1395 *et seq.*, establishes a health insurance program for eligible individuals. Part A covers inpatient hospital stays, other

institutional care, and home health care. 42 U.S.C. § 1395d. Part B is responsible for paying physicians and other health care providers for the medical services they render to Medicare-insured patients. *Id.* § 1395k. Congress tasked the United States Department of Health and Human Services (HHS)—and, in turn, the Centers for Medicare and Medicaid Services (CMS)—with administering Medicare and granted HHS the broad authority to promulgate necessary regulations related to the program.[2] *See id.* § 1302(a). CMS contracts with Medicare Administrative Contractors (MAC) to manage enrollment of health care providers and to process payments. *Id.* §§ 1395kk–1395kk–1(a).

Pursuant to these regulations, "provider[s] or supplier[s] must be enrolled in the Medicare program" and obtain billing privileges to receive payments for their services. 42 C.F.R. § 424.500–505. And physicians are considered "suppliers" while "providers" are limited to hospitals and other medical facilities. *Id.* § 400.202.

To enroll, physicians must complete CMS Form 855I—the "Medicare Enrollment Application for Physicians and Non-Physician Practitioners" in which they must certify

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to me or the organization listed on section 4A of this application . . . . I understand that payment of a claim by

---

[2] The Medicaid Act, 42 U.S.C. § 1396 *et seq.*, established the Medicaid program which is separate from the Medicare program. Under the Medicaid Act, the federal government and the states jointly fund the Medicaid program, with the federal government contributing approximately between 50% and 83% of the funding, with the states responsible for the rest. 42 U.S.C. § 1396d(b).

> Medicare is conditioned upon the claim and underlying transaction complying with such laws, regulations and program instructions (including but not limited to, the Federal Anti-Kickback Statute . . . and the Physician Self-Referral Law (Stark Law)).

CMS Form 855I, available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855i.pdf (last visited July 30, 2025). The form also requires physicians to sign a certification statement that "the information submitted is accurate and that the . . . supplier is aware of, and abides by, all applicable statutes, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3).

To ensure compliance with these laws and regulations, a physician seeking payment for services must submit claims for payment on a CMS 1500 paper form or its electronic counterpart, the X12 837 form. *See* Medicare Claims Processing Manual Ch. 3 § 10.1. As relevant to this matter, CMS Form 1500 requires the physician to certify "this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as the Stark law.)."[3]

---

[3] CMS Form 1500, available at https://www.cms.gov/Medicare/CMS-Forms/CMS Forms/Downloads/CMS1500.pdf (last visited July 30, 2025); *see also* CMS Form 1500, ECF No. 164 at 111-114.

Reimbursement claims by hospitals are submitted on CMS-1450/UB-04 Forms.[4] The reimbursement claim forms contain general compliance certifications specifying that false, misleading, incomplete or inaccurate claims may subject the claimant to civil and criminal penalties. *Id.*

Hospitals also submit an annual cost report to CMS, a CMS Form 2552, *see* 42 C.F.R. § 413.20(b), which requires a mandatory certificate of compliance, and includes the following certification:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND OR IMPRISONMENT MAY RESULT.

CMS Form 2552.[5]

The CMS Form 2552 also requires certification from an officer or administrator of the provider: "I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services

---

[4] CMS Form 1450/UB-04, available at https://www.cms.gov/regulations-and-guidance/legislation/paperworkreductionactof1995/pra-listing-items/cms-1450 (last visited July 30, 2025); *see also* CMS Form 1450/UB-04, ECF No. 164 at 119-20.

[5] CMS Form 2552, available at https://www.cms.gov/regulations-and-guidancelegislationpaperworkreductionactof1995pra-listing/cms-2552-10 (last visited July 30, 2025).

identified in this cost report were provided in compliance with such laws and regulations." *Id.*

The Court now turns to the facts supported by the record evidence.

## C. <u>Facts</u>[6]

### *1. Defendants' Business Model*

Defendants offer emergency department and hospitalist staffing services in predominantly rural areas to hospital clients in Oklahoma and other states. Affidavit of Shonda Rupe ¶ 5 (the "Shonda Rupe Aff."), ECF No 136 at 5. Defendants rely upon independent contractor physicians to staff and supply medical services to the patients presenting for emergency or inpatient care at Defendants' hospital clients. *Id.* ¶ 7, ECF No. 136 at 5.

Defendants' revenue is derived from two sources: (1) a monthly subsidy paid by the hospital client; and (2) collections derived from the professional services provided by Defendants' contract physicians. *Id.* ¶ 8, ECF No. 136 at 5. Defendants receive collections and use a third-party billing company to bill Medicare and state-

---

[6] This section sets forth the facts in accordance with the summary judgment standard summarized *infra*. The recitation of the facts draws from the evidence contained in the summary judgment record provided by the parties and evidence to which the undersigned has overruled a party's objection. *See* Defendants' Appendix in Support of Motion for Summary Judgment, ECF No 136; Relator's Appendix to Motion for Partial Summary Judgment, ECF No. 145; Defendants' Appendix in Opposition to Relator's Motion for Partial Summary Judgment, ECF No. 156; Relator's Appendix to Response in Opposition to Defendants' Motion for Summary Judgment, ECF No. 164 (sealed); Relator's Supplemental Appendix to Response in Opposition to Defendants' Motion for Summary Judgment, ECF No. 185 (sealed) (containing Exhibits C, E, H, I, L, V, W, Y, EE, and HH, designated "Confidential" under the parties' Protective Order).

funded healthcare programs on their behalf for the designated health services (DHS) performed by contract physicians at client hospitals. *Id.* ¶ 11, ECF No. 136 at 6.

Defendants collectively offer three different staffing models at client hospitals: (1) in the emergency department model, Defendants staff emergency physicians, who are limited to services performed for patients presenting in the emergency department; (2) in the hospitalist model ("Hospitalist Model"), Defendants staff only hospitalist physicians, who are limited to services performed for inpatients; and (3) in the hybrid model (the "Hybrid Model"), Defendants staff physicians in the emergency department of client hospitals and the physicians also provide hospitalist services for patients admitted to the hospital. *Id.* ¶¶ 15-17, ECF No. 136 at 6-7.

Between the period beginning January 1, 2015, to the present, ESS or HCC offered services under the Hospitalist Model or the Hybrid Model at eight hospitals in Oklahoma. *Id.* ¶ 18, ECF No. 136 at 7. Defendants had contractual relationships with Oklahoma physicians to staff these hospitals under either the Hospitalist Model or the Hybrid Model, dependent upon Defendants' contract with each hospital. *Id.* ¶ 19, ECF No. 136 at 8.

Defendants marketed their staffing services to hospitals by touting "value-added services aimed at overall volume growth[,]" including "admission maximization." Shonda Rupe Dep. Tr. 147:12-24, ECF No. 164 at 20. Admissions to hospitals increase revenue for the hospital. *Id.* at 139:12-17, ECF No. 164 at 19.

### 2. *Defendants' Contracts with Billing Physicians*

Under both the Hybrid and Hospitalist Model programs, Defendants paid contract physicians a base hourly rate plus a cash "incentive" for each admission (typically $50), round (typically $25), and discharge (typically $25). *Id.* at 80:19-21, 81:6-25, ECF No. 145 at 23 (discussing incentive structure for Hybrid Program physicians); *id.* at 89:17-92:13, ECF No. 145 at 25-26 (discussing incentive payments for a Hospitalist Program physician); *see also* E-Mail from Director of Billing Rachel Cook (ESS-HCC00018773) (sealed) (informing ESS physicians "Please also remember that we use the information entered on IM Bills or census logs to pay out on incentives. $50 for admit, $25 for round, $50 for discharge and $25 for critical care."), ECF No. 164 at 30 (original emphasis).

Defendants' payroll records confirm they paid these cash "incentives" to physicians for their admissions, rounds, and discharges, and calculated those payments by multiplying the cash "incentive" rate by the number of admissions, rounds, and discharges performed by the physician. Shonda Rupe Dep. Tr. 88:10-12, ECF No. 145 at 25; *id.* at 90:21-91:5, ECF No. 145 at 26. Dr. David Ficklen—ESS's Chief Medical Officer (CMO) prior to March of 2018—received "incentive" payments based upon admissions, rounds, and discharges. Dr. Finklin Dep. Tr. 72:22-73:10, ECF No. 145 at 126.

Defendants also required contract physicians to submit daily census logs, which were compiled into a spreadsheet to allow Defendants to track the number of admissions, rounds, and discharges performed by physicians at each client

hospital to calculate physician compensation. Carrie O'Brien Dep. Tr. 71:4-24; 76:8-77:18, ECF No. 164 at 103-104.

Physician agreements between Defendants and contract physicians also confirm that Defendants paid contract physicians cash "incentives," sometimes called "productivity incentives," for "admits," "rounds," and "discharges."[7] Shonda Rupe Aff., Ex. A-1 (Physician Agreement), ECF No. 136 at 26-27; Physician Agreement (ESS-HCC00001544) (sealed), ECF No. 185 at 5.

Unlike inpatient admissions to client hospitals and those services associated with inpatient admissions (such as rounds and discharges), Defendants do not pay physicians a cash "incentive" to transfer a patient from an emergency room to another facility. E-mail from R. Cook to Dr. Damon Armstrong (ESS-HCC00002353) (sealed) (informing Dr. Armstrong that ESS does "not pay out on" transfers from the ER. We only pay transfers on inpatients."), ECF No. 185 at 16.

---

[7] In her Affidavit, Ms. Rupe refers to the cash "incentive" as "Inpatient Encounter Compensation" for "professional and administrative services"—or paperwork. Shonda Rupe Aff. ¶¶ 21-25, ECF No 136 at 8-10. As Relator correctly notes, however, "none of Defendants' contracts with physicians, contemporaneous communications, or internal documentation uses that language or anything remotely similar." Relator's Summ. J. Resp. Br. 10, ECF No. 183. Viewing all evidence in the light most favorable to Relator (as the nonmoving party), the Court relies on the terminology and substance in the actual physician contracts, contemporaneous communications, and internal documentation in ruling on Defendants' Motion for Summary Judgment. Insofar as Relator's additional objection to portions of Ms. Rupe's Affidavit as self-serving, unsupported and conclusory, *see id.* at 19-24, the Court has not relied on any of the evidence to which he objects in ruling on Defendants' Motion for Summary Judgment. Accordingly, the Court **overrules** these objections as moot.

Defendants paid high admitting physicians higher incentive rates for each admission. For example, in June 2018, Dr. James Knecht's monthly admission rate was 14.9% (and his six-month trailing admission rate was 10.6%). Performance Chart for Dr. Knecht (ESS-HCC00001995) (sealed), ECF No. 185 at 12. In a June 20, 2018 e-mail, Tracy Campos, RN, Defendants' Chief Nursing Officer, states that the "[b]iggest issue is admits are down and too many transfers[,]" and she notes that Dr. Knecht's transfer rate was 1.5% "which is much lower than anyone else's." June 20, 2018 e-mail (ESS-HCC00024208) (sealed), ECF No 164 at 32. In January 2019, Ms. Rupe agreed to pay Dr. Knecht a premium $100 per admit incentive bonus, instead of the standard $50 incentive bonus per admission. Jan. 20, 2019 e-mail (ESS-HCC00024737) (sealed), ECF No. 185 at 22. Defendants' expert Todd Mello acknowledged that Dr. Knecht, who had a low transfer rate and a high admission rate, was one of Defendants' highest compensated physicians. Todd Mello Dep. Tr. 161:12-162:7, ECF No. 164 at 23.

Mello—who has over thirty years of experience in the industry—does not recall having seen such a physician compensation structure or a contract that paid physicians cash "incentives" for admissions. Todd Mello Dep. Tr. 126:10-127:7, ECF No. 164 at 23. The CEO of Newman Memorial Hospital (one of Defendants' clients) confirmed he "never heard of" a physician compensation plan that pays a cash incentive for admissions, rounds and discharge on top of an hourly rate in his experience, and the arrangement "raise[d] red flags." Tom Vasko Dep. Tr. 43:13-44:2, ECF No. 164 at 58.

12

### 3. *Billing Medicare and Medicaid*

Defendants, using a third-party billing service, billed federally-funded and state-funded healthcare programs for services performed by contract physicians (who received cash incentives for admissions, rounds, and discharged) at client hospitals. Declaration of Jackie Willett, SVP of Hospital Based Physician Solutions and Practice Management Operations at R1 RMC ¶¶ 10-14 (sealed), ECF No. 164 at 117-118 (R1 received claims data and/or patient records from ESS for services provided to patients by contract physicians, aggregated the electronic claims and, via a clearing house, submitted the files to CMS for payment); *id.* ¶¶ 12-14 (sealed) (attesting to R1's submission of those claims to Medicare, as well as the required physician signature that certifies compliance with the Stark Law and AKS in CMS Form 1500), ECF No. 164 at 118.

Client hospital Memorial Hospital of Texas County submitted claims for inpatient services that were ordered by Defendants' contract physicians and were billed to, and paid by, Medicare and Medicaid. Declaration of Michael Carter and Memorial Hospital of Texas County Billing Data (sealed), ECF No. 164 at 83-95; Billing Records (sealed), ECF No. 185 at 28-39. These provider submissions required certifications on CMS-1450/UB-04 Forms.

### 4. *Chart Reviews & Physician Education*

Dr. Ficklen or Ms. Campos completed chart reviews at all times relevant to this civil action. Shonda Rupe Aff. ¶ 44, ECF No. 136 at 14. Ms. Campos performed "chart reviews" to look for missed admissions that could be captured, with the goal

13

to maximize admissions. Tracy Campos Dep. Tr. 122:1-123:13; 165:11-13; 171:25-172:1-19; 193:22-194:1, ECF No. 145 at 417, 427, 429, 434-435.

After Ms. Campos provided her physicians training on admissions, Defendants' client hospitals realized increased admissions. *Id.* at 122:24-123:4; 143:19-22, ECF No. 145 at 417, 422.

Defendants and their client hospitals reviewed physician performance each month and one indicator of performance was a physician's admission rate, with an arbitrary admission goal of 10%. Physician Manual (ESS-HCC00003877) (sealed), ECF No. 185 at 18; *see also* ESS-HCC00023174 (sealed) (Tracy Campos states "if we do get this [hospital] contract, we will need to make sure that the hospitalists are educated from the beginning on the expectations of admissions . . . ."), ECF No. 164 at 54; *id.* ("Just from the charts I have reviewed, if we get appropriate education to hospitalists and ER docs, admission numbers will increase."), ECF No. 164 at 54.

### 5. *Compliance with Fraud and Abuse Laws*

With respect to ensuring compliance with Medicare fraud rules and statutes, Defendants had no compliance plan until 2018. Shonda Rupe Dep. Tr. 33:3-34:1-14, ECF No. 164 at 6-7. Ms. Rupe, Defendants' Corporate Compliance Officer, acknowledges that she provides and has taken Defendants' internal compliance training "in person," is familiar with the FCA, AKS and Stark Law, and has "experience in the industry." *Id.* at 46:12-49:19, ECF No. 164 at 8. Other than her own belief, Ms. Rupe could not explain how Defendants' physician compensation

complies with the FCA, AKS or Stark Law, stating "we believe – and I believe, personally and as a corporate representative[] [that] we've always complied with Medicare, with the Stark Laws." *Id.* at 33:25-34:2, ECF No. 164 at 6-7.

### Legal Standard

A court will grant summary judgment when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a summary judgment motion, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574,

586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a summary judgment motion. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. If the nonmoving party fails to make a showing sufficient to establish the existence

of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### Analysis

#### A. **The Statutory Framework**

The gravamen of this *qui tam* action is that Defendants illegally pay doctors to refer patients to inpatient hospital care and unjustly profit by billing and causing the billing of federally-funded and state-funded healthcare programs in violation of the FCA, AKS, and Stark Law. A brief overview of the statutes at issue is warranted prior to addressing the parties' summary judgment arguments.

#### 1. *The FCA*

Enacted during the Civil War to curb widespread fraud, the FCA "is intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009) (citation omitted). "To aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators." *Id.* "Relators share in the government's winnings, receiving a bounty of up to thirty percent of the government's proceeds." *United States v. Abundant Life Therapeutic Servs. Texas, LLC*, 2019 WL 1930274, at *4 (S.D. Tex. Apr. 30, 2019) (cleaned up) (citation omitted).

The FCA allows for the award of treble damages against a person who:

(A) knowingly presents, or causes to be presented, to the United States Government a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or

(C) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a)(1)(A)–(C). The FCA attaches liability "not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (cleaned up) (citation omitted). "Knowingly" means "actual knowledge of the information"; "deliberate ignorance of the truth or falsity of the information"; or "reckless disregard to the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)–(iii). Specific intent to defraud is not required to establish knowledge. 31 U.S.C. § 3729(b)(1)(B). "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

"Some of the prototypical claims actionable under the FCA are those in which the claimant did not perform the service he requests compensation for or did perform the service but overcharged the government." *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 662 (S.D. Tex. 2013). But the Act also imposes liability on parties who submit "claims that are [not] false on their face." *Id.* Under some circumstances, "accurate claims submitted for services actually rendered may still be considered fraudulent and give rise to FCA liability if the services were rendered in violation of other laws." *Id.* (citing *United States ex rel.*

*Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)). When "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *Thompson*, 125 F.3d at 902. Thus, a defendant's violation of a law on which the government conditions payment may serve as a "predicate" violation that supports FCA liability. *Id.*

In the healthcare context, two laws that often serve as FCA predicates are the AKS and Stark Law. *United States ex rel. Roshan v. E. Texas Med. Ctr.*, 2020 WL 8918651, at *2 (E.D. Tex. Nov. 24, 2020) (citing cases).

### 2. *The AKS & Stark Law*

The AKS proscribes, in pertinent part, "knowingly and willfully offer[ing] or pay[ing] any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any item or service for which payment may be made whole or in part under a Federal healthcare program." 42 U.S.C. § 1320a–7b(2). A person seeking payment for Medicaid and Medicare services in violation of the AKS is liable under the FCA, 31 U.S.C. § 3729(a)(1)(A). *See United States ex rel. Colquitt v. Abbott Lab.*, 858 F.3d 365, 371 (5th Cir. 2017).

The Stark Law provides that, if a physician has a "financial relationship" with an entity, then (i) the physician "may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made

under [Medicare]," and (ii) "the entity may not present or cause to be presented a claim" to Medicare for such services. 42 U.S.C. § 1395nn(a)(1).

Relator relies on a false certification theory, asserting that Defendants submitted, or caused to be submitted, claims to Medicare and Medicaid in violation of the AKS and Stark Law. "Because compliance with the AKS and Stark is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes may be 'false or fraudulent' for the purposes of the FCA." *Parikh*, 977 F. Supp. 2d at 663; *see also Thompson*, 125 F.3d at 901-903 (holding that an AKS or Stark Law violation may support a claim under the FCA under a false certification theory).

With this background in mind, the Court will now review the evidentiary objections and the parties' respective motions.

## B. <u>Evidentiary Objections</u>

Defendants object to several pieces of evidence Relator submits in support of his response to Defendants' summary judgment motion. *See* Defs.' Reply Br. 10, ECF No. 173. Specifically, Defendants object to Exhibits C–L, O–R, T, V–Z, AA–CC, EE, GG, HH, JJ, and KK to Relator's Appendix to Response in Opposition to Defendants' Motion for Summary Judgment, ECF No. 164 (sealed). *Id.* Defendants ask the Court to strike this evidence "from the summary judgment record on the grounds that the referenced exhibits have not been authenticated and the referenced exhibits constitute inadmissible hearsay." *Id.*

"At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017) (citing Fed. R. Civ. P. 56(c); *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)).

As the Fifth Circuit explained in *Maurer*, after "a 2010 revision to Rule 56, materials cited to support or dispute a fact need only be *capable* of being presented in a form that would be admissible in evidence.'" 870 F.3d at 384 (emphasis in original; internal quotations and citations omitted). This "flexibility allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense it takes to authenticate everything in the record." *Id.* Furthermore, "[a]uthentication is a low burden," *Allen v. Hays*, 812 F. App'x 185, 193 (5th Cir. 2020), that can be satisfied in a variety of ways, including through "testimony by a witness with knowledge," Fed. R. Evid. 901(b)(1); "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," *id*. R. 901(b)(4); the presence of a seal and signature, *id*. R. 902(1); and the presence of a signature and certification, *id*. R. 902(2).

Further, with respect to Defendants' hearsay objections, while the deficiencies noted by Defendants may warrant exclusion at trial, at the summary-

judgment stage, some or all of the objected-to statements may be admissible under an exception to the hearsay rule. *See, e.g.*, Fed. R. Evid. 803(1), (2) and (3). Some may be admissible for a non-hearsay purpose. *See* Fed. R. Evid. 801(c). Defendants may raise their hearsay objections to specific evidence at trial. But at this summary-judgment phase, Defendants have not shown that Relator will be unable to introduce the information Defendants assert is hearsay at trial or that Relator will not be able to authenticate this information at trial.

In addition, a hearsay objection must identify the specific statements constituting hearsay. *See* Fed. R. Evid. 103(a)(1); *United States v. Avants*, 367 F.3d 433, 445 (5th Cir. 2004) ("Evidentiary objections must be specific."). "A loosely formulated and imprecise objection" does not suffice. *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998) (citation omitted). Here, Defendants make a blanket assertion that multiple exhibits contain inadmissible hearsay while failing to identify *any* specific statements to which they object. *See* Defs.' Reply Br. 10. Defendants' hearsay objection is insufficient.

### C. **Defendants' Motion for Summary Judgment**

Defendants move for summary judgment contending they "did not violate the AKS, the Stark Law or the FCA and that there is no genuine dispute as to whether such violations occurred." Defs.' Summ. J. Br. 13. With respect to the AKS, Defendants contend that they "did not knowingly and willfully make a payment or offer of payment in violation of the AKS. Defendants also contend that they did not make payments with the intent to induce a referral." *Id.* As to the Stark Law,

Defendants contend that they are not "physicians" or "entities" for the purposes of the Stark Law and thus could not have violated the Stark Law. They further argue they "were not the recipients of a referral for the furnishing of designated health services (DHS)" and "did not present a claim to the Federal [G]overnment [] or the government of Oklahoma [] for the payment of DHS." *Id.* at 14.

With respect to the FCA, Defendants contend that they "did not make a false claim or a false statement to the Government or to Oklahoma"; "did not possess the requisite scienter in relation to any false claim or false statement"; and any false claim or false statement was not material." *Id.*

In response, Relator argues, among other things, that Defendants' motion "applies the wrong standard . . . and ignores ample material facts revealed in discovery (from its own documents and witnesses) that preclude summary judgment." Relator's Summ. J. Resp. Br. 56, ECF No. 183.[8]

> ### 1. *Because Genuine Disputes of Material Fact Remain with Respect to Whether Defendants Violated the FCA Based on the AKS (Count 1), the Court should Deny Defendants' Motion for Summary Judgment as to Count 1.*

Count 1 alleges that Defendants violated Section 31 U.S.C. 3729(a)(1)(A) of the FCA because they "knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—presented or

---

[8] Exhibits supporting Relator's response are contained in Relator's Appendix to Response in Opposition to Defendants' Motion for Summary Judgment, ECF No. 164 (sealed) and Relator's Supplemental Appendix to Response in Opposition to Defendants' Motion for Summary Judgment, ECF No. 185 (sealed).

caused to be presented false or fraudulent claims to the United States for payment or approval." Compl. ¶ 137. Count 1 further alleges that "[b]y virtue of illegal remuneration (in violations of [the AKS]), Defendants knowingly presented or caused to be presented false or fraudulent claims for improper payments or approval of physician services and inpatient and outpatient hospital care on behalf of federal healthcare beneficiaries." *Id.* ¶ 138. "The United States, unaware of the falsity or fraudulent nature of the claims that Defendants caused, paid for claims that otherwise would not have been allowed." *Id.* ¶ 139.

Defendants argue they "are entitled to summary judgment on Count 1 because [they] did not violate the AKS and because [they] did not violate the FCA." Defs.' Summ. J. Br. 33.

     a.  <u>Violations of the AKS</u>

In support of their summary judgment motion, Defendants argue that Relator has failed to raise a genuine dispute of material fact to support his contention that Defendants knowingly and intentionally violated the AKS or made payments with the intent to induce referrals. Defs.' Summ. J. Br. 37. In response, Relator argues that he has "proven the precise facts the Court previously found were well-pled to establish AKS liability, and at minimum, this evidence shows there is a genuine issue of material fact regarding the intent element of Relator's AKS claim." Relator's Summ. J. Resp. Br. 29.

To establish an AKS violation, Relator must show that Defendants knowingly and willfully solicited, offered, paid, or received "remuneration

(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind" that is intended to induce a referral for an item or service for which payment can be made from a Federal healthcare program. *See* 42 U.S.C. § 1320a–7b(b). The AKS "criminalizes the payment of any funds or benefits designed to encourage an individual to refer another party to a Medicare provider for services to be paid for by the Medicare program." *United States v. Miles*, 360 F.3d 472, 479 (5th Cir. 2004). "As long as *any* part of the transaction was intended to induce referrals, the transaction violates the law." *United States ex rel. Capshaw v. White*, 2018 WL 6068806, at *1 (N.D. Tex. Nov. 20, 2018) (Godbey, J.) (emphasis in original) (citing *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (holding that district court's jury instruction that cash payments to a doctor had to be "for no other purpose" than inducing referrals is an erroneous statement of law)).

As an initial matter—and contrary to Defendants' contention that Relator must show they acted with "specific intent" to violate the AKS, *see* Defs.' Reply Br. 11, ECF No. 173—"the AKS explicitly disclaims the need for bad purpose or the 'specific intent to commit a violation' of the AKS." *United States v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 893 (W.D. Tex. 2022) (quoting 42 U.S.C. § 1320a–7b(h)). To violate the AKS, it must be shown that Defendants acted "voluntarily or purposely—that is, with the intent to commit the acts, not to violate law." *Id.* (citation omitted); *see also United States v. St. Junius*, 739 F.3d 193, 210 (5th Cir. 2013) ("Section 1320a–7b(h) defines willfulness as it pertains to the [AKS]. In

doing so, Section 1320a–7b(h) clarifies that the Government is not required to prove actual knowledge of the [AKS] or specific intent to violate it.").[9] Here, Relator is only required to prove that Defendants "willfully [offered or paid] money for referring Medicare patients" to client hospitals. *See St. Junius*, 739 F.3d at 210.

Viewing all facts in the light most favorable to Relator, as the nonmoving party, the Court finds that he has provided sufficient evidence to raise a genuine dispute of material fact as to whether Defendants knowingly and willfully paid cash incentives to induce their contract physicians to admit patients to client hospitals. Evidence shows that, under both the Hybrid and Hospitalist Programs, Defendants paid physicians cash incentives directly tied to admissions (typically $50), rounds (typically $25), and discharges (typically $25). *See* Shonda Rupe Dep. Tr. 80:19-21, 81:6-25, ECF No. 145 at 23; *id.* at 88:10-12, ECF No. 145 at 25; *id.* at 90:21-91:5, ECF No. 145 at 26; Shonda Rupe Aff., Ex. A-1 (Physician Agreement) (sealed), ECF No. 136 at 26-27; Physician Agreement (ESS-HCC00001544) (sealed), ECF No. 185 at 5; E-Mail from Director of Billing R. Cook (ESS-HCC00018773) (sealed) (informing ESS physicians "Please also remember that we use the information entered on IM Bills or census logs to pay out on incentives. $50 for admit, $25 for round, $50 for discharge and $25 for critical care."), ECF No. 164 at 30; Dr. Finklin Dep. Tr. 72:22-73:10, ECF No. 145 at 126.

---

[9] The "2010 amendment to the [AKS] found in § 1320a–7b(h) . . . made clear that the government need not prove that the defendant had 'actual knowledge of the statute or a specific intent to violate the statute.'" *St. Junius*, 739 F.3d at 210 n.19 (quoting § 1320a–7b(h)).

Although the AKS does not define "referral," Defendants' expert agreed that a physician's decision to admit a patient is a referral of that patient into the hospital. Todd Mello Dep. Tr. 126:10-127:7, ECF No. 164 at 23.

Of note, it is undisputed that Defendants do not pay physicians a cash "incentive" to transfer a patient from an emergency room to another facility, but only for inpatient admissions and those services associated with inpatient admissions (such as rounds and discharges). E-mail from R. Cook to Dr. Armstrong (ESS-HCC00002353) (sealed), ECF No. 185 at 16.

In addition, evidence presented shows that Defendants tracked contract physicians' admissions, rounds, and discharges for purposes of "billing charges [by Defendants] and paying out incentives." E-mail from R. Cook to Dr. Armstrong re: "Missing Census Logs," ECF No. 164 at 76. Defendants encouraged higher admission by paying high admitting physicians, with low transfer rates, higher incentive rates for each admission. Performance Chart for Dr. Knecht (ESS-HCC00001995) (sealed), ECF No. 185 at 12; June 20, 2018 e-mail (ESS-HCC00024208) (sealed), ECF No. 164 at 32; Jan. 20, 2019 e-mail (ESS-HCC00024737) (sealed), ECF No. 185 at 22.

Defendants performed "chart reviews" solely to look for missed admissions that could be captured, with the goal to maximize admissions. Tracy Campos Dep. Tr. 122:1-123:13; 165:11-13; 171:25-172:1-19; 193:22-194:1, ECF No. 145 at 417, 427, 429, 434-435. After Ms. Campos educated physicians on admissions, Defendants'

client hospitals realized increased admissions. *Id.* at 122:24-123:4; 143:19-22, ECF No. 145 at 417, 422.

Defendants and their client hospitals reviewed physician performance each month and one indicator of performance was a physician's admission rate, with an arbitrary admission goal of 10%. Physician Manual, ESS-HCC00003877 (sealed), ECF No. 185 at 18; *see also* ESS-HCC00023174 (sealed), ECF No. 164 at 52-54. Defendants also required contracted physicians to submit daily census logs, which were compiled into a spreadsheet to allow Defendants to track the number of admissions, rounds, and discharges performed by physicians at each client hospital to calculate physician compensation. Carrie O'Brien Dep. Tr. 71:4-24; 76:8-77:18, ECF No. 164 at 103-104.

Finally, Relator has marshaled evidence that Defendants "are familiar with the Anti-Kickback Statute," they are aware of the specific definitions, and Ms. Rupe confirmed that she "understand[s] the Medicare fraud rules" in her role as compliance officer. Shonda Rupe Dep. Tr. 29:18-21; 49:11-13; 49:22-50:9, ECF No. 164 at 5-8.

On this evidence, a jury could reasonably infer that the cash payments to contracted physicians were inducements or payments for referring patients to client hospitals in violation of the AKS. The Court finds this evidence sufficient to raise a genuine dispute of material fact as to whether Defendants "willfully and knowingly" paid remuneration to induce referrals in violation of the AKS. *See* 42 U.S.C. § 1320a–7b(h); *St. Junius,* 739 F.3d at 210; *Marlin Med. Sols. LLC,* 579 F.

Supp. 3d at 893. Relator has also produced evidence that Defendants "had actual knowledge of the Anti-Kickback Statute and its prohibitions even though such proof was not required." *St. Junius*, 739 F.3d at 211.

> b. <u>Violations of the FCA</u>

Even if Relator has provided sufficient evidence of an AKS violation, Defendants contend they are still entitled to summary judgment on Count 1 as they did not violate the FCA. Defs.' Summ. J. Br. 39.

As previously explained, "false claims" under the FCA may be either "factually false" or "legally false." *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 590 (S.D. Tex. 2016) (citation omitted). Here, Relator relies on a false certification theory, asserting that Defendants made legally false claims to the federal government and state of Oklahoma. He contends that Defendants knowingly made, or caused to be made, false certifications of compliance with the AKS (in mandatory forms including the CMS-855I and CMS-1500, *supra*) and submitted claims for reimbursement premised on those false certifications.[10]

A claim under the FCA "consists of four elements: (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex*

---

[10] "The AKS provides no private right of action; therefore, a private plaintiff may not sue a health care provider under the AKS alone." *United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 n.5 (5th Cir. 2013) (citing 42 U.S.C. § 1320a−7b(b)(1−2)).

*rel Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 402 (5th Cir. 2025) (cleaned up) (citation omitted).

Defendants argue that summary judgment is warranted on Relator's FCA claims for several reasons. First, Defendants contend that Relator has failed to adduce evidence that Defendants submitted a false statement or claim to the federal government or state of Oklahoma or falsely certified compliance with any statute or regulation. Defs.' Summ. J. Br. 40-42. Second, Defendants maintain that Relator has failed to adduce evidence to establish the scienter requirement. *Id.* at 42-45. Third, Defendants assert that Relator fails to satisfy the materiality element. *Id.* at 45-48. The Court examines these arguments in turn.

1. Submission of False Claims/Certification

Defendants assert they cannot be liable under the FCA because they "do not submit claims to the federal government or to the state of Oklahoma directly and have always relied on the assistance of their third-party billing company to submit claims." *Id.* at 41-42. Further, Defendants maintain "there is no evidence that Defendants or Defendants' third-party billing company have submitted false statements or false claims to the federal government or to Oklahoma. *Id.* at 42.[11]

---

[11] In their reply brief, Defendants also argue that Relator's false certification claim fails because he has not produced a signed Form 855I from billing physicians, a signed Form 1500 from providers, or any other of the CMS forms required to enroll in, and bill, Medicare, but only copies of these forms. *See* Defs.' Reply Br. 18, ECF No. 173. But, as set forth previously, the Court has evidence that the billing physicians and providers are enrolled in Medicare because documentation reflects that Defendants have submitted, or caused the submission of, claims to Medicare and Medicaid. *See, e.g.*, Declaration of Jackie Willett ¶¶ 11-14 (sealed), ECF No.

In response, Relator argues that "evidence demonstrates that Defendants caused the submission of claims tainted by kickbacks and prohibited referrals to CMS and caused materially false certifications to receive payment for those false claims." Relator's Summ. J. Resp. Br. 43. For the reasons that follow, the Court finds that Relator has raised a genuine dispute of material fact as to whether Defendants submitted, or caused to be submitted, false claims to Medicare.

First, that Defendants use a third-party billing service to submit claims on their behalf to Medicare does not exonerate them from liability. The FCA imposes liability upon any person who "knowingly . . . causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1)(A). "A person need not be the one who actually submitted the claim forms in order to be liable." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (cleaned up) (citation omitted).

Defendants' conduct may be found "to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural

---

164 at 117-118; Declaration of Michael Carter and Memorial Hospital of Texas County Billing Data, ECF No. 164 at 83-95; Billing Records (sealed), ECF No. 185 at 28-39. In addition, Relator asserts, and provides documentation, that he has requested but has not yet received comprehensive data from CMS detailing inpatient hospital claims ordered by Defendants' contract physicians in Oklahoma during the relevant time period. *See* Relator's Summ. J. Resp. Br. 43; Touhy Request Letter, ECF No. 164 at 96-101. Thus, the Court rejects this argument.

consequence of Defendants' conduct." *United States v. Abbott Labs.*, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016) (Lynn, J.).

Here, evidence shows that Defendants staffed their client hospitals with contracted physicians to provide services and bill for them. Shonda Rupe Aff. ¶¶ 7, 8, 11, ECF No. 136 at 5-6. Defendants also incentivized physicians to provide those services. Shonda Rupe Dep. Tr. 61:14-63:7, ECF No. 164 at 10-11; Physician Contract (EES-HCC00001544) (sealed) ("In the event that Physician, for any reason, fails to complete the necessary paperwork in connection with the services rendered hereunder, including but not limited to, patient medical charts, linkage paperwork for Medicare, Medicaid, and all other insurers, and related documentation required by ESS or the medical institution, ESS shall have the right to withhold from Physician's compensation the amount equal to any unbilled patient charges."), ECF No. 185 at 5. Additionally, evidence reflects that Defendants provided the incentivized documentation to a third-party billing company, R1, to bill Medicare on Defendants' behalf. Declaration of Jackie Willett, ¶¶ 11-14 (sealed), ECF No. 164 at 117-118 (R1 received claims data and/or patient records from ESS for services provided to patients by contract physicians, aggregated the electronic claims and, via a clearing house, submitted the files to CMS for payment); Billing Records (sealed), ECF No. 185 at 28-39. And, Defendants advertised to client hospitals how much money the hospital could make through increased admissions by hiring Defendants. Shonda Rupe Dep. Tr. 148:21-149:3, ECF No. 164 at 20; Dr. Ficklen Dep. Tr. 144:21-149:19, ECF No. 164

at 46-47; ESS-HCC00022699 (sealed) (summary of Dr. Finklin's review regarding opportunities for increased admissions, rather than transfers, for Bradley County ER to generate revenue), ECF No. 164 at 51.

The Court finds that the submission of claims for reimbursement by Defendants' billing contractor R1 and the client hospitals was "reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct." *Abbott Labs*, 2016 WL 80000, at *6. Therefore, that Defendants rely on R1 to submit claims to the federal government and state of Oklahoma does not shield Defendants from liability.

In addition, Defendants' billing company, R1, produced a spreadsheet documenting claims for professional services generated by Defendants' contracted physicians over the relevant time period that were submitted to Medicare and Medicaid attendant to an admission. R1 Medicaid Claims Spreadsheet and Medicare Payment 2 spreadsheet, ECF No. 185 at 113-113.12. As previously explained, each of those claims required submission of the CMS Form 1500. *See* Medicare Claims Processing Manual Ch. 3 § 10.1 (physician or an entity to whom the physician has assigned billing rights submits claims for professional services to Medicare using the ASC X12 837 professional claim format, commonly referred to as an "837P file," or where permissible, Form CMS-1500, available at https://www.cms.gov/files/document/837p-cms-1500pdf, last visited July 30, 2025). Further, in Ms. Willett's Declaration, she attests to R1's submission of those claims to Medicare, as well as the required physician signature that certifies

compliance with the Stark Law and AKS in CMS Form 1500. Declaration of Jackie Willett, ¶¶ 11-14 (sealed), ECF No. 164 at 118.

Evidence also reflects that client hospital Memorial Hospital of Texas County submitted claims for inpatient services that were ordered by Defendants' contract physicians (who were provided cash incentives) and were billed to, and paid by, Medicare and Medicaid. Declaration of Michael Carter and Memorial Hospital of Texas County Billing Data (sealed), ECF No. 164 at 83-95; Billing Records (sealed), ECF No. 185 at 28-39.

Viewing this evidence of Defendants' business model, the role of cash incentives to physicians for referrals (as well as rounds and discharges), internal correspondence, billing data, and other evidence referenced in the parties' submissions in the light most favorable to Relator, the Court finds that Relator has raised a genuine dispute of material fact regarding whether Defendants submitted, or caused to be submitted, legally false claims (by way of certifications on the requisite CMS Forms) and such evidence is sufficient to withstand summary judgment on a FCA claim premised upon false compliance with the AKS.

2. Scienter

Defendants argue that "[e]ven if the Court deems that Defendants presented a 'legally false' claim to the Government or to Oklahoma, Defendants lacked the requisite scienter with respect to the submission of any 'legally false' claim." Defs.' Summ. J. Br. 44.

As previously explained, the FCA imposes liability upon any person who "knowingly . . . causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1)(A). "Knowingly" means "actual knowledge of the information"; "deliberate ignorance of the truth or falsity of the information"; or "reckless disregard to the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)–(iii). Specific intent to defraud is not required to establish knowledge. 31 U.S.C. § 3729(b)(1)(B).

Here, the Court finds there are genuine disputes of material fact over whether Defendants knowingly caused the submission of false claims to the United States. In addition to evidence summarized above in the Court's analysis of whether Defendants intended to violate the AKS, *see supra*, Ms. Rupe (as well as other employees) testified at deposition that they knew Defendants billed Medicare for their physicians' professional services, and that Defendants' clients also billed for DHS provided to patients referred from Defendants' physicians. Shonda Rupe Dep. Tr. 96:12-18 (acknowledging that ESS may recover money from Medicare or Medicaid if a physician admits a patient to a client hospital), ECF No. 164 at 17; *id.* at 126:10-127:6 (acknowledging payments from Medicare and Medicaid are electronically transferred to Defendants' lockbox), ECF No. 164 at 18; Tracy Campos Dep. Tr. 184:9-186:9 (explaining Medicare payments to hospital for inpatient care and observation), ECF No. 164 at 71-72.

Shonda Rupe, Defendants' Corporate Compliance Officer, acknowledged at her deposition that she provides and has taken Defendants' internal compliance

training "in person," is familiar with the FCA, AKS and Stark Law, and is "experienced in the [physician staffing] industry." Shonda Rupe Dep. Tr. 46:12-49:19, ECF No. 164 at 8. With respect to ensuring compliance with Medicare fraud rules and statutes, Defendants had no compliance plan until 2018. Shonda Rupe Dep. Tr. 33:3-34:1-14, ECF No. 164 at 6-7. Ms. Rupe could not explain how she "believe[d]" the Defendants' physician compensation is compliant with the FCA, AKS or Stark Law, stating "we believe – and I believe, personally and as a corporate representative[] [that] we've always complied with Medicare, with the Stark Laws." *Id.* at 33:25-34:2, ECF No. 164 at 6-7.

These facts, viewed in the light most favorable to Relator, are sufficient to raise a genuine dispute of material fact as to whether Ms. Rupe or any other of Defendants' employees acted with actual knowledge, deliberate indifference, or reckless disregard with respect to the submission of Medicare and Medicaid claims.

Otherwise stated, there is enough on this record to allow a jury to determine whether something worse than gross negligence led Defendants to cause the submission of claims to Medicare and Medicaid certifying compliance with the AKS, while at the same time paying cash incentives to contract physicians for referrals to inpatient admissions at client hospitals (as well as related services). Additionally, certain credibility determinations will need to be made when weighing the testimony of the parties' witnesses, which is best reserved for the trier of fact.

36

3. Materiality

Defendants argue that summary judgment is warranted because Relator fails to satisfy the materiality requirement. Defs.' Summ. J. Br. 45-48.

Under 31 U.S.C. § 3729, "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). In *Universal Health Services Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016), the Supreme Court held that "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 181. The Court explained that the materiality standard "is demanding," as it serves to protect the FCA from being transformed into "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194. It further noted that the FCA itself defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* at 192-93. Thus, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 193 (internal citations and quotations omitted). It asks whether "a reasonable person would attach importance to" the misrepresented fact in making his or her payment decision. *Id.* at 193 n.5 (quoting Williston on Contracts, § 69:12).

The Supreme Court also described some of the evidence relevant to the materiality issue: (1) "the Government's decision to expressly identify a provision

as a condition of payment[,]" (2) "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement'" and (3) whether "noncompliance is minor or insubstantial." *Id.* at 194-95. The Supreme Court explained further:

> [I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 195.

Defendants argue that Relator cannot meet *Escobar*'s demanding standard. Defs.' Summ. J. Br. 45-48. According to Defendants, because the United States declined to intervene and continued to pay claims without refusal after learning of the alleged fraud and after Defendants complied with a Civil Investigative Demand, "the alleged false statements upon which Relator relies, and the alleged noncompliance with the AKS and the Stark Law, clearly are not material to the Government's payment decision as it pertains to claims made by Defendants." *Id.* at 47.

Relator responds that Defendants' argument is flawed for several reasons. Relator's Summ. J. Resp. Br. 47-53.[12] The Court agrees.

---

[12] Insofar as Relator contends that materiality is not a requirement for express false claims brought under 31 U.S.C. § 3729(a)(1)(A), and that "violation of the AKS is a

First, in the case upon which Defendants rely, the Fifth Circuit acknowledged that continued payment is not necessarily dispositive. *See United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) ("The lesson we draw from these well-considered opinions is that, though not dispositive, continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality."). In addition, *Trinity* is factually distinguishable. Unlike this case, the evidence at trial demonstrated that the government agency had actual knowledge of the violations, thoroughly investigated them, expressly approved the traffic guardrail system despite the violations, and approved reimbursement. *Id.* at 647, 663-664. Further, the government in *Trinity* issued a formal memo explicitly stating that the defendant's claims remained eligible at all times, and the Fifth Circuit noted that the government's position was exceptional in its "gravity and clarity" regarding the alleged violations and left no doubt as to the lack of materiality. *See id.* at 663-64.

Here, although the United States declined to intervene and continued to pay claims, there are factual disputes concerning what the government knew and when

---

*per se* material violation of the FCA," Relator's Summ. J. Resp. Br. 48, the Court need not decide this issue for purposes of ruling on Defendants' Motion for Summary Judgment as the evidence is sufficient to raise a genuine dispute of material fact as to materiality. The Court notes, however, that one district court in the Fifth Circuit has rejected this argument. *See United States ex rel. Mitchell v. CIT Bank, N.A.*, 2022 WL 812364, at *9 (E.D. Tex. Mar. 16, 2022) (finding "that materiality is a required element for express false claims under § 3729(a)(1)(A)") (collecting cases).

and there is no evidence the United States had "actual knowledge" of the fraud or expressly approved Defendants' conduct. Further, as Relator correctly argues, "[t]he Government's declination to intervene in this civil action is not proof of immateriality, either." Relator's Summ. J. Resp. Br. 50. In *Escobar*, the United States chose not to intervene, and the Supreme Court did not even reference this fact as a relevant factor in its materiality analysis. *Escobar*, 579 U.S. at 192-96. Further, in this case, the United States has filed a Statement of Interest informing that Court that "[b]ecause of the myriad possible reasons the government may decline to intervene in any particular *qui tam* action, the mere fact of declination cannot support the conclusion that the violations alleged by a relator are without merit." Statement of Interest 3, ECF No. 52; *see also id.* at 4 ("[T]hat the United States did not intervene in this *qui tam* action should not give rise to any inference whatsoever regarding the merits of Relator's allegations.").

For these reasons, the Court agrees with Relator that the federal government's continued payments in this case and declination to intervene are not dispositive of materiality. Because genuine disputes of material fact remain with respect to materiality, the Court finds that this issue is not appropriate for summary judgment determination.

Accordingly, construing the facts and all reasonable inferences in a light most favorable to Relator, the District Judge should find there are genuine disputes of material fact precluding judgment as a matter of law on the alleged violations of

the FCA predicated on violations of the AKS and, accordingly, deny Defendants'
Motion for Summary Judgment on Count 1.

### 2. The Court should Grant Defendants' Motion for Summary Judgment with Respect to Relator's FCA Claim Premised on Stark Law Violations (Count 2).

In Count 2, Relator alleges that Defendants violated Section 3729(a)(1)(A)
of the FCA by presenting claims to federal healthcare programs that were rendered
false by underlying violations of the Stark Law. Compl. ¶¶ 105-110. Relator
contends that the Hybrid Model violates the Stark Law because: (1) ESS physicians
have a "direct compensation relationship" with ESS; (2) ESS is an "entity" under
the Stark Law; (3) the services rendered by ESS are DHS; and therefore (4) a
referral of a patient for inpatient care by an ESS physician constitutes a prohibited
referral under the Stark Law. *See id.* Relator also contends that ESS violates the
Stark Law because it "causes client hospitals to submit claims for DHS . . . that are
furnished pursuant to prohibited referrals." *Id.* ¶ 110. Relator contends that the
ESS Hospitalist Model violates the Stark Law because ESS pays physicians "to
certify the need for DHS – which is a prohibited referral and violates the Stark
law." *Id.* ¶ 125.

The Stark Law prohibits a physician from making a referral to an entity, with
whom the physician has a financial relationship, for the furnishing of designated
health services. 42 U.S.C. § 1395nn(a)(1)(A); *Thompson,* 125 F.3d at 901-902. The
Stark Law also prohibits an entity, as defined, from presenting or causing to be

presented a claim for payment for services furnished pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(B); *Thompson*, 125 F.3d at 901-902.

Defendants contend they "are entitled to summary judgment on Count 2 because [they] are not entities, they did not receive a referral for the furnishing of DHS and [they] did not present a claim for payment of the DHS to the Government." Defs.' Summ. J. Br. 51.

In response, Relator, rather than responding to Defendants' arguments, for the first time asserts that Count 2 is premised on an "indirect compensation relationship" between contracted physicians and client hospitals. *See* Relator's Summ. J. Resp. Br. 24-25.

In reply, Defendants correctly note that "[t]he Complaint does not allege a claim premised upon an 'indirect compensation relationship' and does not allege a claim against Defendants as non-entities under Stark that do not bill for DHS." Defs.' Reply Br. 23. Defendants contend that "Relator cannot now, after discovery has closed [on April 15, 2024], pursue a new claim premised on facts not alleged in the Complaint." *Id.* They urge that Relator should not be permitted to "materially modify Count 2 without leave of Court[,]" and that any such leave should be denied because his "delay and lack of any effort to seek leave reflects unreasonable delay." *Id.* at 24 (citing *In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996)).

In addition, Defendants contend that "Relator's failure to adequately brief Count 2, as set forth in the Complaint, represents an abandonment of Count 2." *Id.*

at 23. Finally, Defendants posit that "[e]ven if the Court entertains Relator's newly created claim premised upon an indirect financial relationship, Relator's claim fails because he cannot establish the existence of an indirect financial relationship." *Id.* at 24.

"When a party fails to pursue a claim or defense beyond the party's initial complaint, the claim is deemed abandoned or waived." *Graham v. Dallas Area Rapid Transit*, 288 F. Supp. 3d 711, 728 (N.D. Tex. 2017) (Lindsay, J.) (citing *Black v. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (plaintiff abandoned claim when she failed to defend claim in response to motion to dismiss)); *see also id.* (citing *Keenan v. Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived[ ]") (citation omitted)). Relator's Complaint does not allege an "indirect compensation relationship" and does not allege a claim against Defendants as non-entities under Stark that do not bill for DHS.

As Relator has failed to pursue his Stark Law claim against Defendants, as initially pleaded in the Complaint, it is no longer before the Court, and Relator has abandoned or waived this claim. Further, Relator should not be permitted to avoid summary judgment by amending his complaint through argument made in his brief in opposition to Defendants' motion for summary judgment. Accordingly, the District Judge should grant summary judgment in Defendants' favor on Relator's FCA claim premised on violations of the Stark Law (Count 2) based on his abandonment or waiver of this claim and should decline to allow amendment to

assert a new theory of liability—premised on an "indirect compensation relationship" between contracted physicians and client hospitals—via a summary judgment response brief more than a year after discovery has closed.

### 3. Because Genuine Disputes of Material Fact Remain with Respect to Whether Defendants Violated the FCA by Making or Using False Statements or Records Material to a False Claim (Count 3), the Court should Deny Defendants' Motion for Summary Judgment as to Count 3.

Count 3 alleges that Defendants "created or used false billing submissions; false Medicare enrollment certifications, and false Medicare billing certifications in violation of 42 U.S.C. § 1395y and governing Medicare conditions of payment." Compl. ¶ 147.

The FCA imposes liability on any person who "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

Defendants argue that because "there is no evidence to support a claim for violation of 42 U.S.C. § 1395y" and "because there is no evidence of false billing submissions, false Medicare enrollment certifications, or false Medicare billing certifications in violation of 42 U.S.C. § 1395y," summary judgment must be granted in favor of Defendants with respect to Count 3. Defs.' Summ. J. Br. 56-57.

In response, Relator incorporates by reference his earlier arguments and evidence regarding false certifications on required CMS payment forms. *See* Relator's Summ. J. Resp. Br. 53. He contends that "[e]ach of the required CMS payments for which Defendants caused false certifications is a false record that is

44

material to the Government payment decision and satisfies the requirements of 31 U.S.C. 3729(a)(1)(B)." *Id.*

In reply, Defendants assert that Relator "has abandon[ed] Count 3 which is premised upon false certifications in violation of 42 U.S.C. § 1395y. Now, Relator relies on his assertion of false certifications of compliance with the AKS and the Stark Law in an effort to salvage Count 3." Defs.' Reply Br. 32. They contend that "Count 3, as [pleaded], is dependent upon a violation of 42 U.S.C. § 1395y and Relator's new rendition of Count 3 should be dismissed as not properly [pleaded]." *Id.* (citation omitted).[13]

The Court rejects Defendants' argument that Relator has abandoned Count 3. As alleged, Count 3, is not limited to false certifications in violation of 42 U.S.C. § 1395y, as Defendants maintain, but encompasses false certifications in violation of "governing Medicare conditions of payment." Compl. ¶ 147. And, as previously explained, statutes and regulations governing enrolled physicians and hospitals set forth essential obligations and certifications that must be met to obtain reimbursement under the Medicare and Medicaid programs. Based on the evidence summarized above in the Court's analysis of Defendants' Motion for Summary Judgment as to Relator's claims under Section 3729(a)(1)(A), the Court agrees that Relator has proffered sufficient evidence to raise a genuine dispute of

---

[13] Title 42 U.S.C. § 1395y prohibits claims for certain services deemed not "reasonable and necessary" and codifies the Medicare Secondary Payer Act which creates a coordination of benefits regime among primary payers of medical services and the Government as a secondary payer. 42 U.S.C. § 1395y.

material fact as to whether Defendants knowingly submitted, or caused the submission, of false billing submissions, false Medicare enrollment certifications, or false Medicare billing certifications in violation of Section 3729(a)(1)(B).

Accordingly, construing the facts and drawing all reasonable inferences in the light most favorable to Relator, the District Judge should find there are genuine disputes of material fact precluding judgment as a matter of law as to whether Defendants violated the FCA by making or using false statements or records material to a false claim (Count 3), and deny Defendants' Motion for Summary Judgment on Count 3.

### 4. *Defendants are Entitled to Summary Judgment with Respect to Count 4 - Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(1)(G)*

Count 4 alleges a reverse false claim under 31 U.S.C. § 3729(a)(1)(G). Relator contends that Defendants "knew they received substantial amounts of money from the United States for professional fee billings submitted" in violation of the AKS and Stark Law, yet "took no action to satisfy [their] obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States." Compl. ¶ 152.

The reverse false claim provision of the FCA, 31 U.S.C. § 3729(a)(1)(G), formerly 31 U.S.C. § 3729(a)(7), subjects to liability anyone who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government . . . .

31 U.S.C. § 3729(a)(1)(G).

Congress effectuated this statutory language in 2009 by enacting the Fraud Enforcement and Recovery Act (FERA), which amended the previous version of the FCA's reverse false claim provision in two significant ways. First, FERA added the following phrase to the reverse false claim provision: "or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Second, Congress defined the term "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."[14] Id. § 3729(b)(3).

"In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated." United States ex rel. Bain v. Ga. Gulf Corp., 386 F.3d 648, 653 (5th Cir. 2004) (citation omitted).

Defendants contend they are entitled to summary judgment with respect to Count 4 because "[t]o the extent Count 4 is premised on the theory that Defendants

---

[14] The definition resolved a pre-2009 circuit split over whether the obligation needed to be for a fixed sum of money but enshrined the general circuit consensus that an obligation could not be a contingent one. See United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co., 843 F.3d 1033, 1038 (5th Cir. 2016) (concluding that "'whether or not fixed' resolved the active dispute [among circuits] over whether an obligation could be for an uncertain sum, while 'established' confirmed the accepted holding that contingent penalties are not obligations under the FCA").

owe statutory penalties stemming for the allegations set forth in Count 1 and Count 2, any such statutory penalties are contingent and do not constitute 'an obligation to pay or transmit money or property to the Government' within the meaning of" the reverse false claim provision of the FCA. Defs.' Summ. J. Br.  58 (quoting *Georgia Gulf*, 386 F.3d at 658).

Defendants rely heavily on *Georgia Gulf. See id.* In that case, the defendant allegedly submitted false emissions records to avoid a fine or monetary penalty to which it might have been subject if the government had known of the actual emissions and then decided to seek fines or civil penalties against the company. *Georgia Gulf*, 386 F.3d at 654. There was no allegation that the federal government imposed any such penalty or instituted any kind of proceeding against the defendant that could result in such a penalty. *Id.* The Fifth Circuit held the defendant did not have an "obligation" to pay money to the government because the "reverse false claims act does *not* extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed (and as to which no formal proceedings to do so have been instituted) . . ." *Id.* at 653 (emphasis in original).

 In response, Relator fails to address, let alone distinguish, *Georgia Gulf.* Instead, he asserts that in 2019, "Defendants' received a CID from DOJ that should have alerted Defendants of their AKS and Stark Law violations, and resultant obligation to return funds from tainted claims to the Government—but Defendants did not." Relator's Summ. J. Resp. Br. 55. He also notes that in 2023, Newman

48

Hospital's CEO raised concerns regarding the "illegal 'incentive-driven' structure of Defendants' contract," "but Defendants did nothing." *Id.*

Even viewing all evidence in the light most favorable to Relator, the Court finds he has failed to raise a genuine dispute of material fact that Defendants had an existing obligation to reimburse monies received from Medicare, as the United States has never imposed any obligation on Defendants to reimburse any Medicare payments (or instituted any kind of proceeding against Defendants that could result in a penalty). On this record, any such statutory penalties are contingent and do not constitute "an obligation to pay or transmit money or property to the Government" within the meaning of § 3729(a)(1) (G). *See Georgia Gulf*, 386 F.3d at 658; s*ee also U.S. ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 391 (5th Cir. 2008) ("[W]hen potential fines depend on intervening discretionary governmental acts, they are not sufficient to create obligations to pay under the False Claims Act.") (cleaned up) (citations omitted).

Accordingly, even construing the facts and all reasonable inferences in a light most favorable to Relator, the District Judge should find that he has failed to raise a genuine dispute of material fact that Defendants violated the reverse false claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(G), and grant Defendants' Motion for Summary Judgment on Count 4.

> ### 5. Because Genuine Disputes of Material Fact Remain with Respect to Whether ESS and HCC Conspired to Commit Violations of the FCA (31 U.S.C. §3729(a)(1)(C)), the Court should Deny Defendants' Motion for Summary Judgment as to Count 5.

In Count 5, Relator alleges that Defendants violated 31 U.S.C. §3729(a)(1)(C), which imposes liability on a party who "conspires to commit [violations]" of the FCA, including the proscriptions against submitting false claims and making false statements. Compl. ¶¶ 154-157.

Relator alleges a conspiracy between Defendants, their contracted physicians, and their client hospitals to provide illegal remuneration in exchange for prohibited referrals and submit claims tainted by such referrals "to increase inpatient admissions and fraudulently increase revenue from government healthcare programs" in violation of the AKS and the Stark Law as alleged in Count 1 and Count 2. Compl. ¶ 156.

But a claim for conspiracy under the FCA cannot stand independently if the underlying FCA violations are dismissed. *See United States ex rel. Coppock v. Northrop Grumman Corp.*, 2003 WL 21730668, at *14, n.17 (N. D. Tex. July 22, 2003) (Fitzwater, J.) (holding that "secondary liability for conspiracy under §3729(a)(3) cannot exist without a viable underlying claim"). And because the District Judge should grant Defendants' Motion for Summary Judgment with respect to Relator's FCA claim predicated on violations of the Stark Law (Count 2), secondary liability for conspiracy cannot exist as to that theory.

To prevail on a FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), "a relator must show '(1) the existence of an unlawful agreement between Defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement.'" *United States ex rel.*

*Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (quoting *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)). This showing includes that Defendants "shared a specific intent to defraud the [G]overnment." *Id.* (alteration in original).

The Court finds there is sufficient evidence to allow a reasonable juror to find that ESS and HCC conspired with each other and performed an act that furthered the conspiracy. As detailed in the Court's recitation of the facts, *supra*, Relator presents evidence that ESS and HCC participated in paying cash incentives to contract physicians to admit patients into client hospitals; that they marketed their services to client hospitals to maximize admission and paid physicians with higher admissions a higher incentive; and caused the submission of claims for reimbursement to Medicare containing false certifications of compliance with relevant regulations.[15]

Accordingly, construing the facts and all reasonable inferences in a light most favorable to Relator, the District Judge should find there are genuine disputes of material fact precluding judgment as a matter of law as to whether Defendants conspired to violated the FCA based on violations of the AKS (Count 1), 31 U.S.C. §3729(a)(1)(C), and deny Defendants' Motion for Summary Judgment on Count 5.

### 6. *Because Genuine Disputes of Material Fact Remain with Respect to Whether Defendants Violated the Oklahoma FCA,*

---

[15] As the contract physicians are not parties to this action, however, the Court finds insufficient evidence of a conspiracy between Defendants and the contract physicians.

### *the Court should Deny Defendants' Motion for Summary Judgment as to Count 14.*

Relator alleges that Defendants violated the Oklahoma False Claims Act (by presenting claims to the state of Oklahoma that were rendered false by underlying violations of the AKS and the Stark Law). Compl. ¶¶ 200-203. Defendants incorporate by reference their earlier arguments in relation to Count 1 and 2 and contend that because "Defendants did not violate the AKS, the Stark Law or the FCA . . . the Court must render summary judgment in favor of Defendant[s] as to Count 14." Defs.' Summ. J. Br. 62. Defendants also acknowledge that the "Oklahoma False Claims Act is substantively identical to the FCA." *Id.* at 61.

The Oklahoma False Claims Act is substantively identical to the FCA. *Compare* 31 U.S.C. §3729(a)(1) and 63 OK Stat § 5053.1. Courts follow federal case law when interpreting state false claims act claims that closely parallel the FCA. *See New York v. Amgen Inc.*, 652 F.3d 103, 109 (1st Cir. 2011) ("Given the substantive similarity of the state FCAs invoked here and the federal FCA . . . , the state statutes may be construed consistently with the federal act."); *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 537 (N.D. Tex. 2012) (holding that because "the provisions of the state and federal false claims acts are substantively identical," relator's state AKS causes of action failed to state a claim "for the same reasons the FCA-based AKS claims fail").

As explained above, the District Judge should deny Defendants' Motion for Summary Judgment with respect to Count 1, but grant it with respect to Count 2.

Accordingly, for the same reasons, the District Judge should deny Defendants' Motion for Summary Judgment with respect to Relator's Oklahoma FCA claim based on violations of the AKS and, in the event the District Judge accepts the undersigned's recommendation concerning Cout 2, should grant Defendants' Motion for Summary Judgment with respect to Relator's Oklahoma FCA claim based on violations of the Stark Law.

### D. **Relator's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses Based upon AKS and Stark Law Exceptions (ECF No. 143).**

Defendants assert various affirmative defenses including, as relevant here, that Relator's claims are barred in whole or in part "by [AKS] safe harbors including, without limitation, the personal services management contracts and outcomes-based payment arrangements safe harbor" and "Stark Law safe harbors including, without limitation, the personal service arrangements, fair market value compensation, and limited remuneration safe harbors." Defs.' Ans. to Qui Tam Compl., Affirmative Defenses Nos. 13 and 14, ECF No. 63.

Relator moves for summary judgment with respect to Affirmative Defenses Nos. 13 and 14. Among other things, he contends that Defendants do not qualify for the AKS Safe Harbors or the Stark Law Safe Harbors because "there is no genuine dispute of material fact that the compensation paid by Defendants to its contracted physicians is determined in a manner that takes into account the volume or value of referrals or other business generated between the parties." Relator's Mot. Partial Summ. J. 2, ECF No. 143.

When, as here, the summary judgment movant will not have the burden of proof on a defense at trial, it can obtain summary judgment by pointing the Court to the absence of evidence on any essential element of the nonmovant's affirmative defense. *See Celotex*, 477 U.S. at 325.

In response, Defendants argue that the evidence shows that their compensation structure "does not take into the account the volume or value of referrals or business otherwise generated for the purpose of the AKS and the Stark Law." Defs. Br. in Opp. to Relator's Mot. Partial Summ. J. 35, ECF No. 155. They contend that "[a]t a minimum, the evidence in the summary judgment record demonstrates that fact issues remain unresolved." *Id.*

Upon review, the Court agrees with Defendants that fact issues remain unresolved with respect to whether they may avail themselves of the safe harbor provisions asserted in Affirmative Defenses Nos. 13 and 14.[16] The issues raised are significantly intertwined with several other claims and defenses which remain in dispute. Among other evidence, genuine disputes of material fact arise from the report of Defendants' expert, Todd Mello, in which he provides several opinions that go to the heart of these affirmative defenses. *See* Expert Report of Todd Mello, ECF No. 156 at 284-333. In addition, he provides rebuttal opinions to the opinions

---

[16] In this FCR, the Court recommends that the District Judge grant Defendants' Motion for Summary Judgment as to Count 2 alleging presentment of false claims under 31 U.S.C. § 3729(a)(1)(A), predicated on alleged violations of the Stark Law, 42 U.S.C. § 1395nn. In the event the District Judge accepts this recommendation, the matter of whether Defendants qualify for the Stark Law safe harbor will be moot.

of Relator's expert, Timothy Smith. *See id.*  As a result, the District Judge should

deny Relator's Motion for Partial Summary Judgment.

## Recommendation

For the above-stated reasons, the undersigned recommends that the District

Judge:

(1) **DENY** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants under the FCA for presentment of false claims under 31 U.S.C. § 3729(a)(1)(A), predicated on alleged violations of the federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b) (Count 1);

(2) **GRANT** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants under the FCA for presentment of false claims under 31 U.S.C. § 3729(a)(1)(A), predicated on alleged violations of the Stark Law (Count 2);

(3) **DENY** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants under the FCA for knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim (31 U.S.C. § 3729(a)(1)(B)) (Count 3);

(4) **GRANT** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants under the FCA based on the reverse false claims provision therein (31 U.S.C. § 3729(a)(1)(G)) (Count 4);

(5) **DENY** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) insofar as Relator's claim of a conspiracy between ESS and HCC (Count 5), but **GRANT** it insofar as Relator's claim of a conspiracy between Defendants and the contract physicians (who are not parties to this matter) (Count 5);

(6)    **DENY** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants for violations of the Oklahoma False Claims Act predicated on AKS violations (Count 14); and **GRANT** Defendants' Motion for Summary Judgment (ECF No. 134) with respect to Relator's claim against Defendants for violations of the Oklahoma False Claims Act predicated on Stark Law violations (Count 14); and

(7)    **DENY** Relator's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses Based upon Anti-Kickback Statute Exceptions (ECF No. 143), and **DENY as moot** Relator's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses Based upon Stark Law Exceptions (ECF No. 143).

**SO RECOMMENDED.**

July 31, 2025.

_____
REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).